**Endervelt, Jeffrey**                                    **11/8/2007**

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------x
CYNTHIA S. GILLETTE, individually and derivatively
on behalf of Nominal Defendant BLIMPIE OF
CALIFORNIA, INC.,

                    Plaintiff,
            vs.        index# 07 Civ 4697
                              (CLB)

JEFFREY ENDERVELT, BELLE ENDERVELT and DORA RICCI,

                    Defendants,

                    and

BLIMPIE OF CALIFORNIA, INC.,

                    Nominal Defendant.
----------------------------------------------x

            DEPOSITION OF JEFFREY ENDERVELT
                  White Plains, New York
               Thursday, November 8, 2007
                       10:50 a.m.

## Page 2

```
 1               November 8, 2007
 2               White Plains, New York
 3
 4
 5     Deposition of JEFFREY ENDERVELT,
 6     held at the U.S. Courthouse, 300 Quarropas
 7     Street, White Plains, New York, taken by the
 8     Plaintiff, pursuant to Order, before
 9     Jane D. Watson, a Notary Public of the State of
10     New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1     A P P E A R A N C E S :
 2     Attorney for Plaintiff
 3
 4         KEVIN FRITZ, ESQ.
 5         STORCH AMINI MUNVES, PC
 6         2 Grand Central Tower
 7         140 East 45th Street, 25th Floor
 8         New York, New York 10017
 9         Phone: (212) 490-4100
10         Fax: (212) 490-4208
11         kfritz@samlegal.com
12
13     Attorneys for Defendants
14
15         STEVEN T. SLEDZIK, ESQ.
16         JONES GARNEAU, LLP
17         60 East 42nd Street, Suite 3210
18         New York, New York 10165
19         Phone: (212) 759-2500
20         ssledzik@jonesgarneau.com
21
22     ALSO PRESENT:
23             CYNTHIA GILLETTE
24             DORA RICCI
25
```

## Page 4

```
 1
 2         IT IS HEREBY STIPULATED AND AGREED, that all
 3     objections, except as to the form of the
 4     question, shall be reserved to the time of the
 5     trial.
 6         IT IS FURTHER STIPULATED AND AGREED that the
 7     within deposition may be sworn to and signed
 8     before any officer authorized to administer an
 9     oath, with the same force and effect as if signed
10     and sworn to before the Court.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

1          MR. FRITZ:  The parties have
2     stipulated that the deposition of
3     Mr. Endervelt will continue --
4          MR. SLEDZIK:  May continue.
5          MR. FRITZ:  -- if necessary after the
6     Defendants produce the documents that are
7     still owed to the Plaintiff.

9  J E F F R E Y   E N D E R V E L T,  called as a
10 Witness, having been duly sworn by a Notary
11 Public, was examined and testified as follows:

13 EXAMINATION BY
14 MR. FRITZ:

16          Q.    Good morning, Mr. Endervelt.  Thank
17 you for being with us this morning.
18               Have you ever been deposed before?
19          A.    I have.
20          Q.    How many times?
21          A.    I don't recall.  At least five to ten.
22          Q.    Were you a party to those actions?
23          A.    No, not to most of them.  Not in the
24 sense of personally, no.
25          Q.    What were the nature of those

## Page 6

1  litigations?
2          A.    Most of them were business-related
3  franchise cases.  There may have been some that I
4  was personally involved in, but I don't recall at
5  this point.
6          Q.    Can you identify the parties?
7          A.    No.
8          Q.    You don't recall them?
9          A.    No.
10         Q.    Any of them?
11         A.    What period of time are we talking
12 about?
13         Q.    Any period of time.
14         A.    Any period of time?
15         Q.    Yes.
16         A.    I was involved in a lawsuit with Jacob
17 Michael in 1975 against the company we bought
18 from him.  The ones in the '80s, I don't recall.
19 There was a -- there were several franchise
20 lawsuits.  I don't recall them at this point.
21 Coca Cola -- there was a lawsuit with Blimpie
22 International, but I don't think it had to do
23 with me personally.  There were probably others,
24 but I don't recall.
25         Q.    How many would you estimate you've

## Page 7

1  been involved in?
2          A.    As an individual?
3          Q.    Or as a corporate representative?
4          A.    As a corporate representative, I've
5  probably been involved in 10 to 20 of them.
6          Q.    Were you involved in a litigation
7  involving Suzuki?
8          A.    Oh, yes -- well, I don't think I was
9  involved, that I recall.
10         Q.    Or an entity that you were --
11         A.    Not that I recall.  I was involved
12 individually.
13         Q.    Or an entity that you had worked for
14 or were an owner of?
15         A.    Yes.
16         Q.    What year was that Suzuki litigation?
17         A.    What year was it commenced?
18         Q.    Correct.
19         A.    I believe it was commenced in 2002.
20         Q.    And you were deposed in that
21 litigation?
22         A.    You know, I don't recall.
23         Q.    Do you know if anyone was deposed in
24 that litigation?
25         A.    Yes.  Ms. Gillette was deposed in that

## Page 8

1  litigation.  I'm sorry, I don't remember.
2          Q.    Did you ever speak with Ms. Gillette
3  about her testimony in that litigation?
4          A.    I'm sure I did.
5          Q.    Did you ever review any affidavits
6  that she was going to sign?
7          A.    I don't recall.
8          Q.    Did you ever tell her to sign an
9  affidavit that contained untruthful statements?
10         A.    Never.
11         Q.    Are you sure about that?
12         A.    Yes, sir.
13         Q.    What was the nature of the Suzuki
14 litigation?
15         A.    To the best of my recollection, Suzuki
16 sued Blimpie International on a contract for
17 breach of contract, I believe, and I don't
18 remember if it was an oral or written contract,
19 having to do with sponsoring Suzuki cars, and I
20 think Nascar, if I'm correct.
21         Q.    And so why were you involved in that
22 litigation?  Were you a principal of Blimpie
23 International at that time?
24         A.    When the lawsuit was brought, I was a
25 stockholder, yes.  I was also the CEO of the

Endervelt, Jeffrey                                                    11/8/2007

Page 9

1    company.
2         Q.    What about the other litigations that
3    you mentioned, what were the nature of those?
4    You said you were involved in other litigation
5    while you were a principal or owner of other
6    entities?
7         A.    Many of them were franchise claims
8    against either Blimpie of California or Blimpie
9    International, I guess, where a franchisee
10   claimed that the company had breached or someone
11   in the company had breached some representation
12   to it, typical franchisee lawsuits.
13        Q.    Did they claim that you breached --
14        A.    Not that I recall. In any of them, I
15   don't recall that, but I don't recall sitting
16   here today.
17        Q.    Who did they say made the
18   misrepresentations?
19        A.    In one case, Ms. Gillette. In other
20   cases, a salesman who worked for the company.
21        Q.    What was the name of the case in which
22   someone claimed that Ms. Gillette made a
23   misrepresentation?
24        A.    Anto, Inc., A-N-T-O.
25        Q.    Where was that action filed?

Page 10

1         A.    I don't recall if it was an
2    arbitration in California or a case in court.
3         Q.    Case in court in California?
4         A.    Yes.
5         Q.    Who was the Defendant, Blimpie of
6    California?
7         A.    Yes.
8         Q.    Did you do anything to prepare for
9    today's deposition?
10        A.    No.
11        Q.    And that includes reviewing any
12   documents?
13        A.    That's correct.
14        Q.    Can you summarize your educational
15   history for me?
16        A.    I went to high school, college and law
17   school.
18        Q.    Where did you go to college?
19        A.    Brooklyn college.
20        Q.    Did you have a major or concentration?
21        A.    Political science and economics.
22        Q.    What year did you receive that degree?
23        A.    I didn't. I went on to law school at
24   the end of three years.
25        Q.    And you didn't graduate from college?

Page 11

1         A.    Nope.
2         Q.    What law school did you attend?
3         A.    Baltimore, University of Baltimore.
4         Q.    Did the University of Baltimore know
5    that you didn't graduate from college?
6         A.    Of course. You don't have to graduate
7    from college to go to law school.
8         Q.    What year did you graduate from the
9    University of Baltimore?
10        A.    Sixty-six, I think.
11        Q.    When you were either at Brooklyn
12   College or the University of Baltimore, did you
13   take any classes concerning corporations or
14   duties of officers in corporation?
15        A.    No -- in law school?
16        Q.    Either one?
17        A.    Law school, I took corporate law, yes.
18        Q.    What about classwork outside of those
19   institutions?
20        MR. SLEDZIK:  Object to the form.
21        Q.    Regarding management of corporations?
22        A.    Not to my recollection, no. I may
23   have taken over the years some kind of course,
24   but I don't recall.
25        Q.    Are you admitted to practice in any

Page 12

1    states?
2         A.    Yes.
3         Q.    What states?
4         A.    California and New York.
5         Q.    Those are still current?
6         A.    Yes, sir.
7         Q.    And after you graduated University of
8    Baltimore in 1966, what did you do in terms of
9    employment, if any?
10        A.    Initially, I went to work for a firm
11   called Feder & Garten (phonetic) in Baltimore.
12   Then -- you want it all?
13        Q.    Well, I'm going to ask you the
14   positions, duties and tenure at each one.
15        A.    I was a teacher for a year in the
16   public system in Baltimore. After that, I came
17   up and went to work for my uncle in his law firm,
18   Alex Slough (phonetic), just a one-man firm.
19   After that, I was a legislative counsel to
20   congressman John Murphy of Staten Island. After
21   that, I was counsel to the minority leader of the
22   New York State legislature Stanley Steingut. And
23   I served for six months as an aide to former
24   Justice Arthur Goldberg. After that, I practiced
25   for a while independently with some friends of

Endervelt, Jeffrey                                              11/8/2007

## Page 13

1  mine.  After that, I became counsel to a company
2  called Michael Industries at that time.  I then
3  became president of Michael Industries.  That
4  company or its derivatives is where I was until
5  the late '80s.  After that, I served -- I also
6  served in the interim as chairman of the board,
7  president and CEO of Lehigh Valley Industries, a
8  New York Stock Exchange company.  At the same
9  time, I was president of Michael Industries.  And
10 also, after that, I became president of Blimpie
11 of California.  Eventually, in 2002, I became CEO
12 of Blimpie International.
13        And then, currently, I'm president of
14 Blimpie of California and X2Y1.
15     Q.    What is the relationship, if any,
16 between Z2Y1 and Blimpie of California?
17     A.    Affiliated only by the fact I own
18 stock in both companies -- or I own stock in one
19 company.  I'm CEO of both companies.
20     Q.    Which company do you own stock in?
21     A.    X2Y1.
22     Q.    Who are the other stockholders?
23        MR. SLEDZIK:  Objection.
24     A.    David Frommer, Ms. Gillette, Jeffrey
25 Langfelter.  There are people with options and

## Page 14

1  warrants.  Do you want them?
2     Q.    Not at this time.
3        What percent do you own of X2Y1?
4     A.    56 to 60 percent, something like that.
5     Q.    You are the controlling shareholder?
6     A.    Yes, sir.
7     Q.    What percent of X2Y1 does Ms. Gillette
8  own?
9     A.    I think it's around 4.6 percent.
10    Q.    Going back to some of your legal
11 employment, can you explain what type of matters
12 you worked on and what your duties were?
13    A.    Each one was different.  Which one did
14 you want to talk about?
15    Q.    Let's start with the earliest one.
16    A.    Feder & Garten was very short.
17 Basically, I was the low guy on the totem pole.
18 Whatever they gave me to do, and I don't
19 remember -- I tried one criminal case.  I think
20 the guy is getting out soon -- did briefs and
21 stuff.  I don't remember what they were.
22        Then I went to -- my uncle, it was
23 real estate.  He was a real estate lawyer.  And
24 it was mostly real estate.
25        With the congressman and with the

## Page 15

1  assemblyman, it wasn't legal work in the sense
2  that you're talking about.  It was legislative
3  work; bill drafting, bills that I worked on,
4  speech writing.
5     Q.    In any of those positions, did you
6  ever deal with issues involving fiduciary duties
7  of directors or officers of corporations?
8     A.    No, not in terms of -- did I handle a
9  case on the matter, no.
10    Q.    At any point in your career have you
11 dealt with those issues?
12    A.    Have I dealt with the issues?
13        MR. SLEDZIK:  Object to the form.
14    A.    Can you be more specific?
15    Q.    Have you had to take classes?  Have
16 any actions against you besides the current one
17 involved allegations of breaches of fiduciary
18 duty?
19        MR. SLEDZIK:  Object to the form.
20    A.    I don't know if there was ever a case
21 against me for breach of fiduciary duty.  I don't
22 recall.  Have I ever specifically taken a class
23 on it?  I would gather that when I took my PLI
24 seminars, there probably was a course on
25 corporate law within the context of that class

## Page 16

1  that was probably something on fiduciary
2  responsibilities in corporations.  But I don't
3  believe I've ever as a lawyer had a case that I
4  recall.
5     Q.    You mentioned X2Y1.  What is the
6  nature of that entity's business?
7     A.    It's the owner of Maui Tacos
8  International, a Mexican quick casual restaurant
9  chain; Smoothie Island, as its name indicated, a
10 smoothie chain; and we also own the trademarks to
11 Pasta Central, which we're just beginning to
12 develop.
13    Q.    Do you know the value of that company?
14    A.    No, I don't.
15        MR. SLEDZIK:  Object to the form.
16    Q.    Does it pay dividends to its
17 shareholders?
18    A.    No, it doesn't.
19    Q.    Do you receive any income from X2Y1?
20    A.    Right now, no, I don't think so.
21    Q.    At any point have you?
22    A.    Yes -- from X2Y1 itself, I don't
23 recall, but when we owned Blimpie International
24 as an active company, yes.
25    Q.    Would you have records showing whether

## Page 17

1    you ever received any compensation from X2Y1?
2         A.    What period of time?
3         Q.    Any period of time during which you
4    were an owner or an officer or director?
5         A.    Yes.
6         Q.    What years would those records be
7    from?
8         A.    X2Y1 was formed in 2001.  It didn't
9    become an active company until January of 2002
10   when it purchased Blimpie International.  So it
11   would have to be from January 23, 2002 forward.
12        Q.    But there's no relationship besides
13   the common ownership between X2Y1 and Blimpie of
14   California?
15             MR. SLEDZIK:  Objection.
16        A.    You'll have to explain what you mean
17   by the term "relationship."
18        Q.    Is one owned by the other?
19        A.    No.  You're talking legal?  No.
20        Q.    So there's no legal connection?
21             MR. SLEDZIK:  Objection.
22        A.    That's correct.
23        Q.    Has Ms. Gillette ever received any
24   income from X2Y1?
25             MR. SLEDZIK:  Objection.

## Page 18

1         A.    No.
2         Q.    Do you know when Blimpie of California
3    was formed?
4         A.    1984, I believe.
5         Q.    Did you incorporate it?
6         A.    I did.  Well, was I the person legally
7    on the certificate of incorporation, no.
8         Q.    When you say, yes, you did, do you
9    mean that you initiated its existence --
10        A.    That's correct.
11        Q.    -- in some manner?
12             Can you explain for the record the
13   nature of Blimpie of California's business?
14        A.    Blimpie of California is the holder of
15   a license to franchise Blimpie restaurants in
16   most of California from -- at that time, ask the
17   restaurant group, which was Blimpie
18   International, by a name change.
19        Q.    Who are the original owners of Blimpie
20   of California?
21        A.    I don't recall.
22        Q.    Were you one of them?
23        A.    No.
24        Q.    Did you purchase it from someone?
25        A.    No --

## Page 19

1             MR. SLEDZIK:  Objection.
2         Q.    At any point, did you become an owner
3    of Blimpie of California?
4         A.    I don't think I've ever owned stock
5    directly in Blimpie of California.
6         Q.    When you say "directly"?
7         A.    Or indirectly, I mean.
8         Q.    Do you know if the ownership has
9    changed from 1985 to the present?
10        A.    Yes.
11        Q.    Can you explain that?
12        A.    Ms. Gillette was given an option to
13   purchase 15 percent of the stock, which she
14   exercised in early 1998, I believe.
15        Q.    Who owned the other 85 percent?
16        A.    Belle Endervelt.
17        Q.    Who is Belle Endervelt?
18        A.    My mother.
19        Q.    Did Ms. Gillette pay any money for the
20   shares that were issued to her?
21        A.    I believe so.
22        Q.    Do you know how much?
23        A.    When you say she paid, we gave her the
24   money to pay for the shares.  It was $11,000, I
25   believe.

## Page 20

1         Q.    When you say "we gave her the money,"
2    who are you referring to?
3         A.    I believe it was the company who gave
4    her the money.
5         Q.    And what about Belle Endervelt's
6    shares, how much did she pay?
7         A.    She was the founding -- one of the
8    corporations that we owned, the family was the
9    founding corporation.  She didn't pay anything
10   other than put the capital up, initially.
11        Q.    Do you know how much the capital was?
12        A.    No.
13        Q.    Can you estimate?
14        A.    No.
15        Q.    Was it more than $500,000?
16        A.    I can't estimate.  I don't know.
17        Q.    And you've never been an owner of
18   Blimpie of California?
19             MR. SLEDZIK:  Objection.
20        A.    Not to my recollection.
21        Q.    Do you know how many shares have been
22   issued and are outstanding of Blimpie of
23   California?
24        A.    No.
25        Q.    Are Ms. Gillette and Belle Endervelt

## Page 21

1    the only two owners today?
2        A.    Yes.
3        Q.    When did you first meet Spencer
4    Gillette?
5        A.    To the best of my recollection, 1990.
6        Q.    Let me step back for a second.  Are
7    you familiar with something called the uniform
8    franchise offering circular?
9        A.    Yes.
10       Q.    What is that?
11       A.    It's a document that is required to be
12   filed by the federal government and the states.
13   If you're -- if you want to register to sell
14   franchises or offer for sale franchises in any
15   jurisdiction, each jurisdiction has different
16   requirements.
17       Q.    How often -- do you have to file it
18   more than once annually?
19       A.    You have to file it annually and then
20   you have to file any material change.
21       Q.    Has Blimpie of California ever filed
22   any such document?
23       A.    Every year.
24       Q.    Does Blimpie of California maintain
25   copies of those?

## Page 22

1        A.    I don't know how far back.  They do
2    maintain copies, but sitting here, I don't know
3    how far back.
4        MR. FRITZ:  We request those
5        documents.
6        MR. SLEDZIK:  I'll tell you, as I
7        would anyone, put your request in writing,
8        the request for production, and we'll
9        respond to it in writing.
10       Q.    I believe you stated that you first
11   met Spencer Gillette in 1990.  Do you recall
12   where that was?
13       A.    9465 Wilshire Boulevard in Beverly
14   Hills, California.
15       Q.    Do you remember the occasion by which
16   or for which you met Ms. Gillette?
17       A.    At that time, I think I had just moved
18   to California and was opening up an office there
19   and I rented space in an executive suite where
20   there were different companies working there.
21   They offered space, and Ms. Gillette had a
22   company that did secretarial services.  And
23   Mr. Gitlan (phonetic), I believe, was the
24   gentleman's name who ran the facility, and he
25   introduced me to her.

## Page 23

1        Q.    What was your impression of
2    Ms. Gillette?
3        A.    She was a nice young lady.
4        Q.    At any time, did Ms. Gillette work for
5    the same entity as you?
6        A.    At any time?  Yes.
7        Q.    When was the first time?
8        A.    Somewhere in the range of '90 to '92,
9    somewhere in that period.  I don't remember
10   exactly.
11       Q.    For which entity?
12       A.    Blimpie of California.
13       Q.    In which office?  Was it in California
14   or some other --
15       A.    No, it was in California.  I don't
16   remember if it was at 9465 or we had moved over
17   to the other office.
18       Q.    Did she have a title?
19       A.    Initially, I don't believe so.
20       Q.    What were her initial duties?
21       A.    Her initial duties were to assist me
22   in the operation of the business, including
23   training of franchisees, doing reports.  We were
24   required to do reports on each store.  We have to
25   visit the stores, help the franchisees, assist

## Page 24

1    the franchisees, those kind of endeavors.
2        Q.    Whose decision was it to hire her?
3        A.    Mine.
4        Q.    You based that decision on what?
5        A.    Having been associated with her in her
6    capacity; having spoken to her; having talked to
7    her about her background, including her time at
8    Marriott, she seemed to have a good understanding
9    of the food business.
10       Q.    I believe you said that was sometime
11   around 1992 --
12       A.    In the range of '90 to '92.  I don't
13   remember exactly.
14       Q.    Would you have any documents that
15   would show when she first started working for
16   Blimpie of California?
17       A.    I don't know.
18       Q.    At some point, she later became an
19   owner of Blimpie of California?
20       A.    Yes.
21       Q.    Would you have documents showing
22   exactly when?
23       A.    I believe so, yes.
24       Q.    Would you have documents showing the
25   amount of ownership that she was provided or

Endervelt, Jeffrey                                    11/8/2007

## Page 25

1  bought?
2      A.      I believe I do.  I didn't have time to
3  review stuff because I didn't think I was being
4  deposed until tomorrow.  So I don't recall.
5      Q.      At some point, was Spencer promoted by
6  Blimpie of California?
7      A.      Yes.
8      Q.      To what position?
9      A.      Vice president.
10      Q.      Who determined that she should be
11  promoted?
12      A.      I did.
13      Q.      Why did you think that she deserved
14  promotion?
15      A.      Because I thought she was capable at
16  what she does or did.
17      Q.      Did her duties change when she became
18  vice president?
19      A.      I don't believe -- we were a small
20  company.  I don't believe the duties changed.
21      Q.      Did her compensation change?
22      A.      I don't recall.
23      Q.      Do you have documents showing when she
24  became vice president?
25      A.      I don't know.

## Page 26

1      Q.      At some point, did her title change
2  from vice president to something else?
3      A.      I heard her say in her deposition the
4  other day, executive vice president.  It very
5  well may have.  I don't recall.  I'm not denying
6  or admitting it.  I don't recall.
7      Q.      If she was promoted to executive vice
8  president, do you know whose decision at Blimpie
9  of California that would have been?
10          MR. SLEDZIK:  Object to form.
11      A.      Mine.
12      Q.      And that would have been based on her
13  performance?
14          MR. SLEDZIK:  Objection.
15      A.      Yes.
16      Q.      Do you recall what her salary was as
17  executive vice president, to the extent she did
18  become executive vice president?
19          MR. SLEDZIK:  Object to form.
20      A.      No.
21      Q.      Would you have documents showing that?
22          MR. SLEDZIK:  Objection.
23      A.      At the time, I don't know.  You're
24  going back to -- obviously, you're going back in
25  the '90s sometime.  I don't know.

## Page 27

1      Q.      You don't know --
2      A.      I don't know sitting here today
3  whether I have those documents.
4      Q.      When you say "I," you mean Blimpie of
5  California?
6      A.      Yes.
7      Q.      Are you a director of Blimpie of
8  California?
9      A.      Yes.
10      Q.      When did you become a director?
11      A.      Back in the '80s.
12      Q.      How did you become a director?
13  Meaning, was there some type of board meeting?
14  Did you appoint yourself --
15          MR. SLEDZIK:  Objection.
16      A.      I assume back then there was a
17  stockholder meeting, and I was elected as
18  director.
19      Q.      Are there minutes from that meeting?
20      A.      I don't know.
21      Q.      Does Blimpie of California maintain
22  minutes from each board meeting that is held?
23      A.      It does.
24      Q.      What about each shareholders' meeting?
25      A.      It does.

## Page 28

1      Q.      And it maintains those records in its
2  offices?
3      A.      It does.  I don't know how far back it
4  goes.  We, unfortunately, moved several times
5  around the states, and I don't know that I have
6  all the records.
7      Q.      Would they have been purposely
8  discarded --
9      A.      No.
10          MR. SLEDZIK:  You have to let him
11      finish, and give me time to object.
12  BY MR. FRITZ:
13      Q.      Are you unsure whether you have them
14  because there was some type of policy in place
15  for discarding records of a certain age or they
16  may have been lost in the move from one place to
17  another --
18          MR. SLEDZIK:  Objection.
19      Q.      -- or another reason?
20      A.      It would be the latter.  There was no
21  policy in place.
22      Q.      Are you still a director?
23      A.      Yes, I am.
24      Q.      How many other directors are there
25  now, if any?

Pages 25 to 28

Endervelt, Jeffrey                                    11/8/2007

Page 29

1    A.    One.
2    Q.    Who is that?
3    A.    Dora Ricci.
4    Q.    When did she become a director?
5    A.    Within the last year roughly I would
6  say.
7    Q.    How did that occur?
8    A.    There was a vacancy on the board, and
9  I appointed her.
10    Q.    How did the vacancy come about?
11    A.    At some point, Ms. Gillette resigned,
12  as I recall.
13    Q.    As a director?
14    A.    As a director.
15    Q.    Do you recall when that was?
16    A.    2004, I believe.
17    Q.    When did she become a director?  When
18  did Spencer become a director of Blimpie of
19  California?
20    A.    In the '90s.
21    Q.    Was that pursuant to a vote?
22    A.    I just don't recall, sitting here
23  today.
24    Q.    If it was pursuant to a vote, would it
25  have been a board vote or a shareholder vote?

Page 30

1    A.    It would have been a shareholder vote.
2    Q.    Shareholders would have been Belle and
3  Ms. Gillette at the time?
4    MR. SLEDZIK:  Objection.
5    A.    No.
6    Q.    Who would the shareholders have been?
7    A.    Belle.
8    Q.    Do you know why Ms. Gillette resigned
9  in 2004?
10    MR. SLEDZIK:  Objection.
11    A.    To the best of my recollection, I'm
12  really not clear on it sitting here today.  She
13  had left the company, and I believe at the time
14  that she left the company, the company, meaning
15  Blimpie International and Blimpie of California,
16  she resigned from all the companies.
17    Q.    Was she terminated or did she resign?
18    A.    She resigned.
19    Q.    From which positions?
20    A.    All of them, vice president I believe
21  of Blimpie International and vice president or
22  maybe executive vice president, I don't recall,
23  of Blimpie of California.
24    Q.    You also are saying she resigned as
25  director --

Page 31

1    A.    To the best of my --
2    MR. SLEDZIK:  Wait.  Let him finish.
3  BY MR. FRITZ:
4    Q.    Are you also saying she resigned as a
5  director of Blimpie of California?
6    A.    To the best of my recollection.
7    Q.    Would you have any documents showing
8  that?
9    A.    Whether it was a resignation or not,
10  yes.  She might not have been reelected.  One way
11  or the other, it will show.
12    Q.    When you say she might not have been
13  reelected, who would have participated in that
14  vote?
15    A.    That vote, if there was a vote, the
16  stockholder, Belle Endervelt.
17    Q.    So if Ms. Gillette resigned sometime
18  in 2004, Belle Endervelt would have been the
19  voting shareholder to vote her out, vote
20  Ms. Gillette out?
21    MR. SLEDZIK:  Objection to the form.
22    A.    If she resigned, she resigned and
23  there was no vote.  If there was another -- if
24  there was another election of directors, and she
25  was not elected, those electing the stockholders

Page 32

1  at that point would have been Ms. Gillette and
2  Ms. Endervelt, and Ms. Endervelt owns 85 percent
3  of the company.
4    Q.    But if there was a decision to remove
5  Ms. Gillette as director in 2004, and that
6  decision was by the shareholders, who would have
7  been voting in that vote?
8    MR. SLEDZIK:  Object to the form.
9    A.    It would have been the shareholders,
10  Mrs. Endervelt and Ms. Gillette.
11    Q.    And do you know if that vote ever took
12  place?
13    A.    Sitting here today, I don't know.
14  What you're trying to get at, did Ms. Gillette
15  vote?  She had resigned from the company, so I
16  doubt she voted.
17    Q.    I'm not trying to get to that, but I
18  appreciate your attempt to clarify that.  I'm
19  trying to determine which majority shareholder
20  participated in that vote, and whether the vote
21  ever took place, and whether it was a proper
22  vote.
23    A.    The vote would have taken place by me
24  as proxy for my mother, I believe.
25    Q.    Do you have records showing that you

## Page 33

1   had served as proxy?
2       A.    I don't know that I have that record
3   right now.
4       Q.    Do you know if Belle would have them?
5       A.    No -- unfortunately, no.  She wouldn't
6   know where it is.
7       Q.    Would the corporation have them?
8       A.    I don't know.
9       Q.    Has Belle ever attended any
10  shareholders meetings?
11      A.    Ever?  Yes.
12      Q.    When was that?
13      A.    Back in the '90s, probably.
14      Q.    At some point, that stopped?
15      A.    Yes.
16      Q.    Do you know why?
17      A.    For a couple of reasons.
18            MR. SLEDZIK:  I object to the form.
19      A.    Lately, it stopped because,
20  unfortunately, my mother is not in a position to
21  do that.  Prior to that, it probably stopped
22  because it may have been we were in two different
23  places.
24      Q.    So she wouldn't participate, but you
25  would participate as a proxy?

## Page 34

1       A.    That's correct.
2       Q.    And you are not sure if you have
3   records showing that you served as her proxy?
4       A.    That's correct.
5       Q.    Have there been any other directors
6   other than Ms. Ricci, yourself and Miss Gillette?
7       A.    Ever?
8       Q.    Yes.
9       A.    Yes.
10      Q.    Who are those other people?
11      A.    Back in the '80s, a fellow named Alan
12  Moll, M-O-L-L, I believe; a guy named Bert Fried.
13  Back then, there were several others.  I don't
14  recall their names at this point.  May have been
15  a guy named Alan Green, Paul Onorato (phonetic).
16  I don't recall those names.  I think at one point
17  for a period of two years Jerry Weintraub.
18      Q.    Would you have records showing when
19  each person became a director and either resigned
20  or was terminated?
21            MR. SLEDZIK:  Object to the form.
22      A.    There would have been minutes.
23  Whether we still have them or not, I don't know.
24      Q.    Who is the custodian of those records?
25      A.    Now, I am.

## Page 35

1       Q.    Has there been a previous one?
2       A.    At different times, yes.
3       Q.    Who was that?
4       A.    Well, at times, the book and records,
5   after I left California, were in California.  I
6   guess Ava Sumpter had them at the time.  I'm sure
7   at some point -- we're a tiny, little company --
8   Ms. Gillette had them at some point.  This is a
9   very small organization.
10      Q.    Are you an officer of Blimpie of
11  California?
12      A.    I am.
13      Q.    What is your title?
14      A.    President.
15      Q.    How long have you been president?
16      A.    Since 1990, I believe, '89.
17      Q.    How did you become president?
18      A.    The board appointed me.
19      Q.    The board consisted of whom at that
20  point?
21      A.    Me -- it may have just been me at that
22  point.
23      Q.    Was Spencer ever an officer?
24      A.    Yes.  We've been through that.
25      Q.    I believe I asked you what her salary

## Page 36

1   was and you were not sure?
2       A.    I don't know.
3       Q.    Do you know how it was paid?  Was it
4   paid via check or cash?
5       A.    No, I honestly don't know the form.  I
6   didn't do that.
7       Q.    Would you have records showing the
8   amount of her salary?
9       A.    I believe it was all prior to 2002,
10  going back.  I have to check sir.
11      Q.    And the decision to make her vice
12  president was your decision?
13      A.    Yes.
14      Q.    Can you give me a general overview of
15  the performance of Blimpie of California while
16  Ms. Gillette served as either vice president or
17  executive vice president.
18            MR. SLEDZIK:  Can I have the question
19      read back.
20            (Record read.)
21      A.    We have been, unfortunately, a growth
22  company for a lot of years -- a company in
23  growing stages.  Her performance was always fine
24  except for one matter, which cost the company a
25  substantial sum of money.

## Page 37

1    Q.    What matter was that?

2    A.    Anto.

3    Q.    How much did it cost the company?

4    A.    Probably close to $200,000.

5    Q.    That was based on an arbitration, a

6    legal action?

7    A.    Yes.

8    Q.    Why do you say that Spencer was the

9    cause of that?

10   A.    She made material misrepresentations

11   apparently to Mister -- the owner of Anto.

12   Q.    Do you know what those statements

13   were?

14   A.    To the best of my recollection sitting

15   here today, it had to do with what he would be

16   entitled, the number of units he would be

17   entitled to open in Home Depots that we were then

18   testing Blimpie in.

19   Q.    Were these statements oral or written?

20   A.    Well, Ms. Gillette told us they were

21   oral and that she never made them until about a

22   week before the arbitration when the other side

23   produced a written statement signed by her.

24   Q.    Do you have a copy of that statement?

25   A.    I don't, but I believe the attorneys

## Page 38

1    who handled the case still have it.

2    Q.    Who were those attorneys?

3    A.    At that time, it was Miller and Hogeen

4    (phonetic).  The firm has since disbanded.  The

5    attorneys were Stacy Zill (phonetic) and Perry

6    Cameron were the trial attorneys.

7    Q.    Where are those attorneys located?

8    A.    Los Angeles, California.

9    Q.    All of them?

10   A.    All of them.

11   Q.    Did you review the statement before

12   Ms. Gillette signed it?

13        MR. SLEDZIK:   Objection.

14   A.    No.  I didn't even know about it.

15   BY MR. FRITZ:

16   Q.    When was the first time you learned

17   about it?

18   A.    A week before the trial.

19   Q.    You mentioned something about

20   $200,000.  Was that a settlement or an

21   arbitration award?

22   A.    We settled the case.  Our attorneys --

23   on the advice of our attorneys.

24   Q.    Besides from that matter, are there

25   any other areas or any other situations in which

## Page 39

1    you don't believe Ms. Gillette performed

2    adequately?

3    A.    In Blimpie of California?

4    Q.    Correct.

5    A.    No.

6    Q.    Do you know if Ms. Spencer's departure

7    from Blimpie of California, whether by

8    resignation or termination, had anything to do

9    with the litigation involving Blimpie

10   International and Suzuki?

11        MR. SLEDZIK:   Object to the form.

12   A.    To the extent she was leaving Blimpie

13   world, Blimpie International, yes, I think they

14   were connected.

15   Q.    Why do you have that impression?

16   A.    It all took place at the same time

17   and, we were severing our relationship with

18   Spencer as an operating person within our

19   companies.

20   Q.    Were you a part of that decision?

21   A.    Yes.

22   Q.    Why did you make that decision?

23   A.    The board strongly recommended it.

24   Q.    Who?  Which board -- I'm sorry, the

25   board of which company?

## Page 40

1    A.    Blimpie International.

2    Q.    Who was on that board?

3    A.    Dan Dean, Chris Meininger, David

4    Frommer, myself, Chris Sellon.  There was another

5    one or two people's names.  I don't recall,

6    sitting here right now.

7    Q.    So the board decided that she would be

8    terminated --

9    A.    Correct.

10   Q.    -- if she didn't resign?

11   A.    Correct.

12   Q.    That was based on what, just what

13   happened with the Anto litigation?

14   A.    No.  It had nothing to do with the

15   Anto litigation.

16        MR. SLEDZIK:   Object to form.

17   BY MR. FRITZ:

18   Q.    What did it concern?

19   A.    The Suzuki matter and several other

20   internal matters, where our head of human

21   resources suggested that were issues with Miss

22   Gillette and her relationship with some of the

23   people in her areas.

24   Q.    Let's start with the Suzuki matter.

25   What particularly about the Suzuki matter led to

## Page 41

1    or was part of the decision to terminate, if that
2    is what occurred, Ms. Gillette from the Blimpie
3    entities?
4         A.    We found ourselves in a position again
5    much like Anto and Blimpie of California where
6    Ms. Gillette had made a material
7    misrepresentation that cost the company
8    significant money --
9         Q.    Did you believe at the time that that
10   misrepresentation, if it did occur, was willful
11   and intentional?
12        A.    When you say "willful," define that,
13   please.
14             MR. SLEDZIK:   Object to the form.
15   BY MR. FRITZ:
16        Q.    She knew she was making a false
17   statement?
18        A.    Yes.
19             MR. SLEDZIK:   Object to the form.
20        Q.    How do you know that?
21             MR. SLEDZIK:   Objection to the form.
22        A.    Well, the events occurred prior to us
23   ever owning Blimpie International, and she made
24   representations about Blimpie International and
25   she was neither an officer, director, employee or

## Page 42

1    stockholder or anything else, committing Blimpie
2    International to certain contractual obligations.
3    She had no authority, wasn't even involved with
4    Blimpie International.
5         Q.    Did you give her that authority?
6         A.    Absolutely not, sir.
7             MR. SLEDZIK:   Object to the form.
8    BY MR. FRITZ:
9         Q.    Did anyone from those entities give
10   her the authority to make that representation you
11   just classified?
12        A.    No, sir.
13        Q.    Did you agree with the board that
14   Ms. Gillette should be terminated based on what
15   had occurred with the Suzuki litigation?
16        A.    Yes, sir.
17        Q.    You mentioned some other internal
18   matters.  Can you describe what you meant by
19   that?
20        A.    I really don't recall, sitting here
21   today, the actual thing.  It had to do with her
22   relationship with some of the people that were
23   under her.
24        Q.    Is this at Blimpie International or
25   Blimpie California?

## Page 43

1         A.    Blimpie International.
2         Q.    Who was the head of human resources?
3         A.    A woman by the name of Pam Gower.
4         Q.    G-O-W-E-R?
5         A.    That's correct.
6         Q.    Did you ever learn the substance of
7    Ms. Gower's complaints?
8         A.    At some point, I was apprised of it,
9    yes.
10             MR. SLEDZIK:   Object to the form.
11        Q.    What were her concerns?
12        A.    I don't recall, sitting here today.
13        Q.    Are there any documents that would
14   show that?
15        A.    There probably are, but I do not have
16   the documents of Blimpie International.
17        Q.    Do you recall seeing any internal
18   complaints by Ms. Gower about Ms. Gillette?
19             MR. SLEDZIK:   Objection to the form.
20   BY MR. FRITZ:
21        Q.    Were they formal, e-mail, written or a
22   letter?
23        A.    To the best of my recollection, they
24   were formal and in the file.
25        Q.    And those would be in the custody of

## Page 44

1    Blimpie International?
2         A.    No.
3         Q.    In whose custody would they be?
4         A.    KBI.
5         Q.    What is KBI?
6         A.    A subsidary of Kahala Corp.  They
7    purchased the assets and liabilities of Blimpie
8    International.
9         Q.    Kahala Corp. did or KBI?
10        A.    KBI, which is a subsidiary of Kahala
11   Corp.
12        Q.    Are you an owner of either of those
13   two entities?
14        A.    No, sir.
15             MR. SLEDZIK:   "Those" being KBI or
16   Kahala Corp.?
17             MR. FRITZ:   Right.  Either one.
18        A.    No, sir.
19   BY MR. FRITZ:
20        Q.    Did you receive any income from either
21   of those companies?
22        A.    Yes.
23        Q.    Which one?
24        A.    KBI.
25        Q.    Are you an officer?

Page 45

1     A.     No, sir.
2     Q.     Are you a director?
3     A.     No, sir.
4     Q.     What type of income do you receive?
5     A.     Consulting.
6     Q.     What type of consulting work did you
7  do for them?
8     A.     Whatever they asked me to do.
9     Q.     Are you paid on a yearly basis,
10 meaning you have a yearly salary or it's based on
11 the time you put in?
12    A.     No, a yearly.
13           MR. SLEDZIK:   Objection.
14    Yearly.
15    Q.     How much is that?
16    A.     $350,000.
17    Q.     How much time would you estimate you
18 provided consulting services for KBI?
19    A.     Whatever they asked me for, and they
20 haven't asked me for anything so far.
21    Q.     Since what time period?
22    A.     Since they bought out the company.
23    Q.     When was that?
24    A.     January 23, 2006.
25    Q.     So since January 23, 2006, you haven't

Page 46

1  performed any work for KBI, though come this
2  January, you would have received almost $700,000?
3     A.     Correct.
4     Q.     Does Blimpie of California provide any
5  money to Kahala?
6     A.     No.
7     Q.     What about KBI --
8     A.     Well, yes, technically it does because
9  KBI now owns the Blimpie trademarks.
10    Q.     All of them?
11    A.     Yes.
12           And the agreement by which Blimpie of
13 California got its rights to be the master
14 licensee in California derives from an agreement
15 with Blimpie International, and that agreement
16 was assigned to KBI.  And under that agreement,
17 we pay a percentage of the royalties that we
18 collect to KBI -- used to be Blimpie
19 International.
20    Q.     When did that transaction take place?
21    A.     The transaction -- which, the
22 agreement?
23           MR. SLEDZIK:   Object to the form.
24 BY MR. FRITZ:
25    Q.     When did Kahala first become the owner

Page 47

1  of Blimpie trademarks?
2     A.     January 23, 2006.
3     Q.     Which is when you started receiving
4  the salary?
5     A.     Consulting fee.
6     Q.     So does Blimpie of California have to
7  provide any monies to Kahala Corp.?
8     A.     We collect royalties from the
9  franchisees in California.  A percentage of that
10 royalty goes to the master license holder, the
11 master trademark holder, formerly Blimpie
12 International, now KBI.
13    Q.     What percent do you collect from the
14 franchisees -- did Blimpie of California collect
15 --
16    A.     We collect in total gross 6 percent of
17 the net sales of the franchise.
18           MR. SLEDZIK:   Can I have a moment with
19 my client?  You were done with your answer,
20 right?
21           THE WITNESS:   Yes.
22           (Whereupon, the witness and his
23 attorney leave the room.)
24           (Recess taken.)
25    A.     I think the balance of that question

Page 48

1  was out of the 6 percent that we collect, we give
2  two and a half percent -- goes to the master.
3     Q.     Kahala?
4     A.     In this case, KBI.  They now own the
5  agreement.
6     Q.     Since January 23, 2006, do you know
7  the amount of monies Blimpie of California has
8  provided to KBI?
9     A.     No.  Offhand, I don't.
10    Q.     Do you know an approximate number?
11    A.     I'd say about a hundred thousand a
12 year.
13    Q.     So as part of the transactions that
14 consummated on January 23, 2006, you receive a
15 consulting fee, or it was agreed that you would
16 receive a consulting fee, correct?
17    A.     Correct.
18    Q.     Was there any provision made for
19 monies to be paid to the shareholders' of Blimpie
20 of California, meaning from the revenues of KBI?
21    A.     No.
22    Q.     Nothing?
23    A.     Nothing.
24    Q.     Was this ever considered?
25    A.     No.

## Page 49

```
 1              MR. SLEDZIK:  Objection.
 2   MR. FRITZ:
 3        Q.   Why not?
 4        A.   Why yes?
 5        Q.   Well, I mean, putting aside the fact
 6   that I get to ask the questions, but you're
 7   sending some of Blimpie of California's monies to
 8   KBI, who is in turn paying you $350,000 a year;
 9   the shareholders of Blimpie of California aren't
10   getting anything in return.
11        A.   You're twisting.  You're really mixing
12   apples and oranges.
13        Q.   Can you clarify?
14        A.   The two and a half percent that goes
15   to KBI is by virtue of the agreement by which
16   Blimpie got it rights going back to 1984.  They
17   have always paid two and a half percent since
18   1984 of the royalty income that they collect to
19   the master holder of the license.  Prior to
20   Blimpie International, there was a public
21   company, Blimpie International is a private
22   company and now KBI.  It has nothing to do with
23   anything that had to do with me.  I was CEO of
24   Blimpie International.  They bought Blimpie
25   International.  As part of their buying the
```

## Page 50

```
 1   assets and liabilities of Blimpie International,
 2   they entered into a consulting agreement with me,
 3   the then CEO of Blimpie International.  It had
 4   nothing to do with Blimpie of California, as much
 5   as you way want to turn it.
 6        Q.   Was it ever considered to send a
 7   smaller percentage of monies from BOC to KBI if
 8   you took a smaller consulting agreement?
 9        A.   No.
10        Q.   How many employees does Blimpie of
11   California have currently?
12        A.   Full-time, it has two.
13        Q.   Who are they?
14        A.   Ken Sylvain and Anthony Kern.
15        Q.   What are their titles and duties?
16        A.   Ken Sylvain is vice president of
17   operations.  Anthony Kern is director of
18   operations.
19        Q.   Are they paid a salary?
20        A.   They are.
21        Q.   Do you know what it is?
22        A.   I believe Ken Sylvain is $50,000 a
23   year.  I believe Anthony Kern is $40,000 a year.
24        Q.   What are their duties?
25        A.   They are -- they do the day-to-day
```

## Page 51

```
 1   operational work of going into the stores,
 2   inspecting the stores, training franchisees on --
 3   new franchisees, training franchisees on resales,
 4   checking whether the stores are clean, everything
 5   is operationally correct in the stores, which we
 6   required to do under our master agreement.
 7        Q.   Are there any other employees besides
 8   those two?
 9        A.   There are people who do work for
10   Blimpie of California, that's correct.
11        Q.   Who are those people?
12        A.   One of them would be Alonzo Batto
13   (phonetic), who does franchise sales.
14        Q.   Are you saying he's not an actual
15   employee of the corporation, but he provides --
16        A.   He.
17              MR. SLEDZIK:  Let Mr. Fritz finish.
18        Q.   Is it your testimony that Mr. Batto is
19   not on employee of the company, but he receives
20   some type of compensation based on services that
21   he provides?
22        A.   It's Mister.
23        Q.   Mister?
24        A.   Mr. Batto is a franchise salesperson.
25   We share Mr. Batto -- Mr. Batto's time is shared
```

## Page 52

```
 1   with Blimpie of California and Maui Tacos and
 2   Smoothie Island, selling franchises for all three
 3   companies.
 4        Q.   And those latter two entities are
 5   owned by X2Y1?
 6        A.   That's correct.
 7        Q.   Is Ms. Ricci an employee?
 8        A.   No.
 9        Q.   Is she an officer?
10              MR. SLEDZIK:  Objection.
11        A.   She's secretary of the corporation.
12   BY MR. FRITZ:
13        Q.   But she doesn't get paid as an
14   employee of the corporation?
15        A.   She does not get paid as an employee
16   of the company.
17        Q.   What are Blimpie's sources of income
18   besides the royalties that we've already
19   discussed that come from the franchise of
20   California?
21              MR. SLEDZIK:  Blimpie of California
22   you mean?
23              MR. FRITZ:  Yes.
24        A.   Licensing of franchises, resale of
25   franchises, training fees, lease review fees.  I
```

Endervelt, Jeffrey                                        11/8/2007

## Page 53

1    think that pretty much covers it.
2         Q.    You are the president of Blimpie of
3    California.  What are your duties?
4         A.    I oversee the operations of the
5    company.  I do all the legal work for the
6    company, except litigation.  I set marketing
7    direction for the company.  I review all the
8    operational reports of the company.  I send
9    out -- I'm the one who sends out -- in most
10   cases, I'm the one that sends out default letters
11   if there is a problem.  I'll help negotiate the
12   contracts with the food Distributors.
13        Q.    What type of legal work were you
14   referring to?
15        A.    I do the UFOC, the franchise
16   agreements, if we have a new franchise.  I review
17   all the leases for any franchise location, any
18   franchisees' location.  I draw the documents, the
19   addendums, and everything else that goes with the
20   leases for a new franchise.  I do all the resale
21   documents on any resale of any franchise.
22        Q.    Would you say that the legal work is
23   somewhat repetitive, meaning if you have a new
24   store, and you've essentially already done the
25   same type of work for a previously acquired

## Page 54

1    store -- meaning a previous store that's under
2    your umbrella -- isn't that kind of the same
3    work?
4         A.    The same as a litigator doing
5    litigation, yes, it's the same thing.
6         Q.    So you are not -- would it be fair to
7    say you are not really diving into new areas of
8    law, you are copying, pasting and maybe inserting
9    some new names?
10        A.    No.
11        Q.    How much time in terms of legal work
12   do you put in in a week for Blimpie of
13   California?
14        A.    I can't say in a week.  There may be
15   weeks that I do nothing.
16        Q.    On a month?
17        A.    It could be, I mean, we've had months
18   where we've had a few shopping center leases.  If
19   you have ever read a shopping center lease and
20   really taken it apart, that project alone can
21   take six, seven, eight, nine hours.  Then having
22   to negotiate the addendums with the landlords can
23   take a substantial amount of time.  It's -- this
24   past year, it was busy with leases, resales.  On
25   every resale, I've got to do the leases.  Also, I

## Page 55

1    got to renegotiate the addendums.  So it could be
2    a substantial amount of time.
3         Q.    How many franchises pay royalties
4    to --
5         A.    Right now, it's 30.
6         Q.    Is that an increase or decrease from
7    the time that Spencer was a director?
8         A.    Probably decreased a couple since she
9    was director.
10        Q.    Do you know what that is attributed
11   to?
12        A.    Yeah, it's a -- first of all, it's the
13   nature of the business, but a lot of it, one of
14   it, was attributed to someone, I think it was
15   like Winchel's Donuts or one of those, decided to
16   go out of the Blimpie business, so I think they
17   closed four restaurants they had or Mobil Oil
18   went out of the whole Blimpie business
19   nationally.  And that was derived from a national
20   agreement.  Blimpie has on a global scale had
21   it's problem over the last ten years.
22        Q.    Could any of that decline in numbers
23   be attributed to the fact that Spencer is not a
24   director or officer of Blimpie of California?
25        A.    Absolutely not.

## Page 56

1         Q.    How much time a month would you say
2    you put in reviewing operational reports?
3              MR. SLEDZIK:  Object to the form.
4         A.    Probably four to five hours a month.
5         Q.    A month?
6         A.    Yeah.  They're monthly reports.
7         Q.    I'm sorry, these reports are from whom
8    again?
9         A.    They're the operational reports or the
10   reports that operational people do when they go
11   around to the franchise stores.
12        Q.    So from Mr. Kern and Mr. Sylvain?
13        A.    Yes.
14        Q.    Have you ever been loaned any money
15   from Blimpie of California?
16        A.    Yes.
17        Q.    When was the first time?
18        A.    I don't recall.
19        Q.    Was it at a time when Mrs. Gillette
20   was a director?
21        A.    Was I ever loaned -- rephrase the
22   question, please.
23        Q.    At any point in time when Ms. Gillette
24   became a shareholder, which I believe you said
25   was sometime in 1998, at any point thereafter.

Pages 53 to 56

## Page 57

1 Were you ever loaned any money from Blimpie of
2 California?
3      A.   Yes.
4      Q.   When was the first time?
5      A.   I don't recall the date.
6      Q.   Do you recall the amount of the loan?
7      A.   No, I don't.
8      Q.   Do you recall whether there was a
9 written loan agreement?
10     A.   No, there wasn't.
11     Q.   Do you recall --
12          MR. SLEDZIK:  Wait.  You asked him
13     whether he remembered.  He's answered, No,
14     there wasn't.
15          You're answering that there wasn't a
16     written agreement.
17     A.   The question I thought was was there a
18 written agreement.
19 BY MR. FRITZ:
20     Q.   Was there a written loan agreement?
21     A.   Not to my recollection.
22     Q.   Do you recall the rate of interest, if
23 any, by which you had to pay back the loan?
24     A.   Six or seven percent.
25     Q.   Do you recall the amount of time that

## Page 58

1 you had to repay the loan?
2      A.   It was open.  It wasn't -- it was a
3 demand loan.  There was no time frame.
4      Q.   A demand by the corporation for it
5 back?
6      A.   Yes.
7      Q.   Would that be by the board or by the
8 shareholders?
9      A.   By the board.
10     Q.   Who was chairman of the board?
11     A.   I am.
12     Q.   And the only other board member is
13 Ms. Ricci?
14     A.   Today.
15     Q.   Today?
16     A.   Today, the only other board member is
17 Ms. Ricci.
18     Q.   Do you still owe money to Blimpie of
19 California?
20     A.   Yes.
21     Q.   So, in order for it to be repaid,
22 either yourself or Mr. Ricci would have to demand
23 it back?
24     A.   Yes.
25     Q.   How come you haven't demanded it back?

## Page 59

1      A.   Well, basically, I'm the one that is
2 on the hook for all the money the company has --
3 I put up all the money for the company.  I'm the
4 guarantor on the credit lines.  My family just
5 loaned the company $150,000.  Any time the
6 company needs money, I'm the guy who's got to put
7 it in.
8      Q.   If someone had the power to terminate
9 Ms. Ricci, who would it be; meaning, they're the
10 majority shareholder, they have the power of
11 majority over the shareholder, they're the
12 chairman of the board?
13     A.   Me.
14     Q.   So is it fair to assume that Ms. Ricci
15 would never demand that you pay back the loan
16 since she is employed at your whim?
17          MR. SLEDZIK:  Object to form.
18     A.   No, it's not fair to assume that.  You
19 have to ask Ms. Ricci that.
20 BY MR. FRITZ:
21     Q.   I believe you said you don't recall
22 the time that you were first loaned this money?
23     A.   Correct.
24     Q.   Do you know if the shareholders
25 approved of the loan?

## Page 60

1          MR. SLEDZIK:  The loan being the first
2     loan?
3      Q.   The first loan, yes.
4      A.   Are you asking about was there a
5 formal meeting of shareholders to approve the
6 loan?
7      Q.   Yes, I am.
8      A.   No, there was not.
9      Q.   Do you know why?
10     A.   We're a small company.  At that time,
11 it was just a one person company, basically.  So,
12 if I had anything going on, I spoke to mom or me.
13 We just talked and we did it.
14     Q.   So, you approved the loan to yourself?
15          MR. SLEDZIK:  Objection.
16     A.   Initially?
17     Q.   Yes.
18     A.   Yes.
19     Q.   You used the word "initially."  Did
20 that change at any point in time?
21     A.   Only to the extent of knowledge.  I
22 mean, again, this is a tiny little company.  I am
23 the sole support of this company and there are
24 times that I took advances.  Ms. Gillette, during
25 her tenure, was aware of it.  As a small company,

## Page 61

1   no, we didn't hold formal meetings to do a lot of
2   these things.
3          Q.     So there was no shareholder meeting at
4   which the advance to you was approved other than
5   what purportedly may have happened in October of
6   this year.
7                 MR. SLEDZIK:   Object to the form.
8          A.     Correct.
9          Q.     So October 8, 2007 --
10         A.     I don't know if that is correct.
11  There may have been an earlier meeting at which
12  something was approved.  Off the top of my head,
13  I don't recall.
14         Q.     Do you recall what year that meeting
15  may have occurred?
16         A.     It would be post-2004.
17         Q.     Was notice of that meeting sent to the
18  shareholders?
19         A.     It wasn't a shareholder meeting.  It
20  was not a shareholder meeting.  It might have
21  been a board of directors meeting.  I have to
22  check.  I'm not saying it was, but I don't want
23  to categorically cut off the fact it was not,
24  because then I will only be told that I said it
25  was.

## Page 62

1          Q.     If that meeting did occur, would
2   minutes have been taken at that meeting?
3          A.     Yes.
4          Q.     Would Blimpie of California have
5   copies of the minutes of that meeting?
6          A.     Anything post-2003 we have, yes.
7          Q.     You don't remember the amount of the
8   loan?
9          A.     I haven't taken any loans in the last
10  bunch of years.  I haven't taken any loans from
11  the company in quite a few years.
12         Q.     What was the gross amount of the loans
13  you have taken?
14         A.     At any one point?
15         Q.     Let's start with the first time you
16  received a loan.
17         A.     I don't recall what the amount was at
18  that time.
19         Q.     Let's go this way then:  How much
20  money in loans have you received from Blimpie of
21  California?
22         A.     Ever?
23         Q.     Ever.
24         A.     I'm going to make -- I think at the
25  peak, I didn't have a chance to review it,

## Page 63

1   tomorrow I might have known it -- $189,000 I
2   think at the peak.  Maybe that would have been
3   maybe the most.
4          Q.     You expressed a concern that you
5   haven't reviewed documents.  I'll set forth that
6   to the extent you need to continue your
7   deposition because Plaintiff would have received
8   additional documents, certainly you can feel free
9   to amend your statements.
10         A.     I will do that.
11         Q.     And of the approximately 189,000 that
12  you believe you have received, have you ever paid
13  any of that back?
14         A.     Yes.
15         Q.     How much?
16         A.     I don't recall the amounts, but
17  overtime, I paid different amounts.  Every time
18  the company needed money, I put it back.
19         Q.     How do you put it back?
20         A.     Cash.
21         Q.     Can you approximate the amount?
22         A.     Well, in the last few years, I know
23  that at one point a couple of years ago I had to
24  write a check for 22,000.  I did -- 20, in that
25  range, 20 or 22,000.  I wrote that one back.

## Page 64

1   But, again, I'm only focused on the period of the
2   lawsuit.
3          Q.     What was the purpose of the loan?
4                 MR. SLEDZIK:   A specific loan?
5                 MR. FRITZ:   Any of them.
6          A.     I asked for the money.
7   BY MR. FRITZ:
8          Q.     Was there any corporate purpose?
9          A.     The only corporate purpose is the fact
10  that I don't take a salary from the company, and
11  the company can't afford to pay me a salary.  And
12  so -- and I've been running the company for 17
13  years.  And so, during the period, there have
14  been times when I've asked for an advance from
15  the company.
16         Q.     Can you explain why the company can
17  afford a loan, but not to pay you a salary?
18         A.     Yes.
19         Q.     Please do.
20         A.     There is a difference.  The company
21  needs the money back, and its an asset on the
22  books I'm there to give them the money back.  If
23  the company pays me a salary it's a hit on the
24  books and it hits the net worth and then I got to
25  put the money back anyway.

Page 65

1     Q.    Can't you just decrease your salary?
2     A.    As much as you decrease yours.
3     Q.    I'm not in control of the amount of
4   salary that I make, so --
5     A.    I don't take a salary that's ever
6   exceeded -- I think in all the years I worked for
7   Blimpie of California, I think the most I've ever
8   taken was $50,000 in one year.  I think most of
9   the time it's been in the range of 12 to 20 or
10  zero.  So, from zero, I don't know how you reduce
11  it.
12    Q.    The testimony was that you take a loan
13  and not a salary because a loan you can pay back
14  more quickly, if I'm summarizing your testimony
15  correctly.  So my question is why couldn't you
16  simply decrease your salary so the corporation
17  would have more money that way?
18    A.    That's a silly question, truly a silly
19  question.  I theoretically shouldn't be working
20  for nothing, and most years I've worked for
21  nothing to try and build the company.  So there's
22  never been a salary from which to really reduce
23  the salary, if I'm getting -- the couple of years
24  I may have gotten 12 to 20.  How much would you
25  like me to reduce it?

Page 66

1     Q.    We'd like to be --
2     A.    Zero.
3     Q.    We haven't said that.
4     A.    You have said that in the past.
5     Q.    Is the reason why you didn't take a
6   salary is because you didn't want to report
7   income to the --
8     A.    Absolutely not, I reported an enormous
9   amount of income to the IRS.
10    Q.    In what year?
11    A.    Every year.
12    Q.    How much salary did you report?
13    A.    I didn't say I reported salary from
14  Blimpie of California.
15    Q.    Have you reported any salary from
16  Blimpie of California to the IRS?
17    A.    Probably back in the '90s a couple of
18  years, yes.  I haven't taken anything since then
19  until I was just awarded a bonus, and yes, I
20  reported it.
21    Q.    What was the amount of that bonus?
22    A.    10,000 for one year, and 50,000 for
23  another year.
24    Q.    Did you report the loans as income?
25    A.    No, sir.

Page 67

1     Q.    Do you consider it income?
2     A.    No, sir.
3     Q.    In actuality, is it income?
4     A.    No, sir.
5     Q.    Is the money in your pocket?
6     A.    It's a silly question.
7     Q.    Do you have corporate funds in your
8   pocket?
9     A.    No, I have loans that were made to me.
10  They're not corporate funds.  There are loans
11  that were made.  They are loans to me.  It was
12  not income.
13    Q.    You're saying those weren't corporate
14  funds?
15    A.    Oh, the money that was given to me
16  came from the corporation.
17    Q.    And the purpose is what again?  What
18  was the corporation purpose for giving you this
19  loan?
20    A.    Because the company wasn't paying me a
21  salary, and couldn't afford to pay me a salary,
22  so at certain times when I asked for advances, it
23  gave me the advances.
24    Q.    Instead of paying you advances, why
25  couldn't they just you give you a small nominal

Page 68

1   salary?  That's what I'm having trouble
2   understanding.
3     A.    Because the company would need the
4   money back, and I am the sole support of the
5   company.  So I wasn't prepared to take a small
6   salary, pay tax on it, have to pay back the money
7   to the company on after-tax dollars.
8          (Whereupon, Plaintiff's Exhibit 1,
9       financial statements, were marked for
10      identification as of today's date.)
11  BY MR. FRITZ:
12    Q.    Take a look at what's been marked as
13  Plaintiff's Exhibit 1.  Let me know when you're
14  finished.
15        MR. SLEDZIK:  For the record, I'm
16     reading it as December 31, 2002 and 2001;
17     December 31, 2003 and 2002; December 31,
18     2004 and 2003; December 31, 2005 and 2004;
19     December 31, 2005 -- I'm sorry, December 31,
20     2006 and 2005.
21  BY MR. FRITZ:
22    Q.    Do you recognize these documents?
23    A.    I do.
24    Q.    What are they?
25    A.    The financial statements of the

Page 69

```
 1   corporation.
 2        Q.   Turning to the balance sheet, which
 3   looks like it's about the -- maybe the fifth page
 4   in.
 5        A.   Which year?
 6        Q.   2001.
 7        A.   Yes, sir.
 8        Q.   Where it says "advances to officers,"
 9   and it has the amount of $199,059, do you know to
10   which officers those advances were made?
11        A.   I'm seeing different -- advances to
12   officers 199,0059? Ms. Gillette and myself.
13        Q.   How much was made to yourself?
14        A.   I don't recall, because that number
15   includes interest.
16        Q.   How much was made to Ms. Gillette?
17        A.   I think at that time, I think it was
18   $38,000.
19        Q.   And the balance would be an advance to
20   you?
21        A.   No, the interest to Ms. Gillette,
22   interest to me, and advance to me.
23        Q.   Moving to 2002, just to the left it
24   appears that the amount of outstanding advance
25   increased by $60,000?
```

Page 70

```
 1        A.   That's correct.
 2        Q.   Do you know to which officer that
 3   $60,000 went to?  It includes, I understand --
 4        A.   It includes interest, 10,000 something
 5   to Ms. Gillette, and I don't recall the rest, if
 6   there was an adjustment or something else.  I
 7   know that we gave you a spreadsheet, but I don't
 8   recall.
 9        Q.   You don't recall receiving additional
10   monies in 2002?
11        A.   I don't recall.
12        Q.   Do you have any records that would
13   show that?
14        A.   Yes.  I believe you were given those
15   records.
16        MR. SLEDZIK:  Why don't you identify
17        them.
18        A.   I thought there was a spreadsheet that
19   showed you.
20        Q.   Are you referring to the spreadsheet
21   that was provided in advance of that October 2007
22   shareholder meeting?
23        A.   I don't recall.
24        Q.   You don't recall if that is the
25   spreadsheet or --
```

Page 71

```
 1        A.   I don't recall if that is the
 2   spreadsheet.
 3        Q.   Do you know what the corporate purpose
 4   was for increasing the amount of advances to
 5   officers from 2001 to 2002?
 6        A.   No, I don't recall.
 7        Q.   Did the shareholders' approve it?
 8        A.   In a formal meeting, not to my
 9   recollection.
10        Q.   Was it your understanding at the time
11   that the shareholders did have to formally
12   approve it?
13        MR. SLEDZIK:  Object to the form.
14        A.   No, it wasn't my understanding.
15        Q.   Same question with respect to the
16   first time that you received a loan:  Was it your
17   understanding at the time that you had to have
18   shareholders' approval in order for the
19   corporation to make a loan?
20        MR. SLEDZIK:  Objection to the form.
21        A.   I don't know that you need shareholder
22   approval, no.
23        Q.   What type --
24        A.   Board approval maybe.
25        Q.   In 2002, do you know what the net
```

Page 72

```
 1   income of Blimpie of California was?
 2        A.   31,524.
 3        Q.   Was any of that amount paid in the
 4   form of dividends to the shareholders?
 5        A.   No.
 6        Q.   Do you know why not?
 7        A.   Because the company isn't in a
 8   position to pay dividends.
 9        Q.   But if it has $31,000 in net, can you
10   explain why --
11        A.   Companies need working capital.  And
12   if you take a look at the balance sheet, there
13   was not that much in working capital and there
14   was no ability to pay dividends.
15        Q.   Did you ever considering paying back
16   some of the loan to you in order to provide the
17   corporation with working capital, and so it could
18   provide the shareholders with dividends?
19        A.   That wouldn't change, because it has
20   to do also with the net worth and the ability of
21   the company to move forward.  We're not in a
22   position yet to pay dividends to anybody,
23   considering all the money that comes from me and
24   my family, and the guarantees we're on.
25        Q.   You mentioned net worth.  What is the
```

Page 73

1    net worth of Blimpie of California today?
2         A.    Can I take a look?
3         Q.    Absolutely.
4         A.    As of December 31, 2006, it was
5    $140,000.
6         Q.    Did you consider that the value of
7    Blimpie of California?
8         A.    Pretty much.
9         Q.    Has that number, given your position
10   at the corporation, increased or decreased?
11        A.    It's decreased I think slightly.
12        Q.    What would you estimate it at?
13        A.    I don't know.
14        Q.    A hundred thousand dollars?
15        A.    I don't know.
16        Q.    Have you ever employed any valuation
17   experts to value the corporation?
18        A.    I think we did.
19        Q.    When was that?
20        A.    Several years ago.
21        Q.    Do you recall the results of that?
22        A.    I don't, but I can get it for you.
23             MR. FRITZ:  Please.  We would request
24   that.
25        Q.    Do you know what that valuation was,

Page 74

1    based upon what data?
2         A.    It would be based upon the data that I
3    assume -- just based on several things.  Based on
4    the financial statements of the company.  There's
5    different ways they do valuations.  Based on
6    industries, but I'm sure the report, if there was
7    a report, I think that would lay it out.
8         Q.    Has anyone ever offered to buy Blimpie
9    of California?
10        A.    No.  Not to my recollection.
11        Q.    Have you ever sought to sell it?
12        A.    Not to my recollection.
13        Q.    How much would you sell it for?
14        A.    I haven't even thought about it,
15   Counselor.
16        Q.    If Ms. Gillette offered $200,000 to
17   buy Blimpie of California, would you consider
18   that a reasonable offer?
19        A.    I wouldn't consider it.  I'm not
20   interested in selling.
21        Q.    Why not?
22        A.    I want to build the company up.  I'm a
23   young guy and I got a long way to go.
24        Q.    Is there any number that you would
25   take and seriously consider in exchange for

Page 75

1    buying the corporation --
2         A.    I guess in the Alex Rodriguez class.
3         Q.    So, that would be $25 million.
4              Let's stick with the 2002.  We've been
5    discussing the $60,000 that was advanced to some
6    officer, and which also includes interest.  Do
7    you know if there was a written loan agreement
8    pertaining to those advances?
9              MR. SLEDZIK:  Objection to the form.
10        A.    No.
11        Q.    Do you know the interest rate that
12   applies for that loan?
13        A.    Six or 7 percent has been for all the
14   loans.
15        Q.    The time that it's paid back, is that
16   also when one of the members of the board
17   requests it?
18        A.    Very honestly, it's a small company.
19   It's never been discussed when it was going to be
20   paid back.
21        Q.    So, in theory, you could never pay it
22   back, and still have the money in your pocket or
23   whoever the advance was made to?
24             MR. SLEDZIK:  Object to form.
25        A.    In theory, yes.

Page 76

1              (Off the record discussion.)
2              (Luncheon Recess Taken.  Time Noted:
3    12:21 p.m.)
4              A F T E R N O O N   S E S S I O N
5                   (1:17 p.m.)
6
7    J E F F R E Y  E N D E R V E L T, resumed having
8    been previously duly sworn, was examined and
9    testified further as follows:
10
11   EXAMINATION (Cont'd.)
12   BY MR. FRITZ:
13        Q.    Good afternoon.  I believe before we
14   took a break were talking about advances to
15   officers in the year 2002, and I apologize if I
16   asked this.  Was there a shareholder approval of
17   those advances?
18        A.    Not to my recollection.
19        Q.    What was the purpose of the advances
20   in that year, the corporate purpose?
21        A.    If I took one.  I don't recall.  I
22   want to go back and state again, I was going to
23   check the records, but sitting here today, I
24   don't recall.
25        Q.    Did you pay income on whatever

Page 77

```
 1    loans -- have you ever paid any income tax on any
 2    loans or amounts that you received from Blimpie
 3    of California?
 4         A.    One doesn't pay income tax on loans.
 5         Q.    So the answer is?
 6         A.    No, no.
 7         Q.    In 2002, did Blimpie of California pay
 8    any dividends to shareholders?
 9         A.    No.
10         Q.    Looking at the same balance sheet that
11    we've been looking at numbered page two, it's
12    about the fifth page?
13              MR. SLEDZIK:  The one labeled
14         "Assets"?
15              MR. FRITZ:  Yes.
16         A.    Yes.
17    BY MR. FRITZ:
18         Q.    Under "Stockholder's Equity" at the
19    bottom where it says "640 shares issued
20    outstanding," what does that mean?
21         A.    I don't know.  That's the first time
22    that I've seen it -- that I recognize it.  I
23    don't know.
24         Q.    Do you know how many shares of BOC are
25    issued and outstanding?
```

Page 78

```
 1         A.    To my recollection, 1,000.
 2         Q.    So this number is incorrect?
 3         A.    That's my understanding.  When I look
 4    at it, I think so.
 5         Q.    So if someone had -- if in fact there
 6    were 1,000 shares and someone owned 150 shares,
 7    they would own 15 percent of the corporation?
 8         A.    That's correct.
 9         Q.    But if this number is correct, 640,
10    and someone has 150 shares, they would own
11    approximately 23 percent?
12         A.    That's correct.
13         Q.    Do you have records that would
14    indicate whether it's 640 shares outstanding or
15    1000?
16         A.    I'll check.
17         Q.    Why don't we go to the next financial
18    statement of 2003.
19              MR. SLEDZIK:  The assets page, Page 2.
20    BY MR. FRITZ:
21         Q.    Do you see where the advances to
22    officers increased from approximately 282,000 to
23    335,000 between the year 2002 and 2003?
24         A.    Yes.
25         Q.    Do you know to whom that was paid?
```

Page 79

```
 1         A.    Well, a portion of it would be
 2    interest.  The difference, I don't know.
 3    Probably it was either Spencer or myself.  I
 4    don't recall.
 5         Q.    Would you have records showing that?
 6         A.    Yes.
 7         Q.    Do you know what the terms of that
 8    advance was, I mean, the interest when it was to
 9    be repaid, if ever?
10         A.    The interest would have been the same
11    as all the others, 6 to 7 percent.  What was the
12    other part of the question?
13         Q.    The time to repay it?
14         A.    There was no time set.
15         Q.    Was there any loan agreement?
16         A.    No.
17         Q.    Did the shareholders approve of those
18    advances at the meeting?
19         A.    Was there a formal shareholders
20    meeting?  No, there was not.
21         Q.    And the purpose of those loans, the
22    corporate purpose was what?
23         A.    The company was not paying me a
24    salary -- if it was me, and it's hard for me to
25    say, I don't have the information in front of me.
```

Page 80

```
 1         Q.    So rather than go through each of
 2    these years, is it more efficient if we revisit
 3    this topic after you've reviewed the records?
 4              MR. SLEDZIK:  I think he indicated
 5         there was a spreadsheet that was provided to
 6         you pursuant to the shareholders agreement
 7         that would refresh his recollection, if you
 8         want to show him that.  I don't know what
 9         you've brought with you.
10              MR. FRITZ:  I don't have that with me.
11         We can go through it next time, but we'll go
12         through each of the years.  If he recalls, he
13         recalls.
14         Q.    What was the net income of Blimpie of
15    California in 2002?
16         A.    $195,000.
17         Q.    Was any of that paid shareholders
18    dividends?
19         A.    No.
20         Q.    Do you know why?
21         A.    Yes.  We didn't issue dividends.
22         Q.    Whose decision was that?
23         A.    The board of directors.
24         Q.    Which includes you.  And who else did
25    that include at the time?
```

Endervelt, Jeffrey                                              11/8/2007

## Page 81

1          A.    Spencer.
2          Q.    Do you know why that decision was made
3    not to pay dividends?
4          A.    Yes.  We're too small a company to pay
5    dividends.  We don't have that economic clout.
6    We still have loans outstanding that I guaranty.
7          Q.    Would it be fair to say that if you
8    repaid some of the loans that were made to you,
9    then there would be more operating capital for
10   the corporation and thus dividends could be paid?
11         MR. SLEDZIK:  Objection to the form.
12         A.    No.  We're not in a position to pay
13   dividends.
14         Q.    Ever?
15         A.    Not now.  When the company grows,
16   maybe.  A small company like this?  No, sir.
17         Q.    What does the net have to be in your
18   opinion?
19         MR. SLEDZIK:  Wait.  Wait.  Objection
20   to the form.
21   BY MR. FRITZ:
22         Q.    In your --
23         A.    It's more of a matter of what the
24   equity has to be.  I would say it would have to
25   be at least over a half a million dollars.

## Page 82

1          Q.    What is it currently?
2          A.    At this point, it was 275,000.  What
3    it is currently?  I would have to go to the --
4    140,000.
5          MR. SLEDZIK:  This is at the end of
6    2006.
7    BY MR. FRITZ:
8          Q.    I believe you testified earlier you
9    think it's less now, but you are not sure?
10         A.    Correct.
11         Q.    Why don't we go to 2004, the balance
12   sheet page that has assets and liabilities.  Do
13   you see where the advance to officers increased
14   from 335,000 to approximately to 378,000?
15         A.    I've got the wrong years.
16         Yes, I see that.
17         Q.    Do you know to whom that approximately
18   42 or 43,000 was paid, that advance?
19         MR. SLEDZIK:  I Object to the form.
20         A.    I believe it was interest.  I don't
21   believe there was actually a loan that year.  I
22   don't recall, but I don't believe there was.
23         Q.    It would have been to either you or
24   Spencer?
25         A.    Yes.

## Page 83

1          Q.    Shareholders approve that?
2          A.    Formally, no.
3          MR. SLEDZIK:  Objection to the form.
4    BY MR. FRITZ:
5          Q.    When you say "formally," did they
6    approve it informally?
7          A.    Yeah.  We all knew when we took money
8    when there was an advance made.
9          Q.    When you say "we," who are you
10   referring to?
11         A.    Spencer, myself, and by this time in
12   2004, I may have mentioned it to my mother.  At
13   this point she began to get ill, and I can't tell
14   you whether I did or not.  I can't recall.
15         Q.    Did your mother ever affirmatively,
16   whether in writing or orally, ever approve
17   advances to BOC's officers?
18         A.    Yes.
19         Q.    When did that occur?
20         A.    Mostly in the '90s, early 2000s.
21         Q.    Did she do that in writing?
22         A.    No.
23         Q.    How did she convey that to you?
24         A.    I would just talk to her and tell her
25   what's going on.

## Page 84

1          Q.    What did she say, if anything?
2          A.    I don't recall.
3          Q.    Is it fair to say whatever you
4    recommended to her she would approve?
5          A.    Probably.
6          Q.    Has she ever been -- is she a
7    shareholder in any other closed corporations?
8          A.    No.
9          Q.    Is she on the board of directors of
10   any corporation?
11         A.    No.
12         Q.    Is she an officer of any corporation?
13         A.    No.
14         Q.    Has she ever been?
15         A.    Outside of -- no.  To my knowledge,
16   no.
17         Q.    Does she have any experience managing
18   corporations?
19         A.    Yes.  She was in her day a very good
20   business woman.
21         Q.    Do you mind telling me her background?
22         A.    Real estate business, development,
23   management.  That was most of it.
24         Q.    So she's a sophisticated business
25   woman?

Pages 81 to 84

## Page 85

1      A.    She was.
2      Q.    You say "was."  When do you think her
3  mental abilities started to deteriorate?
4      A.    In the last five years.
5      Q.    So approximately 2002 to the present?
6      A.    Yeah.
7      Q.    The corporate purpose, if any, of that
8  loan of approximately 42,000, do you know what it
9  was?
10     A.    There wasn't a loan.  It couldn't have
11 been a loan of 42,000, because some percentage of
12 that had to be interest.  I would say it looks
13 like there may have been a $20,000 advance.  I
14 don't know, sitting here today.
15     Q.    You don't know what the corporate
16 purpose was?
17     A.    No.
18     Q.    Other than to pay you salary, do you
19 recall any other corporate purpose for any other
20 loans to officers?
21     MR. SLEDZIK:  Objection to the form.
22 BY MR. FRITZ:
23     Q.    Other than to pay a salary, which
24 you had testified earlier was one of the
25 corporate purposes of these loans, are there any

## Page 86

1  other --
2      A.    No, I don't think that I said that.
3      MR. SLEDZIK:  Objection to the form.
4      A.    I said they couldn't pay me a salary
5  and they loaned me the money because I wasn't
6  going to take a salary to have to put the money
7  back in after-tax dollars.  So, I'm always
8  available to put the money back, as I do whenever
9  it's necessary.
10     Q.    Other than that, is there any other
11 corporate purpose?
12     A.    No.
13     Q.    In 2004, did BOC pay any dividends to
14 shareholders?
15     A.    No.
16     Q.    What was the net income of Blimpie of
17 California in 2004?
18     A.    $150,000.
19     Q.    Was that money reinvested in the
20 corporation?
21     A.    Yes.  By "reinvested," do you mean
22 does it stay in the corporation?
23     Q.    Yes.
24     A.    Yes.
25     Q.    Did you ever consider paying back some

## Page 87

1  of the loans that were made to you so that the
2  stockholders could receive dividends?
3      A.    The two don't go together.  You keep
4  trying to link the two.  The two definitely don't
5  go together.  The fact that I might pay back the
6  money would not change the net worth of the
7  company because everything is already on the
8  books.  It would not change the net worth of the
9  company, the equity.  So, no, it would not change
10 it.
11     Q.    Let's go to 2005.  Would you agree
12 that it appears that approximately $4,000 was
13 advanced to officers in between year-end 2004 and
14 2005?
15     A.    No.  That would obviously be some
16 insurance and pay downs.
17     Q.    Do you know by whom the pay downs were
18 made?
19     A.    I would presume me.
20     Q.    Do you know how you paid it down?
21     A.    By check.
22     Q.    Not deferral salary or bonus?
23     A.    No.
24     Q.    At what point did you receive power of
25 attorney from your mother?  Was it approximately

## Page 88

1  August of 2005?  Did she grant you the power of
2  attorney?
3      A.    I gave you the document.  I don't
4  recall sitting here.
5      Q.    Going back to 2001.
6      MR. SLEDZIK:  That's the first?
7      MR. FRITZ:  Right.
8      Q.    Do you see where 210,000 was advanced
9  to affiliates in 2001?
10     A.    No.  I see where the sum total on the
11 balance sheet was 210.  That doesn't necessitate
12 the fact it was advanced in that year at all.
13     Q.    Right.  It could have stayed on the
14 books?
15     A.    Yes.
16     Q.    Do you know who those affiliates are?
17     A.    Ninety percent, as I recall it, was
18 BLC #4 Corp.
19     MR. SLEDZIK:  Say that again.
20     THE WITNESS:  Best of my recollection,
21 90 percent of that number would be BLC #4
22 Corp., a subsidiary of Blimpie of
23 California.
24 BY MR. FRITZ:
25     Q.    What was the purpose of that

Page 89

1   subsidiary?
2       A.    That was a leasing subsidiary.  We
3   used those because most of the leases in Blimpie
4   world, the master lease goes in the name of the
5   leasing subsidiary and then is subleased to the
6   franchisee.
7       Q.    Is BLC #4 wholly owned by BOC?
8       A.    It is.
9       Q.    So the purpose of that advance was?
10      A.    To the best of my recollection, that
11  had to do with the Anto, Inc. lawsuit.
12      Q.    Can you explain that?
13      A.    Yes.  We paid off Anto, Inc. through
14  BLC #4.
15      Q.    Why didn't you pay it off through BOC?
16      A.    Because when we settled the case, if I
17  remember correctly, when the case was settled,
18  BLC #4 was the prime tenant on the lease at the
19  Home Depot, and they were, I think, involved in
20  the lawsuit, among others, BOC, BLC #4.  So the
21  attorneys said do it through BLC #4, and so I
22  did.
23      Q.    Are there any other affiliates --
24            MR. SLEDZIK:  Can I interject this one
25      thing?

Page 90

1           Your communications with counsel are
2   privilege.  So, to the extent your answering
3   his question may require you to convey
4   advice that's been given to you by other
5   attorneys or something you've conveyed to
6   the attorney for the purpose of soliciting
7   advice, you should indicate that.  And that
8   would be privileged.  You're the client.
9   You have to the ability to waive privilege,
10  and I instruct you of that.
11  BY MR. FRITZ:
12      Q.    Do you have documents pertaining to
13  those advances to the affiliate?  Does BLC
14  maintain documents in its office here in New
15  York?
16      A.    Yes.  As far back as I have.  I'd have
17  to check.
18      Q.    On page 8, note C at the bottom, it
19  states that "Advances to affiliates with common
20  ownership of working capital purposes totaled
21  210,000 and change for 2002 and 2001."
22            Which affiliate with common ownership
23  is that note referring to?
24            MR. SLEDZIK:  You are on the wrong
25      page.

Page 91

1       Q.    (Indicating).
2       A.    I don't know.
3       Q.    Has BOC ever advanced any money to any
4   other affiliate other than BLC #4?
5       A.    Probably.
6       Q.    What entities would those be?
7       A.    I don't recall.
8       Q.    But it would be an entity that is
9   owned at least in part by Belle or Miss Gillette,
10  correct?
11            MR. SLEDZIK:  Object to the form.
12      A.    I don't recall.  I can't give you the
13  answer since I don't recall.  I'd have to look at
14  a spread sheet and see, then I could answer the
15  question.
16      Q.    The reason why I mentioned Belle and
17  Miss Gillette is because it says "advances to
18  affiliates with common ownership."  You don't own
19  any part of Blimpie of California?
20      A.    That's correct.
21      Q.    So according to this, any advance to
22  an affiliate would have to be to an entity that
23  was owned by Ms. Gillette or your mother?
24      A.    I don't know.  We had another
25  company --

Page 92

1            MR. SLEDZIK:  Object to form.
2       A.    We had a company called J.P. Cools
3   that we formed.  We put money into that company.
4   It was owned by the same people.
5       Q.    Who is we?
6       A.    Blimpie of California put money into
7   that company.  We started up that company.
8       Q.    What was the purpose of that company?
9       A.    We started up an ice cream and
10  smoothie company.  Same ownership, Spencer, me
11  and my mother.
12      Q.    Any other entities?
13      A.    I don't recall.
14      Q.    Is that entity still in business
15  today?
16      A.    No.  I think there's one unit out
17  there, but it's no longer active.
18      Q.    Would Blimpie of California have
19  documents reflecting this common ownership?
20      A.    I'd have to check.  It goes back quite
21  a few years.
22      Q.    The benefit to Blimpie of advancing
23  money to that entity, what was the corporate
24  benefit --
25      A.    We were trying -- we were trying to do

Endervelt, Jeffrey                                    11/8/2007

## Page 93

```
 1    a multi-unit operation.  We thought it would help
 2    Blimpie in terms of selling franchises, offering
 3    another concept, the real estate stake is
 4    improved.  If you can take bigger real estate,
 5    the two incomes from two different operations,
 6    you might be able to get yourself to afford
 7    better real estate.  So there are a lot of
 8    advantages.
 9        Q.    Did it achieve those goals?
10        A.    In some cases initially it did.  The
11    one unit we have does very well.
12        Q.    At some point, did that change?
13        A.    We didn't follow up on it when
14    Ms. Gillette and I moved to Atlanta.
15        Q.    Going back to Page 2, where it says
16    "accounts payable on accrued expenses," for 2001,
17    approximately 242,000, do any of those
18    expenses --
19        A.    Yes.
20        Q.    Do any of those expenses include
21    payment of your personal expenses?
22        A.    I don't recall.
23        Q.    Would you have records reflecting
24    that?
25        A.    I'm sure.
```

## Page 94

```
 1        Q.    Has Blimpie of California ever paid a
 2    personal expense for you?
 3        A.    Yes.
 4              MR. SLEDZIK:  Object to the form.
 5        Q.    What type?
 6        A.    Medical.
 7        Q.    Do you know how much those expenses
 8    have totaled?
 9        A.    No, I don't.
10              MR. SLEDZIK:   Object to the form.
11    BY MR. FRITZ:
12        Q.    When is the first time that Blimpie of
13    California began paying your personal expenses?
14        A.    My medical expense?
15        Q.    Sure.
16        A.    I don't recall.
17        Q.    That's the only personal expense?
18        A.    To the best of my recollection, that's
19    the only expense that they pay.
20        Q.    Was there any corporate purpose for
21    them doing that?
22        A.    Yes.
23        Q.    What is that?
24        A.    I'm the president of the company.
25    They weren't paying me a salary.  I wanted them
```

## Page 95

```
 1    to pay, so they were paying my insured medical
 2    expenses.
 3        Q.    Were they paying your insurance
 4    premiums?
 5        A.    No -- well, back in the '90s, they
 6    were.
 7        Q.    Did that change at some point?
 8        A.    Yes.
 9        Q.    Do you know why?
10        A.    When I became CEO of Blimpie
11    International, they paid it.
12        Q.    Does Blimpie International still pay
13    it?
14        A.    X2Y1 pays it, I believe.
15        Q.    X2Y1 pays the premiums for your
16    insurance?
17        A.    My medical insurance.  We have a
18    medical insurance for everybody.  Yes, I'm part
19    of the program.
20        Q.    Do you know if they pay any part of
21    Spencer Gillette's medical insurance?
22        A.    Today?
23              MR. SLEDZIK:  Presently?
24              MR. FRITZ:  Yes.
25              MR. SLEDZIK:  X2Y1?
```

## Page 96

```
 1              MR. FRITZ:  Yes.
 2        A.    No.
 3    BY MR. FRITZ:
 4        Q.    And X2Y1 doesn't pay any dividends?
 5        A.    They don't any pay dividends.
 6        Q.    Period?
 7        A.    Period.
 8        Q.    Did there come a time when you either
 9    personally or through an entity purchased
10    majority interest in Blimpie International?
11        A.    Me and others.
12              MR. SLEDZIK:  He's asking through an
13    entity?
14        A.    Yes, through an entity.
15    BY MR. FRITZ:
16        Q.    What entity was that?
17        A.    X2Y1.
18        Q.    Is Belle Endervelt a shareholder of
19    X2Y1?
20        A.    No.
21        Q.    Looking at note G, the last page, it
22    says "Effective January 24, 2002, the company's
23    principal shareholder purchased a majority
24    interest in Blimpie International, Inc."
25              Who was BOC's principal shareholder in
```

**Endervelt, Jeffrey**                                   **11/8/2007**

| Page 97 |
| --- |

```
1    2002?
2        A.      The principal shareholder was Belle.
3        Q.      But she never purchased a majority
4    interest in Blimpie International?
5        A.      That's correct.
6        Q.      So this statement is incorrect?
7        A.      That is definitely incorrect.
8        Q.      If you could go to page 5.  In the
9    middle of the page under "Cash Flows from
10   Investing Activities," do you see where it says
11   "Advances to Affiliates" four lines down?
12       A.      Yes.
13       Q.      And in 2002, it appears that BOC was
14   paid back $60,000 approximately?
15       A.      Yes.
16       Q.      So am I correct they paid that money
17   back to BOC?
18       A.      That's what it looks like.
19       Q.      Going to Page 2, do you know why the
20   advances to affiliates stayed the same between
21   2001 and 2002?
22       A.      No, I don't.
23       Q.      Do you see where the advances to
24   officers changed by the exact number that is
25   referenced under "Advances to Affiliates" on the
```

| Page 98 |
| --- |

```
1    fifth page, that we just looked at?
2        A.      Yes.
3        Q.      Why is that?
4        A.      I have no idea.
5        Q.      You don't know why?
6        A.      No.
7        Q.      Would it be fair to say these
8    financial statements are not 100 percent
9    accurate?
10       A.      I can't say that.  I would have to go
11   find the backup and understand it.
12       Q.      Do you have the backup?
13       A.      I would think we probably do.
14       Q.      But just looking at it, as we sit here
15   today, do you think there's something wrong with
16   these statements, that they are not 100 percent
17   accurate?
18       A.      I wouldn't hypothesize until I see the
19   backup.
20       Q.      How many franchises did Blimpie
21   receive revenue from in 2002?
22       A.      I don't recall.
23       Q.      Turn to page 8.
24       A.      Same statement?
25       Q.      Yes.
```

| Page 99 |
| --- |

```
1            Looking at "Franchise Ownership
2    Changes," does that refresh your recollection?
3        A.      Yes.
4        Q.      Was it 47 franchises?
5        A.      Forty-seven.
6        Q.      In that year, 2002, the accounts
7    payable on accrued expenses was approximately
8    $167,000, Page 2?
9        A.      Yes.
10       Q.      If we could skip now to 2006.
11       A.      Yes.
12       Q.      If you could turn to Page 6.  Do you
13   see where it says that the number of franchises
14   in operations is 28?
15       A.      No -- yes, I'm sorry.
16       Q.      So, it's almost half the amount that
17   it had in 2002, correct?
18       A.      Correct.
19       Q.      Do you know if the expenses increased
20   from 2002 to 2006, the expenses of Blimpie
21   California?
22       A.      Without looking, no, I don't.
23       Q.      If the number of franchises decreased,
24   would there be any reason why the expenses should
25   increase?
```

| Page 100 |
| --- |

```
1        A.      Yes.
2        Q.      Besides inflation?
3        A.      Yes, of course.
4        Q.      What are those?
5        A.      We tried to build the company up, so
6    we probably did a lot more advertising and we did
7    other things that we think are necessary to build
8    the company up.
9        Q.      Would it include additional payment of
10   your personal expenses, meaning medical expense?
11       A.      In 2006 --
12           MR. SLEDZIK:  Objection to the form.
13       A.      If there was anything, it was minimal.
14   BY MR. FRITZ:
15       Q.      We spoke earlier about the shareholder
16   meeting that took place in October of 2007.  Do
17   you recall that shareholders' meeting?
18       A.      I do.
19           (Whereupon, Plaintiff's Exhibit 2,
20   shareholders' meeting notice, was marked for
21   identification as of today's date.)
22           MR. SLEDZIK:  How many pages do you
23   have in the exhibit?
24           MR. FRITZ:  Thirteen.
25           MR. SLEDZIK:  It's essentially notices
```

Pages 97 to 100

Endervelt, Jeffrey                                    11/8/2007

## Page 101

1       and other things from 2005 to the present.
2               MR. FRITZ:  That's correct.
3               MR. SLEDZIK:  And there are certified
4       mail return receipts; there are some
5       envelopes, faxes, and as well as fax
6       transmittal sheets, and one e-mail.
7               MR. FRITZ:  That's correct.
8               MR. SLEDZIK:  And then a Federal
9       Express form.
10              MR. FRITZ:  Yes.
11      BY MR. FRITZ:
12          Q.      Have you reviewed the document?
13          A.      I just reviewed the top page.
14          Q.      Is that your signature at the bottom?
15          A.      Yes.
16          Q.      According to this notice, what was the
17      purpose of the meeting to be held on October 8,
18      2007?
19          A.      "Discussion of vote taken on whether
20      to ratify the action by the board in extending
21      certain loans to officers and affiliates between
22      the years 1999 and 2007."
23          Q.      Did you reside over that shareholder
24      meeting?
25          A.      I did.

## Page 102

1          Q.      Did you call for a vote to approve all
2       prior acts of Blimpie International?
3          A.      I did -- no, no.  I did not.
4               THE WITNESS:  Can I have the question
5       read back.
6               (Record read.)
7          A.      Yes.
8       BY MR. FRITZ:
9          Q.      Was that business specified in the
10      notice?
11          A.      Not specifically, no.
12          Q.      When you say, "not specifically"?
13          A.      No, it's not mentioned.
14          Q.      In any manner?
15          A.      No.
16          Q.      Would you agree that that vote is
17      invalid?
18          A.      No.
19          Q.      Why not?
20          A.      My attorney --
21              MR. SLEDZIK:  Wait a second.  I want
22      to object to the question before that that
23      you just asked, the why not.  I don't know
24      which lawyer you're going to talk about.
25      It's your privilege.  If You want to waive,

## Page 103

1       it go ahead.
2          A.      No, I don't want to waive it.
3               MR. SLEDZIK:  Upon advice of counsel.
4       BY MR. FRITZ:
5          Q.      According to Blimpie of California's
6       record, is the vote that approved all prior acts
7       of Blimpie California a valid vote?
8               MR. SLEDZIK:  Can I have the record
9       read back.
10              (Record read.)
11              MR. SLEDZIK:  Objection to the form.
12          A.      Yes.
13      BY MR. FRITZ:
14          Q.      What documentation did you provide to
15      Ms. Gillette concerning all prior acts that were
16      going to be voted on?  What documentation did you
17      prior to her before the meeting?
18          A.      Would you read back the final
19      question?  I thought I heard two questions.
20          Q.      Strike that.
21              Before October 8, 2007, did you
22      provide Ms. Gillette with all documentation
23      concerning all of the acts, the approval of which
24      would be sought at the shareholder meeting?
25              MR. SLEDZIK:  Object to the form.

## Page 104

1          A.      I don't recall.
2       BY MR. FRITZ:
3          Q.      Did you send her anything?
4          A.      I sent you something.  I know that.
5          Q.      Was it all documentation concerning
6       all acts of the corporation?
7          A.      Any act, no.  It was not.
8          Q.      But the vote was held to approve any
9       act of the corporation?
10          A.      Yes.
11          Q.      Do you know if that is in compliance
12      with the bylaws of the corporation?
13          A.      Again, I have to go on the advice of
14      counsel.
15              MR. SLEDZIK:  Wait a second, he's
16      asking whether you know.  Do you know,
17      independent of advice of counsel?
18          A.      No.  Sitting here right now, I don't
19      know one way or the other.
20          Q.      When was the last time you read the
21      bylaws of the corporation?
22          A.      Oh, it probably has been a couple of
23      years.
24              (Whereupon, Plaintiff's Exhibit 3,
25      bylaws, were marked for identification as of

## Page 105

1       today's date.)
2   BY MR. FRITZ:
3       Q.    If you didn't provide Ms. Gillette
4   with all of the records of all of the acts of the
5   corporation before the vote, how did you expect
6   her to make an informed decision on how to vote?
7       A.    I can't answer that.  Again, I was
8   just responding to what my counsel advised me.
9       Q.    You're counsel advised you to hold a
10  vote to approve all corporate acts, even though
11  you haven't provided documentation about those
12  acts to one of the shareholders?
13          MR. SLEDZIK:  You're asking him
14      specifically what his lawyer told him.
15          MR. FRITZ:  He waived it.  He told me
16      that's what you told me.
17          MR. SLEDZIK:  You assume it's me,
18      which is appreciated, but it's factually
19      incorrect.  He hasn't identified the counsel
20      yet.
21          MR. FRITZ:  Whomever it was, he waived
22      it.
23          MR. SLEDZIK:  Let me have the previous
24      question and answer read back.
25          (Record read.)

## Page 106

1          MR. SLEDZIK:  He's not telling you
2   what his counsel advised him.
3          MR. FRITZ:  He is.  He is saying his
4   counsel advised him to hold the vote
5   nonetheless.
6          MR. SLEDZIK:  You asked him how can
7   you do this without having any knowledge.
8   He is saying he's responding to what counsel
9   told him.  He's not telling you what counsel
10  told him.  How can that be waiving privilege?
11          MR. FRITZ:  He's saying that counsel
12  told him it would be kosher.  So he did.
13  BY MR. FRITZ:
14      Q.    Let's go back.
15          The vote occurred, correct?
16      A.    Correct.
17      Q.    Let's take a look at what's been
18  marked as Plaintiff's Exhibit 3.
19          MR. SLEDZIK:  That's the bylaws.
20      Q.    If you could look at Page 3, section
21  3, "Special Meetings."  Please let me know after
22  you've reviewed that.
23      A.    Okay.  I read it.
24      Q.    Did the shareholder meeting on
25  October 8, would you agree that was a special

## Page 107

1   shareholder meeting?
2       A.    I couldn't agree one way or the other.
3   I don't recall.
4       Q.    Does it state that it was an annual
5   meeting?
6       A.    No.  It doesn't say it was a special
7   meeting either.
8       Q.    But it states it was to be held for
9   the purpose of ratifying certain loans to
10  officers and affiliates?
11      A.    That's correct.
12      Q.    After reviewing this provision in the
13  bylaws, is it still your opinion that the vote to
14  approve prior acts of the corporation was a
15  validly held vote on October 8, 2007?
16      A.    Yes.
17      Q.    What is your basis for saying that
18  other than what your counsel told you?
19      A.    That's my basis.
20      Q.    Do you see the last sentence that
21  says, "In addition to the matters required by
22  items A, and if applicable, C of the previous
23  section, notice of any special meetings shall
24  specify the general nature of the business to be
25  transacted, and no other business may be

## Page 108

1   transacted at such meeting."
2           Do you see that?
3       A.    Yes.
4       Q.    Is it still your testimony that
5   despite the fact that the bylaws say that no
6   other business may be transacted if it's not
7   noticed, that it was still a valid vote?
8       A.    Yes.
9       Q.    Before the October 8, 2007 meeting,
10  were the loans approved at any other prior
11  shareholder meeting?
12      A.    Not to my recollection.
13      Q.    And was a vote held on October 8,
14  2007?
15      A.    Yes.
16      Q.    And did the vote pass?
17      A.    Yes.
18      Q.    Did you count the votes of Belle
19  Endervelt?
20      A.    Yes.
21      Q.    Was Ms. Endervelt present?
22      A.    No.
23      Q.    Who voted on her behalf?
24      A.    I did.
25      Q.    Does she render you the power of

**Endervelt, Jeffrey**                                      **11/8/2007**

## Page 109

1   attorney?
2       A.   Correct.
3       Q.   Do you think there's a conflict of
4   interest between you using the majority
5   shareholders' vote, power of her vote, to approve
6   loans to yourself?
7       A.   No --
8            MR. SLEDZIK:  Object to the form.
9       A.   No.
10      Q.   Given that under California law the
11  votes of a shareholder are not to be counted when
12  approving loans or advances to that shareholder
13  in their capacity as director or an officer, do
14  you that Belle's votes should have counted?
15           MR. SLEDZIK:  Object.
16      A.   Absolutely.
17  BY MR. FRITZ:
18      Q.   Why do you think that?
19      A.   Because Belle wasn't approving loans
20  to herself.
21      Q.   Do you provide Belle with any
22  financial assistance?
23      A.   No.
24      Q.   You've never given her any money?
25      A.   Never financial assistance.

## Page 110

1       Q.   I'm sorry?
2       A.   Never financial assistance.
3       Q.   Have you given her any money?
4       A.   Birthday presents.  Money -- for what
5   you're talking about, no.
6       Q.   When you say what I'm talking about,
7   what do you mean?
8       A.   You're talking about did I ever give
9   my mother financial assistance.  In my entire
10  life?  I have no idea.
11      Q.   Since the time that Ms. Gillette was a
12  shareholder, for argument's sake let's say 1998?
13      A.   Have I ever loaned my mother money?
14  Possibly.
15      Q.   Has she paid it back?
16      A.   Absolutely.
17      Q.   To you personally?
18      A.   Yes.
19      Q.   Have you ever paid any expenses for
20  her?
21      A.   My mom?
22      Q.   Maybe she has a healthcare aid?
23      A.   She has a healthcare aide.
24      Q.   Who pays for that?
25      A.   My mother.

## Page 111

1       Q.   Do you pay for any type of services
2   that she receives?
3       A.   Thank God, my mother doesn't need that
4   help.
5       Q.   Does she receive a dividend from
6   Blimpie of California?
7       A.   No, she does not.  She put money in,
8   but no.
9       Q.   So can you explain how payment of
10  Blimpie's money to you, approved for your power
11  of attorney from the majority shareholder is fair
12  to the corporation?
13           MR. FRITZ:  Objection to the form.
14      A.   I have a power of attorney.  In that
15  position, I represent my mother.  I voted on
16  behalf of my mother on any act -- it's her vote.
17  I'm voting in her stead.  She has given me that
18  power.
19  BY MR. FRITZ:
20      Q.   Do you think that is in the best
21  interest of the corporation?
22      A.   Absolutely --
23           MR. SLEDZIK:  Do you think what is in
24      the best interest?  I think the question is
25      vague.  I didn't know what "what" is.

## Page 112

1   BY MR. FRITZ:
2       Q.   Do you think it's fair to the
3   corporation to use your power of attorney over
4   the majority shareholders to approve loans to
5   yourself?
6       A.   Yes.
7       Q.   Even though you don't pay any
8   dividend, the corporation pays no dividend to
9   Spencer Gillette?
10      A.   One has nothing to do -- you keep
11  trying to twist things.  One has nothing to do
12  with the other.
13      Q.   I'm not trying to twist anything --
14      A.   Of course you are.
15      Q.   With respect to the vote to approve
16  the loans to yourself, what documentation did you
17  provide to the shareholders in advance?
18      A.   I don't know exactly --
19           MR. SLEDZIK:  On the record, we faxed
20      you a spreadsheet I think on the 5th, which
21      is a Friday, before I provided to you by fax
22      with the cover letter.  I know that the
23      materials in Exhibit 2 make reference to a
24      spreadsheet.  I think you can concur it was
25      attached to the documents.

Pages 109 to 112

Endervelt, Jeffrey                                                    11/8/2007

## Page 113

BY MR. FRITZ:

1  BY MR. FRITZ:
2       Q.     Besides the spreadsheet, did you
3  provide anything else?
4       A.     Not to my recollection.
5       Q.     Do you think Spencer was entitled to
6  have those records before she voted on whether to
7  approve the loans or advances to you?
8              MR. SLEDZIK:   Objection to the form.
9       A.     Yes.
10 BY MR. FRITZ:
11      Q.     But you didn't provide it to her?
12      A.     The loans?  We did provide it to you.
13      Q.     Besides the spreadsheet, anything
14 else?
15      A.     No.
16      Q.     Do you have any other documents
17 regarding the loans exist?
18      A.     Can you be more specific.
19      Q.     Do any other records regarding the
20 loans exist besides the spreadsheet and the
21 reference to them on financial statements?
22      A.     Any documents that exist pertaining to
23 the loans have been given to you, either in
24 discovery or that spreadsheet.
25      Q.     Prior to the vote?

## Page 114

1       A.     You were given the spreadsheet.
2       Q.     Were we given the ledgers and other
3  information --
4       A.     No.
5       Q.     So is it fair to say that Spencer
6  can't make a fully and fair decision on how to
7  vote?
8       A.     No.   You were offered the opportunity
9  to look at the records.   You chose not to accept
10 that.
11      Q.     Are you referring to your offer to
12 make some of the records available to --
13      A.     Not at all.  You're twisting again.  I
14 offered to show all the records to you.   You
15 chose not to look at them.
16      Q.     Why don't we look at the notice of
17 annual meeting of stockholders regarding the
18 January 23, 2006 meeting.  It's about the fifth
19 page in.
20             MR. SLEDZIK:  On Exhibit 2?
21             MR. FRITZ:   Correct.
22      A.     Correct.
23      Q.     Do you recognize this document?
24      A.     I do.
25      Q.     Do you know if this document was sent

## Page 115

1  to Ms. Gillette?
2       A.     I do.
3       Q.     Was it --
4       A.     I know it was sent, yes.
5       Q.     Do you know how it was sent to her?
6       A.     I believe -- no, registered mail or
7  FedEx, I don't recall.
8       Q.     Looking at the next page, on the upper
9  right-hand corner, it looks like it was mailed
10 some point around December 18, 2006?
11      A.     Yes.
12      Q.     And at some point, Blimpie of
13 California received this back from the postal
14 service?
15      A.     Correct.
16      Q.     When you received it back, did you
17 verify her address, Spencer's address?
18      A.     Did I personally?  No, I personally
19 did not.
20      Q.     Did anyone?
21      A.     Yes.
22      Q.     Who?
23      A.     Dora Ricci.
24      Q.     What steps, if any, did Ms. Ricci take
25 at that point to notify Ms. Gillette of the

## Page 116

1  shareholders meeting?
2       A.     You can ask her, but I think she
3  resent it, I believe.
4       Q.     Are there any documents in BOC's
5  possession that would show that?
6       A.     I don't know offhand.
7       Q.     Besides from potentially what
8  Ms. Ricci did, did you take any steps to notify
9  Spencer?
10      A.     I don't recall whether I spoke to you
11 or not at that time.
12      Q.     You're referring to me?
13      A.     Yeah, you.  At some point, I know I
14 had spoken to you, but I don't recall.  I don't
15 remember the date.  I don't remember if it was in
16 relation to this or something else.  I don't
17 recall.
18      Q.     Looking at what appears to be the
19 third to the page -- before we get to that.
20 You're not sure if you have any documentation
21 showing the type of notice that Ms. Gillette
22 would have received, you just think that
23 Ms. Ricci notified her in some manner?
24      A.     Yeah, I don't know what occurred.
25      Q.     Looking at the letter dated June 17,

Pages 113 to 116

## Page 117

1  2005 to you from Spencer, do you recognize this
2  document?
3      A.   I've seen it before.
4      Q.   In the document, Ms. Gillette asks for
5  copies of certain corporate records?
6      A.   Yes.
7      Q.   At the time she requested it, she was
8  a shareholder, correct?
9      A.   Yes.
10     Q.   Would you agree that as a shareholder,
11 she has the right to inspect the books and
12 records of the corporation?
13     A.   Yes.
14          MR. SLEDZIK:  Objection to the form.
15     A.   Yes.
16 BY MR. FRITZ:
17     Q.   Did you ever respond to this letter?
18     A.   I don't remember.  I just don't
19 remember.
20     Q.   Why don't we look at two pages before
21 that.  This was a document produced by your
22 counsel.  Do you recognize this document?
23     A.   Not really.
24     Q.   Does it appear to be a memo from you
25 to Ms. Gillette?

## Page 118

1      A.   It does.
2      Q.   And the date is June 23, 2005?
3      A.   Correct.
4      Q.   Is that the date that this memo was
5  sent?  Do you recall?
6      A.   I don't recall.
7      Q.   Would you have sent it with a date --
8  would you have sent it before this date?
9      A.   Probably not.
10     Q.   Do you recall the date of the
11 shareholder meeting?  You can look at the notice.
12 It's the second to the last page.
13          MR. SLEDZIK:  (Indicating).
14     A.   Yes, I see.  It's June 24, 2005.
15     Q.   So, the day before the meeting, is it
16 fair to say then you informed Spencer that you
17 are processing the information and will forward
18 it to her?
19     A.   Well, her letter is dated June 17th. I
20 don't know how she sent it, so obviously I didn't
21 get it until sometime June 20th or later.  So we
22 responded on June 23rd.
23     Q.   Do you know if she emailed the
24 document?
25     A.   I really don't.

## Page 119

1      Q.   You said you were in the process of
2  gathering that information and would forward it
3  to her as soon as possible.  Did you ever do
4  that?
5      A.   I don't recall.
6      Q.   Who at Blimpie California would know
7  that information?
8      A.   I don't recall.
9      Q.   Who else handles requests for
10 information from shareholders besides you?
11     A.   I would have put it together.  There
12 are no shareholder agreements.  That's easy.  The
13 statements, I would be happy -- these things are
14 so minor that we just would have put it together
15 and sent it.  I just don't remember.
16     Q.   Do you have a record of sending it to
17 her?
18     A.   I don't know.  I have not seen one,
19 no.
20     Q.   Is it fair to say it does not exist?
21     A.   No, it's not.
22     Q.   You can check the records and
23 determine if you actually sent her --
24     A.   I can try, yes.
25     Q.   Turning two pages a head of that, it

## Page 120

1  appears to be an e-mail from Ms. Ricci to
2  Ms. Gillette --
3      A.   Yes.
4      Q.   -- which essentially includes the same
5  language as your memo, correct?
6      A.   Correct.
7      Q.   Did you instruct her to write this
8  e-mail?
9      A.   I would assume so, only by looking at
10 it.  I don't have any independent recollection.
11          MR. SLEDZIK:  It's an e-mail to
12     Mr. Endervelt.
13          MR. FRITZ:  And it addresses
14     Ms. Gillette.
15          MR. SLEDZIK:  The address of the
16     e-mail itself is to Mr. Endervelt.
17 BY MR. FRITZ:
18     Q.   Do you see the e-mail is addressed to
19 Miss Gillette, and it says, "We are in receipt of
20 your request"?
21     A.   Yes.
22     Q.   So either Ms. Ricci inadvertently sent
23 it to you or Ms. Gillette was CC'd in some
24 fashion; is that fair?
25     A.   No.

## Page 121

1    MR. SLEDZIK:  Object --
2    Q.    Why not?
3    A.    It could have been as simple as I had
4    dictated something to Dora, I was in a hurry and
5    shut it down, and I said I was in a hurry, just
6    send it over to me and I'll get it out.  I don't
7    know.
8    Q.    Did Ms. Gillette ever come to the
9    office to inspect the records pursuant to her
10   request in 2005?
11   A.    No.
12   Q.    Did you ever advise her that she could
13   do that?
14   A.    I never spoke to her.
15   Q.    Your answer is no?
16   A.    No.
17   Q.    Am I correct that your answer is no?
18   A.    My answer is no.
19   Q.    Why did you not offer her the
20   opportunity to come to the office to review the
21   book and records?
22   A.    To my understanding, she lived in
23   Henderson, Nevada.  If anything, I would send it
24   her because it wouldn't make sense to say Come
25   all the way to New York to look at it.

## Page 122

1    Q.    Did she tell you that she wouldn't fly
2    to New York --
3    A.    No, she didn't.  It was just a
4    courtesy.
5    Q.    To her?
6    A.    Yeah.
7    Q.    If she had told you that she will come
8    to New Rochelle to inspect the records, would you
9    have permitted her to?
10   A.    Absolutely --
11   MR. SLEDZIK:  Objection.
12   Q.    Other than these shareholders meetings
13   that we've discussed, what other shareholder
14   meetings have been held since 1999?
15   A.    Ninety-nine?
16   Q.    Yes.
17   A.    I don't recall off hand.
18   Q.    Have other meetings been held?
19   A.    I don't know.
20   Q.    How many?
21   A.    I don't know.
22   Q.    Do you have minutes from those
23   meetings?
24   A.    I don't know if I have them in this
25   office or not.

## Page 123

1    Q.    Has there ever been a situation where
2    the shareholder meeting was held, but the minutes
3    weren't recorded?
4    A.    Yes.
5    Q.    When did that occur?
6    A.    This last meeting, because I haven't
7    gotten it back from the stenographer yet.
8    Q.    I have a copy.
9    MR. SLEDZIK:  This counsel has a copy
10   of it.
11   BY MR. FRITZ:
12   Q.    I'm sorry.  So aside from the
13   October 2007 meeting, are there any other
14   shareholder meetings that were held at which
15   minutes were not recorded?
16   A.    No.
17   Q.    So somewhere in BOC's records should
18   be minutes of every shareholder meeting that has
19   been held?
20   A.    I would hope so, yes.
21   Q.    Do you know if Spencer received
22   notices of all of those meetings?
23   A.    Formally or informally?
24   MR. SLEDZIK:  Of all those meetings?
25   Do it by time frame in terms of the

## Page 124

1    question.
2    BY MR. FRITZ:
3    Q.    Besides from the October 2007 meeting,
4    the January 2006 meeting, which notice for which
5    was returned, and you believed that someone may
6    have advised Spencer of, and this May --
7    June 2005 meeting, did Spencer receive written
8    notice of any other meeting of the shareholders?
9    A.    Not that I recall.
10   Q.    Were other shareholder meetings held?
11   A.    Yes.
12   Q.    Was she informed in a manner other
13   than a written notice?
14   A.    Yes.
15   Q.    How?
16   A.    Verbally.
17   Q.    Did she attend those meetings?
18   A.    To the best of my recollection, yes.
19   Q.    All of them?
20   A.    To the best of my recollection, yes.
21   Q.    Do you recall what business was
22   conducted at such meetings?
23   A.    No.
24   Q.    Do you have the proxy forms that
25   Ms. Endervelt filled out so you could vote on her

Page 125

1    behalf?
2        A.    I have the last one before I had the
3    power of attorney.
4        Q.    Any others?
5        A.    I don't know if I have the records any
6    more.
7        Q.    But you can check?
8        A.    Yes.
9        Q.    Did you ever sign any Blimpie of
10   California documents on Spencer's behalf?
11       A.    No.  Sign her name?
12       Q.    Yes.
13       A.    Never.
14       Q.    That would include financial opinions
15   on the value of Blimpie of California?
16       A.    You'll have to be more clearer than
17   that.
18       Q.    Have you ever signed her name to
19   anything?
20       A.    No.
21       Q.    And that includes --
22             MR. SLEDZIK:  "Anything" would be
23   everything.
24             MR. FRITZ:  Maybe I may refresh his
25   recollection.

Page 126

1        Q.    Are you familiar with an entity called
2    Provident Capital?
3        A.    Yes.
4        Q.    What is that?
5        A.    Provident Capital was the bank that
6    loaned us money for the transaction to buy
7    Blimpie International.
8        Q.    What type of documents did they
9    demand, if any, from Blimpie of California in
10   exchange for that loan?  What documents did they
11   demand in connection with that loan?
12       A.    There's two different questions.
13             MR. SLEDZIK:  It's a different
14   question.
15   BY MR. FRITZ:
16       Q.    Let's start with the first one.
17             (Record read.)
18       A.    The only one that I remember, sitting
19   here right now, was the resignations.
20       Q.    Did they require any financial
21   documents from Blimpie of California?
22       A.    I don't recall.
23       Q.    Would you have records showing that?
24       A.    I don't know.
25             (Whereupon, Plaintiff's Exhibit 4,

Page 127

1        minutes of meeting, was marked for
2        identification as of today's date.)
3    BY MR. FRITZ:
4        Q.    If you can turn to the second page,
5    the board of directors meeting minutes of
6    February 13, 2007.  Do you recognize that
7    document?
8        A.    I do.
9             MR. SLEDZIK:  Can we have this
10        described in some way.  It seems to be
11        minutes of -- I note the witness stepped out
12        for a moment.
13             This is the minutes of the meetings of
14        the stockholders and directors from
15        June 2005 to February 3, 2007.  It's --
16        there is one, minutes of the stockholder
17        meeting dated December 13, 2007; one,
18        minutes of the board of directors meeting
19        with that same date; minutes of the
20        stockholders meeting dated June 2, 2006;
21        minutes of the board of directors meeting
22        dated June 2, 2006; minutes of the board of
23        directors meeting dated June 24, 2005 and
24        minutes of a shareholders meeting dated that
25        same day -- stockholders meeting.  I

Page 128

1        misspoke.
2        Q.    At this board meeting held on February
3    13, 2007, did the board approve Blimpie's payment
4    of $12,000 per month to X2Y1?
5        A.    Yes.
6        Q.    And you are the majority shareholder
7    of that entity, X2Y1?
8        A.    Yes.
9        Q.    How does Blimpie of California benefit
10   from paying X2Y1 $12,000 --
11       A.    Because it gets the use of all of the
12   people on this list, and gets the use of an
13   office, gets the use of all of -- of a whole
14   operation, and it's contributing just a portion
15   of that money.  It sharing.  We're just sharing
16   expenses.  It shares this.  This is the minority
17   portion of expenses obviously.
18       Q.    Has X2Y1 ever paid you income?
19             MR. SLEDZIK:  Object to the form.
20       A.    I don't believe X2Y1 has ever paid me?
21       Q.    Would you have records showing if it
22   did?
23       A.    Yeah.  They had loans from me.
24       Q.    X2Y1 loaned you money?
25       A.    No, I loaned it.

Endervelt, Jeffrey                                    11/8/2007

## Page 129

1    Q.    How much did you loan them?

2    A.    I don't remember.

3    Q.    So the benefit to Blimpie of

4  California is that in exchange for paying X2Y1

5  $12,000, it gets to share the resources, whether

6  human or otherwise of X2Y1?

7    A.    Correct.

8    Q.    Why is that necessary?

9    A.    Why?

10         MR. SLEDZIK:  Object to the form.

11   A.    Well, as an example, I consider Alonzo

12  Botta, the vice president of franchise

13  development, one of the most competent franchise

14  sales guys in America.  Blimpie of California no

15  way could afford him by itself.  I consider Mark

16  Gelish (phonetic) one of the best menu and

17  operations and training guys.  Blimpie of

18  California could not afford him.

19         There are secretarial and work to be

20  done administerial.  Blimpie of California would

21  have to hire its own people.  It can't afford to

22  do that.  It's a small company.  So it gets to

23  share with everybody else and it benefits

24  immensely from this.

25   Q.    Was Blimpie of California able to

## Page 130

1  conduct its operation before this arrangement

2  with X2Y1 took place?

3    A.    It did.

4    Q.    But not to your satisfaction?

5    A.    Well, it had an office.  It paid

6  rent.  It had a secretary.  It paid the

7  secretary.  It had -- those are the things -- it

8  had office expenses.  So now it's paying less of

9  the shares.

10   Q.    But the expenses of Blimpie of

11  California are more now than they were before

12  this arrangement?

13   A.    I'd have to go back and check, but

14  I -- hopefully, we're a little bit up because

15  we're trying to put things together to grow the

16  brand.

17   Q.    What else are you doing to try to grow

18  the brand besides this arrangement with X2Y1?

19   A.    We're selling more franchises.  We got

20  five restaurants opening in the next 90 days.  We

21  got another deal that is closing next week.  So

22  that's Mr. Botto.  He's more than paid for his

23  way.  We put new products in.

24         Smoothie Island, which is a subsidiary

25  of X2Y1, we're allowing that to be used by

## Page 131

1  Blimpie franchisees without charging them a

2  license fee.  So there are many benefits that

3  Blimpie is getting to help it grow and become a

4  sustainable company.

5    Q.    In the minutes, it refers to "a

6  detailed copy of the expenses being shared be

7  attached to these minutes."  Do you have a copy

8  of those detailed expenses?

9    A.    Sure.

10   Q.    Those are readily available in your

11  office?

12   A.    They are.

13   Q.    Turning to the next page, it appears

14  that the board voted to provide you with a

15  $50,000 bonus?

16   A.    Yes, sir.

17   Q.    Who participated in that vote?

18   A.    Dora Ricci.

19   Q.    Is it fair to say that her employment

20  is contingent on your approval?

21   A.    No.

22   Q.    Who else --

23   A.    It's highly twisting things.

24   Q.    Who else is involved in the decision

25  to employ Ms. Ricci?

## Page 132

1    A.    I am.

2    Q.    Anyone else?

3    A.    No.

4    Q.    So essentially, she votes to approve

5  you a bonus and you pay her salary and make her a

6  director and officer; is that fair?

7    A.    No, that's not fair.  Come on.  You're

8  playing games.

9    Q.    I'm asking you a question.

10   A.    No, your innuendos and your twisting

11  of the facts aren't quite the same.

12   Q.    Did you report that $50,000 as income?

13   A.    I did.

14   Q.    What was the benefit to the

15  corporation for that $50,000?

16   A.    All the services that I provide.  I'm

17  tired of working for nothing.

18   Q.    And the reason why you couldn't just

19  take a salary is what?

20   A.    The company didn't have it to give me.

21   Q.    Is that because they're sharing

22  expenses with other entities and they're paying

23  your medical expenses?

24   A.    No, that's not why.

25   Q.    Do you know what the reason is?

Pages 129 to 132

## Page 133

1     A.     Yes.  We need to grow more.  That's
2  why I haven't been taking a salary, to try and
3  use my time to help the company grow.
4     Q.     Was the growth of the company
5  proceeding better, so to speak, when Spencer was
6  there?
7     A.     No.
8     Q.     You're doing better now?
9     A.     Now, we're beginning to.  Now, it's
10  beginning to pay off.  We had to change Blimpie.
11     Q.     Even though you lost franchises?
12     A.     Blimpie International across the
13  country has half the franchises it's had.  The
14  brand had enormous problems.
15     Q.     Was Spencer paid any dividends in
16  2006?
17     A.     No.
18     Q.     So if there was an extra $50,000 paid
19  to you as a bonus, do you in any way think it
20  should have gone to Spencer or your mother as the
21  shareholders?
22     A.     No.
23     Q.     Why not?
24     A.     Because I work.
25     Q.     Didn't Spencer work also?

## Page 134

1     A.     No.
2     Q.     She never worked for Blimpie of
3  California?
4     A.     Not in 2006.
5     Q.     But prior to that she did, right?
6     A.     Yes.
7     Q.     And you also received $10,000 in 2005?
8     A.     Correct.
9     Q.     And the benefit to the corporation is
10  the same according to you as the $50,000 bonus
11  that you got in --
12     A.     Yes.
13            (Whereupon, Plaintiff's Exhibit 5,
14            affidavit of witness, was marked for
15            identification as of today's date.
16  BY MR. FRITZ:
17     Q.     Do you recognize this document?
18     A.     Yes.
19            MR. FRITZ:  For the record, this is
20        the affidavit of Jeffrey Endervelt dated
21        July 31, 2007.
22            MR. SLEDZIK:  Notarized on the
23        following day.
24            MR. FRITZ:  Notarized on the following
25        day.

## Page 135

1  BY MR. FRITZ:
2     Q.     Looking at paragraph six, do you see
3  where you state that "anyone who received these
4  advances is expected and legally obligated to
5  repay these advances?
6     A.     Correct.
7     Q.     Does that include you?
8     A.     Yes, sir.
9     Q.     When do you expect to repay these
10  advances, if ever?
11     A.     Oh, I expect to repay them as the
12  company -- as I need to pay them.  I'll be happy
13  to repay them.  I'll agree that if Ms. Gillette
14  and I both put our money in now, they'll be
15  repaid right now.
16     Q.     At what rate of interest?
17     A.     6 percent, I think it is.
18     Q.     Would you pay that back in cash if and
19  when you ever repaid it?
20     A.     As opposed to -- I don't understand
21  your question.
22     Q.     In your affidavit, you refer to
23  "deferring compensation," so --
24     A.     Depends on the circumstances at the
25  time.

## Page 136

1     Q.     So, if and when you pay it back, you
2  wouldn't necessarily pay it back in cash?
3     A.     That's correct.
4     Q.     Why not?
5     A.     Well, because it would just be paying
6  it back to pay it back.  If I owe the company
7  money, the company owes me money, I'll take it as
8  income, but I may offset.  They may not have the
9  cash to pay me.
10     Q.     So, for instance, in the situation
11  where Blimpie of California approves through the
12  board of directors, meaning you or the
13  shareholders, meaning your mother, approves a
14  bonus to you, let's say a $100,000, instead of
15  paying back the advance in cash, you would just
16  consider that you owe a $100,000 less and pay
17  back that advance?  Is that what you mean by
18  deferring compensation?
19     A.     Yes.
20     Q.     So, what would prevent you from
21  approving loans to yourself for a million
22  dollars, and that you have power of attorney over
23  your mother, what would prevent you from
24  authorizing payment of a bonus of a million
25  dollars to yourself?

## Page 137

1    A.    Only one thing.

2    Q.    What?

3    A.    I would have to put the million

4  dollars in.

5    Q.    Why is that?

6    A.    The company doesn't have it.  And the

7  only person that puts money into the company is

8  me.

9    Q.    So, let's say the maximum that the

10  company can afford, can't you take a loan to

11  yourself for that amount, and then say that you

12  pay it back through deferring compensation in the

13  same amount?

14    A.    I haven't taken any money from this

15  company in years, number one.  Number two, I'm

16  working.  I expect to be paid.  I'm not going to

17  work for free anymore.  I expect to be paid.

18    Q.    My question is whether that was

19  possible.

20    A.    Is it possible?  Anything is possible.

21  Anything is possible.

22        MR. SLEDZIK:  He's answered your

23  question.

24  BY MR. FRITZ:

25    Q.    Would it be possible for you to pay

## Page 138

1  Spencer a million dollars in dividends?

2    A.    Sure, if I put the money in.

3    Q.    So you agree that it's possible for

4  you to set the amount of loans that you take, and

5  then only to pay it back by approving a salary or

6  bonus to you?

7        MR. SLEDZIK:  Object to the form.

8    A.    It's obvious I already paid in cash

9  $22,000 a couple years ago.

10    Q.    But it's possible for you to do it by

11  deferring compensation that you essentially

12  approve for yourself; is that possible?

13    A.    Absolutely possible.

14    Q.    And the funds would still be in your

15  pocket from the loans?

16    A.    No, I would be putting it back because

17  the company would have to give me the money.  If

18  there's is a salary, the company has to pay me.

19  The cash comes back to me.  So if I turn around

20  and hand it back to the company, it's the same

21  thing.  I'm entitled to a salary right,

22  counselor?

23    Q.    I get to ask the questions.

24        You're receiving compensation from

25  KBI, aren't you?

## Page 139

1    A.    Yes, I have.

2    Q.    So, before, where you stated during

3  the shareholder meeting that you don't work for

4  free and that you needed these loans because you

5  don't work for free, you do have another source

6  of income don't you?

7    A.    Today, today.  I didn't have it when I

8  took those loans, by the way.

9    Q.    But now you do?

10    A.    And I don't take anything.

11    Q.    But you haven't repaid the loans.

12    A.    Haven't repaid the loan.  Neither has

13  your client.

14    Q.    But you could repay it since you

15  received $350,000 from KBI?

16    A.    I could.

17    Q.    Why haven't you?

18    A.    Until now, it's never come up.

19        If the company needs the money, I put

20  the money in.  If I have to guaranty the

21  signature for the lines of credit, I sign my name

22  and guaranty the lines of credit so the company

23  has money.

24    Q.    Do you think the company needs the

25  money now?

## Page 140

1    A.    Right now?

2    Q.    Yes.

3    A.    No.  It may need it next year, but

4  I'll have to put it in.

5    Q.    What about to pay Spencer dividends?

6    A.    Oh, please.  You're being silly, you

7  know a little bit about business, I assume.

8  There is no way a company of this size is paying

9  dividends, as much as you try and twist it.

10    Q.    Even though you get $350,000 because a

11  portion of the revenue of Blimpie of California

12  is paid to Kahala and KBI?

13    A.    That is absurd.  That is totally

14  absurd.

15    Q.    I believe you also stated that in your

16  affidavit that you needed these loans because you

17  don't work for free essentially, right?

18        MR. SLEDZIK:  He's stated that here

19    today.

20    A.    Yes.

21  BY MR. FRITZ:

22    Q.    Have you considered resigning?

23    A.    No.

24    Q.    Why?

25    A.    Because I protect my mother's

Endervelt, Jeffrey                                                    11/8/2007

## Page 141

1  interests.
2      Q.    Whenever she is deceased, and I hope
3  that's not anytime soon, what about then?
4      A.    No.  Then I own the company.
5      Q.    And so, when you own the company, you
6  won't be able to approve the loans to yourself
7  any more, correct?  If you're the majority
8  shareholder, you can't approve a loan to yourself
9  as the director: is that accurate?
10     A.    If that's what my counsel advises me,
11 that's what will happen.
12         MR. FRITZ:  Can we take a five-minute
13    break?
14         MR. SLEDZIK:  Sure.
15         (Recess taken).
16 BY MR. FRITZ:
17     Q.    Turn back to the shareholder notices,
18 the meeting notices.  I think it's --
19         MR. SLEDZIK:  Exhibit 2.
20 BY MR. FRITZ:
21     Q.    Exhibit 2.  If you could turn to the
22 last page.  You produced this document, right?
23     A.    No.
24     Q.    Your attorney did?
25     A.    When you say "produce," did you mean

## Page 142

1  create or deliver?
2         MR. SLEDZIK:  He's meaning it in a
3     legal sense.
4  BY MR. FRITZ:
5      Q.    You delivered it to Plaintiff's
6  counsel?
7      A.    Yes.
8      Q.    Purportedly to show that Ms. Gillette
9  received notice of whatever -- she received
10 whatever meeting notice was enclosed, which
11 appears to be the shareholder meeting for
12 June 24, 2005?
13     A.    I assume so.
14     Q.    If you look at the previous page.
15     A.    Looks like it is.
16     Q.    Is this the return receipt that you
17 received from Ms. Gillette or her agent?
18     A.    I don't know.  I mean, I wasn't
19 involved in sending it out, so I really don't
20 know.
21     Q.    Is it fair to say this came from
22 Blimpie of California?
23     A.    Yes.
24     Q.    And this purports to show that a
25 package was signed for by -- do you recognize

## Page 143

1  that signature?
2      A.    I think so.
3      Q.    Whose signature is that?
4      A.    Ava Sumpter (phonetic).
5      Q.    Who is that?
6      A.    Spencer Gillette's sister.
7      Q.    So this document was produced to show
8  that Spencer's sister received a package for her
9  at 50 South Valley Verde Drive?
10     A.    I don't recall, but I don't think that
11 is what this says.
12     Q.    What does it say?
13     A.    I think it says this was sent to
14 Spencer at 10850 Wilshire Boulevard,
15 Los Angeles, California.
16     Q.    Then why would her signature be on the
17 same document as the Henderson, Nevada address?
18     A.    Whose signature?
19     Q.    Ms. Gillette's sister, Ava's?
20         MR. SLEDZIK:  Object to the form.
21     A.    This May 19, 2005 document seems to
22 be addressed to Spencer at 10850 Wilshire
23 Boulevard, Los Angeles, California.
24     Q.    Let's stick to the page following
25 that.

## Page 144

1         MR. SLEDZIK:  What is your question?
2  BY MR. FRITZ:
3      Q.    My question is:  Was this page
4  produced to us to show that Spencer's sister
5  received the package at the Henderson, Nevada
6  address?
7         MR. SLEDZIK:  Object to the form.
8      A.    I really don't know.
9      Q.    Would you agree that is what it
10 purports to show, that Spencer's sister signed
11 for the package in Henderson, Nevada?
12         MR. SLEDZIK:  Object to the form.
13     A.    It was received by Ava, and more than
14 that, I can't -- received by David.  There's two
15 different things here.
16     Q.    I'm referring to the one at the top.
17     A.    But they're the same.  Why would you
18 refer to just one?
19     Q.    That's my question.
20     A.    My guess is that Ava was in the office
21 at 10850 Wilshire Boulevard.
22     Q.    Was she ever in Henderson, Nevada?
23     A.    I don't know.
24     Q.    Would you agree that this document
25 purports to show that's where she received it?

LiveNote World Service        800.548.3668 Ext. 1

## Page 145

1      A.     I honestly don't know because I'd have
2  to see the entire package for me to know.
3      Q.     Do you have the entire package?
4      A.     I don't know that either.
5      Q.     If you did, would have it have been
6  produced to us?
7      A.     I would think so, but I don't know.
8      Q.     Do you know if 50 South Valley Verde
9  Drive is Spencer's correct address?
10     A.     I don't know.  I heard her say
11  something the other day, which I think was a
12  different address.
13     Q.     55 South Valley --
14     A.     I don't know.
15     Q.     Why don't we look at 6.
16            Do you recognize that document?
17            (Whereupon, Plaintiff's Exhibit 6,
18      letter from Mr. Endervelt to Mr. Fritz, was
19      marked for identification as of today's
20      date.)
21  BY MR. FRITZ:
22     Q.     Do you recognize what's been marked as
23  Exhibit 6?
24     A.     Yes.
25     Q.     This is a letter that you sent to me

## Page 146

1  setting forth the stock ownership and the address
2  of the shareholders?
3      A.     Yes.
4      Q.     And what is Spencer's address
5  according to your books and records?
6      A.     55 South Valley Verde --
7      Q.     So not 50 as designated on this --
8      A.     Correct.
9      Q.     Looking again at this return receipt,
10  do you see where it says "service type number 3"?
11     A.     Yes.
12     Q.     Is any service type checked off?
13     A.     No.
14     Q.     And the article number, does that
15  appear in the delivery section, the article
16  number, number 2?
17     A.     There's an article number on here.
18     Q.     Do you know when you send documents
19  via return receipt, do you know whether the
20  article number should appear in the delivery
21  section?
22     A.     I don't.
23     Q.     Who would know that --
24     A.     Dora.
25     Q.     You guys fabricated this document,

## Page 147

1  right?
2      A.     You're full of crap, Counsel.  Come
3  on.  Cut it out.  Why don't you grow up.
4      Q.     Explain to me --
5      MR. SLEDZIK:  Just answer no.
6      A.     The answer is no.
7  BY MR. FRITZ:
8      Q.     Can you explain to me why Spencer's
9  sister's signature is on a document purporting to
10  show that she received something at an address
11  which Spencer did not reside?
12     A.     I cannot tell you.
13     Q.     Who at Blimpie of California would be
14  able to explain that?
15     A.     Probably Ms. Sumpter is the best
16  person to ask.
17     Q.     What about Dora Ricci?
18     A.     I don't know.
19     Q.     Who sent this package?
20     A.     I don't know who actually sent the
21  package.
22     Q.     If it's not you, who could it have
23  been at Blimpie California?
24     A.     There are several young people who
25  work in our office part-time.  Any one of them

## Page 148

1  could have sent it.
2            (Whereupon, Plaintiff's Exhibit 7,
3      transactions by account document, was marked
4      for identification as of today's date.)
5  BY MR. FRITZ:
6      Q.     Do you recognize what's been marked as
7  Exhibit 7?
8      MR. SLEDZIK:  It looks like you've got
9  two sets.  You have 2006 and 2007.  It's
10  obviously intentional.
11     MR. FRITZ:  Yes.  The document is
12  what is labeled transactions by account for
13  the year 2006 and 2007.
14     MR. SLEDZIK:  Is there a reason that
15  there's two sets of these?
16     MR. FRITZ:  This is printed in the way
17  that you produced it.
18     MR. SLEDZIK:  Are you telling me that
19  I gave you two sets stuck together?
20     MR. FRITZ:  That may have been.  If
21  it's a copy error on my part, I apologize.
22     MR. SLEDZIK:  I'm trying to be clear.
23  So the document, as it's marked, is the
24  transaction by account for 2007, and the
25  transaction by account for the year 2006,

Pages 145 to 148

Page 149

1    and then a second copy of the same. Okay.
2  BY MR. FRITZ:
3       Q.    We were discussing before that Blimpie
4  of California gives $12,000 to X2Y1 a month,
5  correct?
6       A.    Correct.
7       Q.    Is that paid weekly?
8       A.    I don't know.
9             MR. SLEDZIK:  Objection to the form.
10 BY MR. FRITZ:
11      Q.    Looking at the first entry here,
12 number 4484, X2Y1 management fee $3,000?
13      A.    Yes.
14      Q.    Would you agree that shows a payment
15 from Blimpie of California to X2Y1?
16      A.    Yes.
17      Q.    And the transaction 4493, X2Y1
18 management fee, week of 1/8/07, $3,000?
19      A.    Correct.
20      Q.    And then there's another one, entry
21 4500, management fee for $3,000?
22      A.    Yes.
23      Q.    So it's fair to say they're paid
24 12,000, $3,000 a week?
25      A.    Seems to be.

Page 150

1       Q.    Who owns Maui Tacos?
2       A.    X2Y1.
3       Q.    Can you explain why at entry 4511 Maui
4  Tacos is given a management fee of $10,000?
5             MR. SLEDZIK:  Where are you?
6             MR. FRITZ:  Entry 4511.
7             MR. SLEDZIK:  The date?
8             MR. FRITZ:  1/26/07.
9       A.    I have a problem with this.  This
10 says transaction by account as of December 31,
11 2007.
12 BY MR. FRITZ:
13      Q.    That date has not arrived.
14            MR. SLEDZIK:  I think we can all
15      agree.  The document -- I'm not sure what
16      your reason for raising it.
17            THE WITNESS:  I'm trying to figure it
18      out.
19            MR. SLEDZIK:  The portion of the
20      document, according to the top left --
21            THE WITNESS:  Was printed out October
22      4.
23            MR. SLEDZIK:  According to the
24      document, it was printed October 4.  The
25      documents speaks for itself.  So he's asking

Page 151

1  you a question about the transaction 4511 on
2  the 26th of January 2007.
3       A.    No, I don't know.
4  BY MR. FRITZ:
5       Q.    You don't know why Maui Tacos was
6  paid a $10,000 management fee?
7       A.    No.
8       Q.    Who at Blimpie of California would
9  know that information, if anyone?
10      A.    The person who did this is no longer
11 with us.
12      Q.    Who is that?
13      A.    It was a lady by the name of Fran.  I
14 forgot her last name.
15      Q.    Do you know where she resides?
16      A.    In New York.
17      Q.    Would BOC's books and records show her
18 last known address?
19      A.    I would assume so.
20      Q.    Such as payroll information?
21      A.    Yes.
22      Q.    You're the president and chairman of
23 the board, and you don't know why Blimpie of
24 California paid Maui Tacos $10,000?
25      A.    As the president and chairman and

Page 152

1  sitting here today, no, I do not know why they
2  paid them $10,000.
3       Q.    Would there be any books and records
4  at the corporation that would explain this?
5       A.    Yes.
6       Q.    And you'll look for them?
7       A.    Absolutely.
8       Q.    Moving down to the -- it doesn't have
9  a number, but just below the entry 4539, it
10 says --
11      A.    Where?
12      Q.    March 2, 2007?
13      A.    Yes.
14      Q.    I'm not sure what is meant by "split,"
15 but doesn't it show an amount going from Blimpie
16 of California to X2Y1 in the amount of $16,000?
17      A.    No.
18      Q.    Can you explain what that is?
19      A.    I assume it's one of two things.
20 That's probably the advertising split.  We get --
21 we collect 10 percent.
22      Q.    From?
23      A.    From the franchisee.  And 4 percent
24 goes to advertising.  So that could be the
25 advertising split.  It could have something to do

## Page 153

1  with Kahala.  It has nothing to do with X2Y1 --
2  I'm looking at the wrong one.  You're looking at
3  where it says 16,000 on the split?
4       Q.   Yes.
5       A.   I have no idea what that is.
6       Q.   Who would know the purpose for that
7  transaction?
8       A.   It's in the books and records.  We can
9  get an answer.
10       Q.   Moving down to 4542, entry 4542, X2Y1
11  loaned $10,000.  Is it fair to say that shows
12  that Blimpie of California loaned X2Y1 10,000 on
13  or about --
14       A.   Looks like it.
15       Q.   Do you know why?
16       A.   I don't recall at this point.
17       Q.   You don't know the corporate purpose
18  for that?
19       A.   I don't know what the loan is for.  So
20  before I could tell you what the corporate
21  purpose was, I'd have to know what the loan was
22  for.
23       Q.   Anyone other than you, would they know
24  the purpose of that?
25       A.   I would have to check the books and

## Page 154

1  records and see what is written.  I'm sure
2  there's an account and it's written on the
3  account what it was for.
4       Q.   Would any other employees of the
5  corporation of Blimpie of California know the
6  purpose for loaning $10,000 --
7       A.   I don't know.
8            MR. SLEDZIK:  Object to the form.
9  BY MR. FRITZ:
10       Q.   Obviously, I can go through all of
11  these on this document, but is it fair to say
12  wherever money was loaned from BOC to X2Y1 or
13  where a management fee was paid to Maui Tacos,
14  sitting here today, you don't know why the
15  corporation did that?
16       A.   That specifically?  Right.  I can find
17  out, but.
18       Q.   Rather than waste everyone's time and
19  go through each entry, you'll investigate why
20  these amounts, meaning management fees to Maui
21  Tacos or loans to X2Y1 or management fees to
22  X2Y1, why those were paid?
23       A.   Yes.
24            MR. FRITZ:  I think this is a good
25       point to break, since he has no knowledge

## Page 155

1  of --
2            MR. SLEDZIK:  When we come back, the
3  universe of the deposition is the questions
4  with respect to this and whatever we produce
5  as documents.
6            MR. FRITZ:  Or whatever else he said
7  he doesn't have knowledge of because he
8  needs to review documents.  He did that
9  several times, so.  He said he would have
10  known if he was deposed tomorrow, because he
11  was going to review documents.
12            MR. SLEDZIK:  Well, no.  He said that
13  a couple of times, but, I mean to the extent
14  that he said he didn't know because he
15  hadn't reviewed the document, it doesn't
16  necessarily mean he would have reviewed
17  those documents before he came.  Like, you
18  asked about Spencer's salary.  I don't know
19  as I sit here today that Jeff would have
20  done that tonight.  You can put a request
21  for production of documents if you think
22  that anything came up.  Put it in writing.
23  I'll try to get it to you within the rules.
24  I'll get you the other stuff in accordance
25  with the rules, and any obligations and

## Page 156

1  promises I've made to you.  When we come
2  back, again, I think that the deposition
3  should be limited to what we give you and
4  where we are with respect to this issue on
5  Exhibit 7.
6            MR. FRITZ:  I think it's fair that we
7  won't want to continue the deposition until
8  we have the documentation.  Whether that has
9  to be before or after the mediation, I think
10  that is in everyone's interest not to come
11  here until the disclosure.
12
13
14
15
16
17
18            (Continued on next page to include
19  jurat.)
20
21
22
23
24
25            MR. SLEDZIK:  Want to do this off the

## Page 157

1    record?
2              MR. FRITZ:  Sure.
3              (Off the record discussion.)
4              (Whereupon, the deposition was
5    adjourned.)
6              (Time noted: 2:59 p.m.)
7
8
9              _____
10                      JEFFREY ENDERVELT, ESQ.
11
12
13   Subscribed and sworn to
14   Before me this ___ day Of_____ 2007
15
16   _____
17
18
19
20
21
22
23
24
25

## Page 158

1                    I N D E X
2              INFORMATION REQUESTS
3              REQUESTS: 21, 73, 155
4
5
6                  E X H I B I T S
7    PLAINTIFF'S                            FOR ID.
8    Exhibit 1 Financial statements           68
9    Exhibit 2 Shareholders' meeting notice   100
10   Exhibit 3 Bylaws                         104
11   Exhibit 4 Minutes of meeting             126
12   Exhibit 5 Affidavit of witness           134
13   Exhibit 6 Letter from Mr. Endervelt to
14            Mr. Fritz                       145
15   Exhibit 7 Transactions by account document  148
16
17
18
19
20
21
22
23
24
25

## Page 159

1              C E R T I F I C A T E
2
3    STATE OF NEW YORK    )
4                        :  Ss
5    COUNTY OF DUTCHESS   )
6
7         I, Jane Watson, a Reporter and Notary
8    Public within and for the State of New York
9    do hereby certify:
10        That JEFFREY ENDERVELT, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by the witness.
14        I further certify that I am not related to
15   any of the parties to this action by blood or
16   marriage, and that I am in no way interested.
17   in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand this 11th day of November, 2007.
20
21        _____
21                      JANE D. WATSON
22
23
24
25

## Page 160

1                  E R R A T A
2         I wish to make the following changes, for
3    the following reasons:
4
5    PAGE   LINE
6    ____  ____   CHANGES: _____
7                 REASON: _____
8    ____  ____   CHANGES: _____
9                 REASON: _____
10   ____  ____   CHANGES: _____
11                REASON: _____
12   ____  ____   CHANGES: _____
13                REASON: _____
14   ____  ____   CHANGES: _____
15                REASON: _____
16   ____  ____   CHANGES: _____
17                REASON: _____
18   ____  ____   CHANGES: _____
19                REASON: _____
20
21   _____     _____
22   WITNESS' SIGNATURE               DATE
23
24
25

## A

**abilities** 85:3
**ability** 72:14,20 90:9
**able** 93:6 129:25 141:6 147:14
**Absolutely** 42:6 55:25 66:8 73:3
    109:16 110:16 111:22 122:10
    138:13 152:7
**absurd** 140:13,14
**accept** 114:9
**account** 148:3,12,24,25 150:10
    154:2,3 158:15
**accounts** 93:16 99:6
**accrued** 93:16 99:7
**accurate** 98:9,17 141:9
**achieve** 93:9
**acquired** 53:25
**act** 104:7,9 111:16
**action** 9:25 37:6 101:20 159:15
**actions** 5:22 15:16
**active** 16:24 17:9 92:17
**Activities** 97:10
**acts** 102:2 103:6,15,23 104:6
    105:4,10,12 107:14
**actual** 42:21 51:14
**actuality** 67:3
**addendums** 53:19 54:22 55:1
**addition** 107:21
**additional** 63:8 70:9 100:9
**address** 115:17,17 120:15
    143:17 144:6 145:9,12 146:1,4
    147:10 151:18
**addressed** 120:18 143:22
**addresses** 120:13
**adequately** 39:2
**adjourned** 157:5
**adjustment** 70:6
**administer** 4:8
**administerial** 129:20
**admitted** 11:25
**admitting** 26:6
**advance** 61:4 64:14 69:19,22,24
    70:21 75:23 79:8 82:13,18
    83:8 85:13 89:9 91:21 112:17
    136:15,17
**advanced** 75:5 87:13 88:8,12
    91:3
**advances** 60:24 67:22,23,24
    69:8,10,11 71:4 75:8 76:14,17
    76:19 78:21 79:18 83:17 90:13
    90:19 91:17 97:11,20,23,25
    109:12 113:7 135:4,5,10
**advancing** 92:22
**advantages** 93:8
**advertising** 100:6 152:20,24,25
**advice** 38:23 90:4,7 103:3
    104:13,17
**advise** 121:12

**advised** 105:8,9 106:2,4 124:6
**advises** 141:10
**affidavit** 8:9 134:14,20 135:22
    140:16 158:12
**affidavits** 8:5
**affiliate** 90:13,22 91:4,22
**Affiliated** 13:17
**affiliates** 88:9,16 89:23 90:19
    91:18 97:11,20,25 101:21
    107:10
**affirmatively** 83:15
**afford** 64:11,17 67:21 93:6
    129:15,18,21 137:10
**afternoon** 76:13
**after-tax** 68:7 86:7
**age** 28:15
**agent** 142:17
**ago** 63:23 73:20 138:9
**agree** 42:13 87:11 102:16
    106:25 107:2 117:10 135:13
    138:3 144:9,24 149:14 150:15
**agreed** 4:2,6 48:15
**agreement** 46:12,14,15,16,22
    48:5 49:15 50:2,8 51:6 55:20
    57:9,16,18,20 75:7 79:15 80:6
**agreements** 53:16 119:12
**ahead** 103:1
**aid** 110:22
**aide** 12:23 110:23
**Alan** 34:11,15
**Alex** 12:18 75:2
**allegations** 15:17
**allowing** 130:25
**Alonzo** 51:12 129:11
**amend** 63:9
**America** 129:14
**AMINI** 3:5
**amount** 24:25 36:8 48:7 54:23
    55:2 57:6,25 62:7,12,17 63:21
    65:3 66:9,21 69:9,24 71:4 72:3
    99:16 137:11,13 138:4 152:15
    152:16
**amounts** 63:16,17 77:2 154:20
**Angeles** 38:8 143:15,23
**annual** 107:4 114:17
**annually** 21:18,19
**answer** 47:19 77:5 91:13,14
    105:7,24 121:15,17,18 147:5,6
    153:9
**answered** 57:13 137:22
**answering** 57:15 90:2
**Anthony** 50:14,17,23
**Anto** 9:24 37:2,11 40:13,15 41:5
    89:11,13
**anybody** 72:22
**anymore** 137:17
**anytime** 141:3

**anyway** 64:25
**apart** 54:20
**apologize** 76:15 148:21
**apparently** 37:11
**appear** 117:24 146:15,20
**appears** 69:24 87:12 97:13
    116:18 120:1 131:13 142:11
**apples** 49:12
**applicable** 107:22
**applies** 75:12
**appoint** 27:14
**appointed** 29:9 35:18
**appreciate** 32:18
**appreciated** 105:18
**apprised** 43:8
**approval** 71:18,22,24 76:16
    103:23 131:20
**approve** 60:5 71:7,12 79:17
    83:1,6,16 84:4 102:1 104:8
    105:10 107:14 109:5 112:4,15
    113:7 128:3 132:4 138:12
    141:6,8
**approved** 59:25 60:14 61:4,12
    103:6 108:10 111:10
**approves** 136:11,13
**approving** 109:12,19 136:21
    138:5
**approximate** 48:10 63:21
**approximately** 63:11 78:11,22
    82:14,17 85:5,8 87:12,25
    93:17 97:14 99:7
**arbitration** 10:2 37:5,22 38:21
**areas** 38:25 40:23 54:7
**argument's** 110:12
**arrangement** 130:1,12,18
**arrived** 150:13
**Arthur** 12:24
**article** 146:14,15,17,20
**aside** 49:5 123:12
**asked** 35:25 45:8,19,20 57:12
    64:6,14 67:22 76:16 102:23
    106:6 155:18
**asking** 60:4 96:12 104:16
    105:13 132:9 150:25
**asks** 117:4
**assemblyman** 15:1
**asset** 64:21
**assets** 44:7 50:1 77:14 78:19
    82:12
**assigned** 46:16
**assist** 23:21,25
**assistance** 109:22,25 110:2,9
**associated** 24:5
**assume** 27:16 59:14,18 74:3
    105:17 120:9 140:7 142:13
    151:19 152:19
**Atlanta** 93:14

**attached** 112:25 131:7
**attempt** 32:18
**attend** 11:2 124:17
**attended** 33:9
**attorney** 3:2 47:23 87:25 88:2
  90:6 102:20 109:1 111:11,14
  112:3 125:3 136:22 141:24
**attorneys** 3:13 37:25 38:2,5,6,7
  38:22,23 89:21 90:5
**attributed** 55:10,14,23
**August** 88:1
**authority** 42:3,5,10
**authorized** 4:8
**authorizing** 136:24
**Ava** 35:6 143:4 144:13,20
**available** 86:8 114:12 131:10
**Ava's** 143:19
**award** 38:21
**awarded** 66:19
**aware** 60:25
**A-N-T-O** 9:24
**a.m** 1:16

**B**

**B** 158:6
**back** 14:10 21:6 22:1,3 26:24,24
  27:11,16 28:3 33:13 34:11,13
  36:10,19 49:16 57:23 58:5,23
  58:25 59:15 63:13,18,19,25
  64:21,22,25 65:13 66:17 68:4
  68:6 72:15 75:15,20,22 76:22
  86:7,8,25 87:5 88:5 90:16
  92:20 93:15 95:5 97:14,17
  102:5 103:9,18 105:24 106:14
  110:15 115:13,16 123:7
  130:13 135:18 136:1,2,6,6,15
  136:17 137:12 138:5,16,19,20
  141:17 155:2 156:2
**background** 24:7 84:21
**backup** 98:11,12,19
**balance** 47:25 69:2,19 72:12
  77:10 82:11 88:11
**Baltimore** 11:3,3,4,9,12 12:8,11
  12:16
**bank** 126:5
**based** 24:4 26:12 37:5 40:12
  42:14 45:10 51:20 74:1,2,3,3,5
**basically** 14:17 59:1 60:11
**basis** 45:9 107:17,19
**Batto** 51:12,18,24,25
**Batto's** 51:25
**began** 83:13 94:13
**beginning** 16:11 133:9,10
**behalf** 1:3 108:23 111:16 125:1
  125:10
**believe** 7:19 8:17 16:3 18:4
  19:14,21,25 20:3 22:10,23

23:19 24:10,23 25:2,19,20
29:16 30:13,20 32:24 34:12
35:16,25 36:9 37:25 39:1 41:9
50:22,23 56:24 59:21 63:12
70:14 76:13 82:8,20,21,22
95:14 115:6 116:3 128:20
140:15
**believed** 124:5
**Belle** 1:6 19:16,17 20:5,25 30:2
  30:7 31:16,18 33:4,9 91:9,16
  96:18 97:2 108:18 109:19,21
**Belle's** 109:14
**benefit** 92:22,24 128:9 129:3
  132:14 134:9
**benefits** 129:23 131:2
**Bert** 34:12
**best** 8:15 21:5 30:11 31:1,6
  37:14 43:23 88:20 89:10 94:18
  111:20,24 124:18,20 129:16
  147:15
**better** 93:7 133:5,8
**Beverly** 22:13
**bigger** 93:4
**bill** 15:3
**bills** 15:3
**Birthday** 110:4
**bit** 130:14 140:7
**BLC** 88:18,21 89:7,14,18,20,21
  90:13 91:4
**Blimpie** 1:3,9 6:21 8:16,22 9:8,8
  10:5 13:10,12,14,16 16:23
  17:10,13 18:2,13,14,15,17,19
  19:3,5 20:18,22 21:21,24
  23:12 24:16,19 25:6 26:8 27:4
  27:7,21 29:18 30:15,15,21,23
  31:5 35:10 36:15 37:18 39:3,7
  39:9,12,13 40:1 41:2,5,23,24
  42:1,4,24,25 43:1,16 44:1,7
  46:4,9,12,15,18 47:1,6,11,14
  48:7,19 49:7,9,16,20,21,24,24
  50:1,3,4,10 51:10 52:1,21 53:2
  54:12 55:16,18,20,24 56:15
  57:1 58:18 62:4,20 65:7 66:14
  66:16 72:1 73:1,7 74:8,17 77:2
  77:7 80:14 86:16 88:22 89:3
  91:19 92:6,18,22 93:2 94:1,12
  95:10,12 96:10,24 97:4 98:20
  99:20 102:2 103:5,7 111:6
  115:12 119:6 125:9,15 126:7,9
  126:21 128:9 129:3,14,17,20
  129:25 130:10 131:1,3 133:10
  133:12 134:2 136:11 140:11
  142:22 147:13,23 149:3,15
  151:8,23 152:15 153:12 154:5
**Blimpie's** 52:17 111:10 128:3
**blood** 159:15
**board** 13:6 26 27:13,22 29:8,25

35:18,19 39:23,24,25 40:2,7
42:13 58:7,9,10,12,16 59:12
61:21 71:24 75:16 80:23 84:9
101:20 127:5,18,21,22 128:2,3
131:14 136:12 151:23
**BOC** 50:7 77:24 86:13 89:7,15
  89:20 91:3 97:13,17 154:12
**BOC's** 83:17 96:25 116:4
  123:17 151:17
**bonus** 66:19,21 87:22 131:15
  132:5 133:19 134:10 136:14
  136:24 138:6
**book** 35:4 121:21
**books** 64:22,24 87:8 88:14
  117:11 146:5 151:17 152:3
  153:8,25
**Botta** 129:12
**Botto** 130:22
**bottom** 77:19 90:18 101:14
**bought** 6:17 25:1 45:22 49:24
**Boulevard** 22:13 143:14,23
  144:21
**brand** 130:16,18 133:14
**breach** 8:17 15:21
**breached** 9:10,11,13
**breaches** 15:17
**break** 76:14 141:13 154:25
**briefs** 14:20
**Brooklyn** 10:19 11:11
**brought** 8:24 80:9
**build** 65:21 74:22 100:5,7
**bunch** 62:10
**business** 16:6 18:13 23:22 24:9
  55:13,16,18 84:20,22,24 92:14
  102:9 107:24,25 108:6 124:21
  140:7
**business-related** 6:2
**busy** 54:24
**buy** 74:8,17 126:6
**buying** 49:25 75:1
**bylaws** 104:12,21,25 106:19
  107:13 108:5 158:10

**C**

**C** 3:1 90:18 107:22 159:1,1
**California** 1:3,9 9:8 10:2,3,6
  12:4 13:11,14,16 17:14 18:2
  18:14,16,20 19:3,5 20:18,23
  21:21,24 22:14,18 23:12,13,15
  24:16,19 25:6 26:9 27:5,8,21
  29:19 30:15,23 31:5 35:5,5,11
  36:15 38:8 39:3,7 41:5 42:25
  46:4,13,14 47:6,9,14 48:7,20
  49:9 50:4,11 51:10 52:1,20,21
  53:3 54:13 55:24 56:15 57:2
  58:19 62:4,21 65:7 66:14,16
  72:1 73:1,7 74:9,17 77:3,7

Endervelt, Jeffrey                                                          11/8/2007

80:15 86:17 88:23 91:19 92:6
92:18 94:1,13 99:21 103:7
109:10 111:6 115:13 119:6
125:10,15 126:9,21 128:9
129:4,14,18,20,25 130:11
134:3 136:11 140:11 142:22
143:15,23 147:13,23 149:4,15
151:8,24 152:16 153:12 154:5
**California's** 18:13 49:7 103:5
**call** 102:1
**called** 5:9 12:11 13:2 21:7 92:2
126:1
**Cameron** 38:6
**capable** 25:15
**capacity** 24:6 109:13
**capital** 20:10,11 72:11,13,17
81:9 90:20 126:2,5
**career** 15:10
**cars** 8:19
**case** 9:19,21 10:2,3 14:19 15:9
15:20 16:3 38:1,22 48:4 89:16
89:17
**cases** 6:3 9:20 53:10 93:10
**cash** 36:4 63:20 97:9 135:18
136:2,9,15 138:8,19
**casual** 16:8
**categorically** 61:23
**cause** 37:9
**CC'd** 120:23
**center** 54:18,19
**Central** 3:6 16:11
**CEO** 8:25 13:7,11,19 49:23 50:3
95:10
**certain** 28:15 42:2 67:22 101:21
107:9 117:5
**certainly** 63:8
**certificate** 18:7
**certified** 101:3
**certify** 159:9,14
**chain** 16:9,10
**chairman** 13:6 58:10 59:12
151:22,25
**chance** 62:25
**change** 18:18 21:20 25:17,21
26:1 60:20 72:19 87:6,8,9
90:21 93:12 95:7 133:10
**changed** 19:9 25:20 97:24
**changes** 99:2 160:2,6,8,10,12
160:14,16,18
**charging** 131:1
**check** 36:4,10 61:22 63:24
76:23 78:16 87:21 90:17 92:20
119:22 125:7 130:13 153:25
**checked** 146:12
**checking** 51:4
**chose** 114:9,15
**Chris** 40:3,4

**circular** 21:8
**circumstances** 135:24
**Civ** 1:5
**claim** 9:13
**claimed** 9:10,22
**claims** 9:7
**clarify** 32:18 49:13
**class** 15:22,25 75:2
**classes** 11:13 15:15
**classified** 42:11
**classwork** 11:18
**CLB** 1:5
**clean** 51:4
**clear** 30:12 148:22
**clearer** 125:16
**client** 47:19 90:8 139:13
**close** 37:4
**closed** 55:17 84:7
**closing** 130:21
**clout** 81:5
**Coca** 6:21
**Cola** 6:21
**collect** 46:18 47:8,13,14,16 48:1
49:18 152:21
**college** 10:16,18,19,25 11:5,7
11:12
**come** 29:10 46:1 52:19 58:25
96:8 121:8,20,24 122:7 132:7
139:18 147:2 155:2 156:1,10
**comes** 72:23 138:19
**commenced** 7:17,19
**committing** 42:1
**common** 17:13 90:19,22 91:18
92:19
**communications** 90:1
**companies** 13:18,19 22:20
30:16 39:19 44:21 52:3 72:11
**company** 6:17 9:1,10,11,20
13:1,4,8,19,20 16:13,24 17:9
20:3 22:22 25:20 30:13,14,14
32:3,15 35:7 36:22,22,24 37:3
39:25 41:7 45:22 49:21,22
51:19 52:16 53:5,6,7,8 59:2,3
59:5,6 60:10,11,22,23,25
62:11 63:18 64:10,11,12,15,16
64:20,23 65:21 67:20 68:3,5,7
72:7,21 74:4,22 75:18 79:23
81:4,15,16 87:7,9 91:25 92:2,3
92:7,7,8,10 94:24 100:5,8
129:22 131:4 132:20 133:3,4
135:12 136:6,7 137:6,7,10,15
138:17,18,20 139:19,22,24
140:8 141:4,5
**company's** 96:22
**compensation** 17:1 25:21 51:20
135:23 136:18 137:12 138:11
138:24

**competent** 129:13
**complaints** 43:7,18
**compliance** 104:11
**concentration** 10:20
**concept** 93:3
**concern** 40:18 63:4
**concerning** 11:13 103:15,23
104:5
**concerns** 43:11
**concur** 112:24
**conduct** 130:1
**conducted** 124:22
**conflict** 109:3
**congressman** 12:20 14:25
**connected** 39:14
**connection** 17:20 126:11
**consider** 67:1 73:6 74:17,19,25
86:25 129:11,15 136:16
**considered** 48:24 50:6 140:22
**considering** 72:15,23
**consisted** 35:19
**consulting** 45:5,6,18 47:5 48:15
48:16 50:2,8
**consummated** 48:14
**contained** 8:9
**context** 15:25
**contingent** 131:20
**continue** 5:3,4 63:6 156:7
**Continued** 156:18
**contract** 8:16,17,18
**contracts** 53:12
**contractual** 42:2
**contributing** 128:14
**control** 65:3
**controlling** 14:5
**Cont'd** 76:11
**convey** 83:23 90:3
**conveyed** 90:5
**Cools** 92:2
**copies** 21:25 22:2 62:5 117:5
**copy** 37:24 123:8,9 131:6,7
148:21 149:1
**copying** 54:8
**corner** 115:9
**Corp** 44:6,9,11,16 47:7 88:18,22
**corporate** 7:3,4 11:17 15:25
64:8,9 67:7,10,13 71:3 76:20
79:22 85:7,15,19,25 86:11
92:23 94:20 105:10 117:5
153:17,20
**corporation** 11:14 20:9 33:7
51:15 52:11,14 58:4 65:16
67:16,18 69:1 71:19 72:17
73:10,17 75:1 78:7 81:10
84:10,12 86:20,22 104:6,9,12
104:21 105:5 107:14 111:12
111:21 112:3,8 117:12 132:15

Endervelt, Jeffrey                                                                11/8/2007

134:9 152:4 154:5,15
**corporations** 11:13,21 15:7
    16:2 20:8 84:7,18
**correct** 7:18 8:20 10:13 17:22
    18:10 34:1,4 39:4 40:9,11 43:5
    46:3 48:16,17 51:5,10 52:6
    59:23 61:8,10 70:1 78:8,9,12
    82:10 91:10,20 97:5,16 99:17
    99:18 101:2,7 106:15,16
    107:11 109:2 114:21,22
    115:15 117:8 118:3 120:5,6
    121:17 129:7 134:8 135:6
    136:3 141:7 145:9 146:8 149:5
    149:6,19
**correctly** 65:15 89:17
**cost** 36:24 37:3 41:7
**counsel** 12:19,21 13:1 90:1
    103:3 104:14,17 105:8,9,19
    106:2,4,8,9,11 107:18 117:22
    123:9 141:10 142:6 147:2
**counselor** 74:15 138:22
**count** 108:18
**counted** 109:11,14
**country** 133:13
**COUNTY** 159:5
**couple** 33:17 55:8 63:23 65:23
    66:17 104:22 138:9 155:13
**course** 11:6,23 15:24 100:3
    112:14
**court** 1:1 4:10 10:2,3
**courtesy** 122:4
**Courthouse** 2:6
**cover** 112:22
**covers** 53:1
**crap** 147:2
**cream** 92:9
**create** 142:1
**credit** 59:4 139:21,22
**criminal** 14:19
**current** 12:5 15:16
**currently** 13:13 50:11 82:1,3
**custodian** 34:24
**custody** 43:25 44:3
**cut** 61:23 147:3
**CYNTHIA** 1:2 3:23

**D**

**D** 2:9 5:9 76:7 158:1 159:21
**Dan** 40:3
**data** 74:1,2
**date** 57:5 68:10 100:21 105:1
    116:15 118:2,4,7,8,10 127:2
    127:19 134:15 145:20 148:4
    150:7,13 160:22
**dated** 116:25 118:19 127:17,20
    127:22,23,24 134:20
**David** 13:24 40:3 144:14

**day** 26:4 84:19 118:15 127:25
    134:23,25 145:11 157:14
    159:19
**days** 130:20
**day-to-day** 50:25
**deal** 15:6 130:21
**dealt** 15:11,12
**Dean** 40:3
**deceased** 141:2
**December** 68:16,17,17,18,19,19
    73:4 115:10 127:17 150:10
**decided** 40:7 55:15
**decision** 24:2,4 26:8 32:4,6
    36:11,12 39:20,22 41:1 80:22
    81:2 105:6 114:6 131:24
**decline** 55:22
**decrease** 55:6 65:1,2,16
**decreased** 55:8 73:10,11 99:23
**default** 53:10
**Defendant** 1:3,10 10:5
**Defendants** 1:7 3:13 5:6
**deferral** 87:22
**deferring** 135:23 136:18 137:12
    138:11
**define** 41:12
**definitely** 87:4 97:7
**degree** 10:22
**deliver** 142:1
**delivered** 142:5
**delivery** 146:15,20
**demand** 58:3,4,22 59:15 126:9
    126:11
**demanded** 58:25
**denying** 26:5
**departure** 39:6
**Depends** 135:24
**deposed** 5:18 7:20,23,25 25:4
    155:10
**deposition** 1:13 2:5 4:7 5:2 10:9
    26:3 63:7 155:3 156:2,7 157:4
    159:11,12
**Depot** 89:19
**Depots** 37:17
**derivatively** 1:2
**derivatives** 13:4
**derived** 55:19
**derives** 46:14
**describe** 42:18
**described** 127:10
**deserved** 25:13
**designated** 146:7
**despite** 108:5
**detailed** 131:6,8
**deteriorate** 85:3
**determine** 32:19 119:23
**determined** 25:10
**develop** 16:12

**development** 84:22 129:13
**dictated** 121:4
**difference** 64:20 79:2
**different** 14:13 21:15 22:20
    33:22 35:2 63:17 69:11 74:5
    93:5 126:12,13 144:15 145:12
**direction** 53:7
**directly** 19:5,6
**director** 17:4 27:7,10,12,18
    28:22 29:4,13,14,17,18 30:25
    31:5 32:5 34:19 41:25 45:2
    50:17 55:7,9,24 56:20 109:13
    132:6 141:9
**directors** 15:7 28:24 31:24 34:5
    61:21 80:23 84:9 127:5,14,18
    127:21,23 136:12
**disbanded** 38:4
**discarded** 28:8
**discarding** 28:15
**disclosure** 156:11
**discovery** 113:24
**discussed** 52:19 75:19 122:13
**discussing** 75:5 149:3
**discussion** 76:1 101:19 157:3
**Distributors** 53:12
**DISTRICT** 1:1,1
**dividend** 111:5 112:8,8
**dividends** 16:16 72:4,8,14,18
    72:22 77:8 80:18,21 81:3,5,10
    81:13 86:13 87:2 96:4,5
    133:15 138:1 140:5,9
**diving** 54:7
**document** 21:11,22 88:3 101:12
    114:23,25 117:2,4,21,22
    118:24 127:7 134:17 141:22
    143:7,17,21 144:24 145:16
    146:25 147:9 148:3,11,23
    150:15,20,24 154:11 155:15
    158:15
**documentation** 103:14,16,22
    104:5 105:11 112:16 116:20
    156:8
**documents** 5:6 10:12 22:5
    24:14,21,24 25:23 26:21 27:3
    31:7 43:13,16 53:18,21 63:5,8
    68:22 90:12,14 92:19 112:25
    113:16,22 116:4 125:10 126:8
    126:10,21 146:18 150:25
    155:5,8,11,17,21
**doing** 23:23 54:4 94:21 130:17
    133:8
**dollars** 68:7 73:14 81:25 86:7
    136:22,25 137:4 138:1
**Donuts** 55:15
**Dora** 1:6 3:24 29:3 115:23 121:4
    131:18 146:24 147:17
**doubt** 32:16

**downs** 87:16,17
**drafting** 15:3
**draw** 53:18
**Drive** 143:9 145:9
**duly** 5:10 76:8 159:11
**DUTCHESS** 159:5
**duties** 11:14 12:14 14:12 15:6
  23:20,21 25:17,20 50:15,24
  53:3
**duty** 15:18,21

### E

**E** 3:1,1 5:9,9,9,9,9 76:4,4,7,7,7,7
  76:7 158:1,6 159:1,1 160:1
**earlier** 61:11 82:8 85:24 100:15
**earliest** 14:15
**early** 19:14 83:20
**East** 3:7,17
**easy** 119:12
**economic** 81:5
**economics** 10:21
**educational** 10:14
**effect** 4:9
**Effective** 96:22
**efficient** 80:2
**eight** 54:21
**either** 9:8 11:11,16 34:19 36:16
  44:12,17,20 58:22 79:3 82:23
  96:8 107:7 113:23 120:22
  145:4
**elected** 27:17 31:25
**electing** 31:25
**election** 31:24
**emailed** 118:23
**employ** 131:25
**employed** 59:16 73:16
**employee** 41:25 51:15,19 52:7
  52:14,15
**employees** 50:10 51:7 154:4
**employment** 12:9 14:11 131:19
**enclosed** 142:10
**endeavors** 24:1
**Endervelt** 1:6,6,13 2:5 5:3,16
  19:16,17 20:25 31:16,18 32:2
  32:2,10 96:18 108:19,21
  120:12,16 124:25 134:20
  145:18 157:10 158:13 159:10
**Endervelt's** 20:5
**enormous** 66:8 133:14
**entered** 50:2
**entire** 110:9 145:2,3
**entities** 9:6 41:3 42:9 44:13
  52:4 91:6 92:12 132:22
**entitled** 37:16,17 113:5 138:21
**entity** 7:10,13 23:5,11 91:8,22
  92:14,23 96:9,13,14,16 126:1
  128:7

**entity's** 16:6
**entry** 149:11,20 150:3,6 152:9
  153:10 154:19
**envelopes** 101:5
**equity** 77:18 81:24 87:9
**error** 148:21
**ESQ** 3:4,15 157:10
**essentially** 53:24 100:25 120:4
  132:4 138:11 140:17
**estate** 14:23,23,24 84:22 93:3,4
  93:7
**estimate** 6:25 20:13,16 45:17
  73:12
**events** 41:22
**Eventually** 13:11
**everybody** 95:18 129:23
**everyone's** 154:18 156:10
**exact** 97:24
**exactly** 23:10 24:13,22 112:18
**EXAMINATION** 5:13 76:11
**examined** 5:11 76:8
**example** 129:11
**exceeded** 65:6
**exchange** 13:8 74:25 126:10
  129:4
**executive** 22:19 26:4,7,17,18
  30:22 36:17
**exercised** 19:14
**exhibit** 68:8,13 100:19,23
  104:24 106:18 112:23 114:20
  126:25 134:13 141:19,21
  145:17,23 148:2,7 156:5 158:8
  158:9,10,11,12,13,15
**exist** 113:17,20,22 119:20
**existence** 18:9
**expect** 105:5 135:9,11 137:16
  137:17
**expected** 135:4
**expense** 94:2,14,17,19 100:10
**expenses** 93:16,18,20,21 94:7
  94:13 95:2 99:7,19,20,24
  100:10 110:19 128:16,17
  130:8,10 131:6,8 132:22,23
**experience** 84:17
**experts** 73:17
**explain** 14:11 17:16 18:12 19:11
  64:16 72:10 89:12 111:9 147:4
  147:8,14 150:3 152:4,18
**Express** 101:9
**expressed** 63:4
**extending** 101:20
**extent** 26:17 39:12 60:21 63:6
  90:2 155:13
**extra** 133:18
**e-mail** 43:21 101:6 120:1,8,11
  120:16,18

### F

**F** 5:9,9 76:4,7,7 159:1
**fabricated** 146:25
**facility** 22:24
**fact** 13:17 49:5 55:23 61:23 64:9
  78:5 87:5 88:12 108:5
**facts** 132:11
**factually** 105:18
**fair** 54:6 59:14,18 81:7 84:3
  98:7 111:11 112:2 114:5,6
  118:16 119:20 120:24 131:19
  132:6,7 142:21 149:23 153:11
  154:11 156:6
**false** 41:16
**familiar** 21:7 126:1
**family** 20:8 59:4 72:24
**far** 22:1,3 28:3 45:20 90:16
**fashion** 120:24
**fax** 3:10 101:5 112:21
**faxed** 112:19
**faxes** 101:5
**February** 127:6,15 128:2
**Feder** 12:11 14:16
**federal** 21:12 101:8
**FedEx** 115:7
**fee** 47:5 48:15,16 131:2 149:12
  149:18,21 150:4 151:6 154:13
**feel** 63:8
**fees** 52:25,25 154:20,21
**fellow** 34:11
**fiduciary** 15:6,17,21 16:1
**fifth** 69:3 77:12 98:1 114:18
**figure** 150:17
**file** 21:17,19,20 43:24
**filed** 9:25 21:12,21
**filled** 124:25
**final** 103:18
**financial** 68:9,25 74:4 78:17
  98:8 109:22,25 110:2,9 113:21
  125:14 126:20 158:8
**find** 98:11 154:16
**fine** 36:23
**finish** 28:11 31:2 51:17
**finished** 68:14
**firm** 12:10,17,18 38:4
**first** 21:3 22:10 23:7 24:15
  38:16 46:25 55:12 56:17 57:4
  59:22 60:1,3 62:15 71:16
  77:21 88:6 94:12 126:16
  149:11
**five** 5:21 56:4 85:4 130:20
**five-minute** 141:12
**Floor** 3:7
**Flows** 97:9
**fly** 122:1
**focused** 64:1
**follow** 93:13

**following** 134:23,24 143:24
  160:2,3
**follows** 5:11 76:9
**food** 24:9 53:12
**force** 4:9
**forgot** 151:14
**form** 4:3 11:20 15:13,19 16:15
  26:10,19 31:21 32:8 33:18
  34:21 36:5 39:11 40:16 41:14
  41:19,21 42:7 43:10,19 46:23
  56:3 59:17 61:7 71:13,20 72:4
  75:9,24 81:11,20 82:19 83:3
  85:21 86:3 91:11 92:1 94:4,10
  100:12 101:9 103:11,25 109:8
  111:13 113:8 117:14 128:19
  129:10 138:7 143:20 144:7,12
  149:9 154:8
**formal** 43:21,24 60:5 61:1 71:8
  79:19
**formally** 71:11 83:2,5 123:23
**formed** 17:8 18:3 92:3
**former** 12:23
**formerly** 47:11
**forms** 124:24
**forth** 63:5 146:1 159:11
**Forty-seven** 99:5
**forward** 17:11 72:21 118:17
  119:2
**found** 41:4
**founding** 20:7,9
**four** 55:17 56:4 97:11
**frame** 58:3 123:25
**Fran** 151:13
**franchise** 6:3,19 9:7 18:15 21:8
  47:17 51:13,24 52:19 53:15,16
  53:17,20,21 56:11 99:1 129:12
  129:13
**franchisee** 9:9,12 89:6 152:23
**franchisees** 23:23,25 24:1 47:9
  47:14 51:2,3,3 53:18 131:1
**franchises** 21:14,14 52:2,24,25
  55:3 93:2 98:20 99:4,13,23
  130:19 133:11,13
**free** 63:8 137:17 139:4,5 140:17
**Friday** 112:21
**Fried** 34:12
**friends** 12:25
**Fritz** 3:4 5:1,5,14 22:4 28:12
  31:3 38:15 40:17 41:15 42:8
  43:20 44:17,19 46:24 49:2
  51:17 52:12,23 57:19 59:20
  64:5,7 68:11,21 73:23 76:12
  77:15,17 78:20 80:10 81:21
  82:7 83:4 85:22 88:7,24 90:11
  94:11 95:24 96:1,3,15 100:14
  100:24 101:2,7,10,11 102:8
  103:4,13 104:2 105:2,15,21

106:3,11,13 109:17 111:13,19
  112:1 113:1,10 114:21 117:16
  120:13,17 123:11 124:2
  125:24 126:15 127:3 134:16
  134:19,24 135:1 137:24
  140:21 141:12,16,20 142:4
  144:2 145:18,21 147:7 148:5
  148:11,16,20 149:2,10 150:6,8
  150:12 151:4 154:9,24 155:6
  156:6 157:2 158:14
**Frommer** 13:24 40:4
**front** 79:25
**full** 147:2
**fully** 114:6
**Full-time** 50:12
**funds** 67:7,10,14 138:14
**further** 4:6 76:9 159:14

---

## G

**G** 96:21
**games** 132:8
**GARNEAU** 3:16
**Garten** 12:11 14:16
**gather** 15:23
**gathering** 119:2
**Gelish** 129:16
**general** 36:14 107:24
**gentleman's** 22:24
**getting** 14:20 49:10 65:23 131:3
**Gillette** 1:2 3:23 7:25 8:2 9:19
  9:22 13:24 14:7 17:23 19:12
  19:19 20:25 21:4 22:11,16,21
  23:2,4 29:11 30:3,8 31:17,20
  32:1,5,10,14 34:6 35:8 36:16
  37:20 38:12 39:1 40:22 41:2,6
  42:14 43:18 56:19,23 60:24
  69:12,16,21 70:5 74:16 91:9
  91:17,23 93:14 103:15,22
  105:3 110:11 112:9 115:1,25
  116:21 117:4,25 120:2,14,19
  120:23 121:8 135:13 142:8,17
**Gillette's** 95:21 143:6,19
**Gitlan** 22:23
**give** 28:11 36:14 42:5,9 48:1
  64:22 67:25 91:12 110:8
  132:20 138:17 156:3
**given** 19:12 67:15 70:14 73:9
  90:4 109:10,24 110:3 111:17
  113:23 114:1,2 150:4 159:13
**gives** 149:4
**giving** 67:18
**global** 55:20
**go** 10:18 11:7 55:16 56:10 62:19
  74:23 76:22 78:17 80:1,11,11
  82:3,11 87:3,5,11 97:8 98:10
  103:1 104:13 106:14 130:13
  154:10,19

**goals** 93:9
**God** 111:3
**goes** 28:4 47:10 48:2 49:14
  53:19 89:4 92:20 152:24
**going** 8:6 12:13 14:10 26:24,24
  36:10 49:16 51:1 60:12 62:24
  75:19 76:22 83:25 86:6 88:5
  93:15 97:19 102:24 103:16
  137:16 152:15 155:11
**Goldberg** 12:24
**good** 5:16 24:8 76:13 84:19
  154:24
**gotten** 65:24 123:7
**government** 21:12
**Gower** 43:3,18
**Gower's** 43:7
**graduate** 10:25 11:5,6,8
**graduated** 12:7
**Grand** 3:6
**grant** 88:1
**Green** 34:15
**gross** 47:16 62:12
**group** 18:17
**grow** 130:15,17 131:3 133:1,3
  147:3
**growing** 36:23
**grows** 81:15
**growth** 36:21 133:4
**guarantees** 72:24
**guarantor** 59:4
**guaranty** 81:6 139:20,22
**guess** 9:9 35:6 75:2 144:20
**guy** 14:17,20 34:12,15 59:6
  74:23
**guys** 129:14,17 146:25
**G-O-W-E-R** 43:4

---

## H

**H** 158:6
**half** 48:2 49:14,17 81:25 99:16
  133:13
**hand** 122:17 138:20 159:19
**handle** 15:8
**handled** 38:1
**handles** 119:9
**happen** 141:11
**happened** 40:13 61:5
**happy** 119:13 135:12
**hard** 79:24
**head** 40:20 43:2 61:12 119:25
**healthcare** 110:22,23
**heard** 26:3 103:19 145:10
**held** 2:6 27:22 101:17 104:8
  107:8,15 108:13 122:14,18
  123:2,14,19 124:10 128:2
**help** 23:25 53:11 93:1 111:4
  131:3 133:3

**Henderson** 121:23 143:17
144:5,11,22
**hereinbefore** 159:11
**hereunto** 159:18
**high** 10:16
**highly** 131:23
**Hills** 22:14
**hire** 24:2 129:21
**history** 10:15
**hit** 64:23
**hits** 64:24
**Hogeen** 38:3
**hold** 61:1 105:9 106:4
**holder** 18:14 47:10,11 49:19
**Home** 37:17 89:19
**honestly** 36:5 75:18 145:1
**hook** 59:2
**hope** 123:20 141:2
**hopefully** 130:14
**hours** 54:21 56:4
**human** 40:20 43:2 129:6
**hundred** 48:11 73:14
**hurry** 121:4,5
**hypothesize** 98:18

————— I —————

**ice** 92:9
**ID** 158:7
**idea** 98:4 110:10 153:5
**identification** 68:10 100:21
104:25 127:2 134:15 145:19
148:4
**identified** 105:19
**identify** 6:6 70:16
**ill** 83:13
**immensely** 129:24
**impression** 23:1 39:15
**improved** 93:4
**inadvertently** 120:22
**include** 80:25 93:20 100:9
125:14 135:7 156:18
**includes** 10:11 69:15 70:3,4
75:6 80:24 120:4 125:21
**including** 23:22 24:7
**income** 16:19 17:24 44:20 45:4
49:18 52:17 66:7,9,24 67:1,3
67:12 72:1 76:25 77:1,4 80:14
86:16 128:18 132:12 136:8
139:6
**incomes** 93:5
**incorporate** 18:5
**incorporation** 18:7
**incorrect** 78:2 97:6,7 105:19
**increase** 55:6 99:25
**increased** 69:25 73:10 78:22
82:13 99:19
**increasing** 71:4

**independent** 104:17 120:10
**independently** 12:25
**index** 1:5
**indicate** 78:14 90:7
**indicated** 16:9 80:4
**Indicating** 91:1 118:13
**indirectly** 19:7
**individual** 7:2
**individually** 1:2 7:12
**industries** 13:2,3,7,9 74:6
**inflation** 100:2
**informally** 83:6 123:23
**information** 79:25 114:3 118:17
119:2,7,10 151:9,20 158:2
**informed** 105:6 118:16 124:12
**initial** 23:20,21
**initially** 12:10 20:10 23:19 60:16
60:19 93:10
**initiated** 18:9
**innuendos** 132:10
**inserting** 54:8
**inspect** 117:11 121:9 122:8
**inspecting** 51:2
**instance** 136:10
**institutions** 11:19
**instruct** 90:10 120:7
**insurance** 87:16 95:3,16,17,18
95:21
**insured** 95:1
**intentional** 41:11 148:10
**interest** 57:22 69:15,21,22 70:4
75:6,11 79:2,8,10 82:20 85:12
96:10,24 97:4 109:4 111:21,24
135:16 156:10
**interested** 74:20 159:16
**interests** 141:1
**interim** 13:6
**interject** 89:24
**internal** 40:20 42:17 43:17
**International** 6:22 8:16,23 9:9
13:12 16:8,23 17:10 18:18
30:15,21 39:10,13 40:1 41:23
41:24 42:2,4,24 43:1,16 44:1,8
46:15,19 47:12 49:20,21,24,25
50:1,3 95:11,12 96:10,24 97:4
102:2 126:7 133:12
**introduced** 22:25
**invalid** 102:17
**investigate** 154:19
**Investing** 97:10
**involved** 6:4,16 7:1,5,6,9,11
8:21 9:4 15:17 42:3 89:19
131:24 142:19
**involving** 7:7 15:6 39:9
**IRS** 66:9,16
**Island** 12:20 16:9 52:2 130:24
**issue** 80:21 156:4

**issued** 19:20 20:22 77:19,25
**issues** 15:6,11,12 40:21
**items** 107:22

————— J —————

**J** 5:9 76:7
**Jacob** 6:16
**Jane** 2:9 159:7,21
**January** 17:9,11 45:24,25 46:2
47:2 48:6,14 96:22 114:18
124:4 151:2
**Jeff** 155:19
**Jeffrey** 1:6,13 2:5 13:24 134:20
157:10 159:10
**Jerry** 34:17
**John** 12:20
**JONES** 3:16
**July** 134:21
**June** 116:25 118:2,14,19,21,22
124:7 127:15,20,22,23 142:12
**jurat** 156:19
**jurisdiction** 21:15,15
**Justice** 12:24
**J.P** 92:2

————— K —————

**Kahala** 44:6,9,10,16 46:5,25
47:7 48:3 140:12 153:1
**KBI** 44:4,5,9,10,15,24 45:18
46:1,7,9,16,18 47:12 48:4,8,20
49:8,15,22 50:7 138:25 139:15
140:12
**keep** 87:3 112:10
**Ken** 50:14,16,22
**Kern** 50:14,17,23 56:12
**KEVIN** 3:4
**kfritz@samlegal.com** 3:11
**kind** 11:23 24:1 54:2
**knew** 41:16 83:7
**know** 7:22,23 11:4 15:20 16:13
18:2 19:8,22 20:11,16,21 22:1
22:2 24:17 25:25 26:8,23,25
27:1,2,20 28:3,5 30:8 32:11,13
33:2,4,6,8,16 34:23 36:2,3,5
37:12 38:14 39:6 41:20 48:6
48:10 50:21 55:10 59:24 60:9
61:10 63:22 65:10 68:13 69:9
70:2,7 71:3,21,25 72:6 73:13
73:15,25 75:7,11 77:21,23,24
78:25 79:2,7 80:8,20 81:2
82:17 85:8,14,15 87:17,20
88:16 91:2,24 94:7 95:9,20
97:19 98:5 99:19 102:23 104:4
104:11,16,16,19 106:21
111:25 112:18,22 114:25
115:4,5 116:6,13,24 118:20,23
119:6,18 121:7 122:19,21,24

————— FOOTER —————

123:21 125:5 126:24 132:25
140:7 142:18,20 144:8,23
145:1,2,4,7,8,10,14 146:18,19
146:23 147:18,20 149:8 151:3
151:5,9,15,23 152:1 153:6,15
153:17,19,21,23 154:5,7,14
155:14,18
**knowledge** 60:21 84:15 106:7
154:25 155:7
**known** 63:1 151:18 155:10
**kosher** 106:12

---
**L**
---

**L** 5:9 76:7
**labeled** 77:13 148:12
**lady** 23:3 151:13
**landlords** 54:22
**Langfelter** 13:25
**language** 120:5
**late** 13:5
**Lately** 33:19
**law** 10:16,23 11:2,7,15,17,17
12:17 15:25 54:8 109:10
**lawsuit** 6:16,21 8:24 64:2 89:11
89:20
**lawsuits** 6:20 9:12
**lawyer** 14:23 16:3 102:24
105:14
**lay** 74:7
**leader** 12:21
**learn** 43:6
**learned** 38:16
**lease** 52:25 54:19 89:4,18
**leases** 53:17,20 54:18,24,25
89:3
**leasing** 89:2,5
**leave** 47:23
**leaving** 39:12
**led** 40:25
**ledgers** 114:2
**left** 30:13,14 35:5 69:23 150:20
**legal** 14:10 15:1 17:19,20 37:6
53:5,13,22 54:11 142:3
**legally** 18:6 135:4
**legislative** 12:19 15:2
**legislature** 12:22
**Lehigh** 13:7
**letter** 43:22 112:22 116:25
117:17 118:19 145:18,25
158:13
**letters** 53:10
**let's** 14:15 40:24 62:15,19 75:4
87:11 106:14,17 110:12
126:16 136:14 137:9 143:24
**liabilities** 44:7 50:1 82:12
**license** 18:15 47:10 49:19 131:2
**licensee** 46:14

**Licensing** 52:24
**life** 110:10
**limited** 156:3
**LINE** 160:5
**lines** 59:4 97:11 139:21,22
**link** 87:4
**list** 128:12
**litigation** 7:6,16,21,24 8:1,3,14
8:22 9:4 39:9 40:13,15 42:15
53:6 54:5
**litigations** 6:1 9:2
**litigator** 54:4
**little** 35:7 60:22 130:14 140:7
**lived** 121:22
**LLP** 3:16
**loan** 57:6,9,20,23 58:1,3 59:15
59:25 60:1,2,3,6,14 62:8,16
64:3,4,17 65:12,13 67:19
71:16,19 72:16 75:7,12 79:15
82:21 85:8,10,11 126:10,11
129:1 137:10 139:12 141:8
153:19,21
**loaned** 56:14,21 57:1 59:5,22
86:5 110:13 126:6 128:24,25
153:11,12 154:12
**loaning** 154:6
**loans** 62:9,10,12,20 66:24 67:9
67:10,11 75:14 77:1,2,4 79:21
81:6,8 85:20,25 87:1 101:21
107:9 108:10 109:6,12,19
112:4,16 113:7,12,17,20,23
128:23 136:21 138:4,15 139:4
139:8,11 140:16 141:6 154:21
**located** 38:7
**location** 53:17,18
**long** 35:15 74:23
**longer** 92:17 151:10
**look** 68:12 72:12 73:2 78:3
91:13 106:17,20 114:9,15,16
117:20 118:11 121:25 142:14
145:15 152:6
**looked** 98:1
**looking** 77:10,11 96:21 98:14
99:1,22 115:8 116:18,25 120:9
135:2 146:9 149:11 153:2,2
**looks** 69:3 85:12 97:18 115:9
142:15 148:8 153:14
**Los** 38:8 143:15,23
**lost** 28:16 133:11
**lot** 36:22 55:13 61:1 93:7 100:6
**low** 14:17
**Luncheon** 76:2

---
**M**
---

**mail** 101:4 115:6
**mailed** 115:9
**maintain** 21:24 22:2 27:21

90:14
**maintains** 28:1
**major** 10:20
**majority** 32:19 59:10,11 96:10
96:23 97:3 109:4 111:11 112:4
128:6 141:7
**making** 41:16
**management** 11:21 84:23
149:12,18,21 150:4 151:6
154:13,20,21
**managing** 84:17
**manner** 18:11 102:14 116:23
124:12
**March** 152:12
**Mark** 129:15
**marked** 68:9,12 100:20 104:25
106:18 127:1 134:14 145:19
145:22 148:3,6,23
**marketing** 53:6
**marriage** 159:16
**Marriott** 24:8
**master** 46:13 47:10,11 48:2
49:19 51:6 89:4
**material** 21:20 37:10 41:6
**materials** 112:23
**matter** 15:9 36:24 37:1 38:24
40:19,24,25 81:23 159:17
**matters** 14:11 40:20 42:18
107:21
**Maui** 16:7 52:1 150:1,3 151:5,24
154:13,20
**maximum** 137:9
**mean** 17:16 18:9 19:7 27:4 49:5
52:22 54:17 60:22 77:20 79:8
86:21 110:7 136:17 141:25
142:18 155:13,16
**meaning** 27:13 30:14 45:10
48:20 53:23 54:1 59:9 100:10
136:12,13 142:2 154:20
**meant** 42:18 152:14
**mediation** 156:9
**medical** 94:6,14 95:1,17,18,21
100:10 132:23
**meet** 21:3
**meeting** 27:13,17,19,22,24 60:5
61:3,11,14,17,19,20,21 62:1,2
62:5 70:22 71:8 79:18,20
100:16,17,20 101:17,24
103:17,24 106:24 107:1,5,7
108:1,9,11 114:17,18 116:1
118:11,15 123:2,6,13,18 124:3
124:4,7,8 127:1,5,17,18,20,21
127:23,24,25 128:2 139:3
141:18 142:10,11 158:9,11
**meetings** 33:10 61:1 106:21
107:23 122:12,14,18,23
123:14,22,24 124:10,17,22

127:13
**Meininger** 40:3
**member** 58:12,16
**members** 75:16
**memo** 117:24 118:4 120:5
**mental** 85:3
**mentioned** 9:3 16:5 38:19 42:17
    72:25 83:12 91:16 102:13
**menu** 129:16
**met** 22:11,16
**Mexican** 16:8
**Michael** 6:17 13:2,3,9
**middle** 97:9
**Miller** 38:3
**million** 75:3 81:25 136:21,24
    137:3 138:1
**mind** 84:21
**mine** 13:1 24:3 26:11
**minimal** 100:13
**minor** 119:14
**minority** 12:21 128:16
**minutes** 27:19,22 34:22 62:2,5
    122:22 123:2,15,18 127:1,5,11
    127:13,16,18,19,21,22,24
    131:5,7 158:11
**misrepresentation** 9:23 41:7,10
**misrepresentations** 9:18 37:10
**misspoke** 128:1
**Mister** 37:11 51:22,23
**mixing** 49:11
**Mobil** 55:17
**Moll** 34:12
**mom** 60:12 110:21
**moment** 47:18 127:12
**money** 19:19,24 20:1,4 36:25
    41:8 46:5 56:14 57:1 58:18
    59:2,3,6,22 62:20 63:18 64:6
    64:21,22,25 65:17 67:5,15
    68:4,6 72:23 75:22 83:7 86:5,6
    86:8,19 87:6 91:3 92:3,6,23
    97:16 109:24 110:3,4,13 111:7
    111:10 126:6 128:15,24
    135:14 136:7,7 137:7,14 138:2
    138:17 139:19,20,23,25
    154:12
**monies** 47:7 48:7,19 49:7 50:7
    70:10
**month** 54:16 56:1,4,5 128:4
    149:4
**monthly** 56:6
**months** 12:23 54:17
**morning** 5:16,17
**mother** 19:18 32:24 33:20 83:12
    83:15 87:25 91:23 92:11 110:9
    110:13,25 111:3,15,16 133:20
    136:13,23
**mother's** 140:25

**move** 28:16 72:21
**moved** 22:17 23:16 28:4 93:14
**Moving** 69:23 152:8 153:10
**multi-unit** 93:1
**MUNVES** 3:5
**Murphy** 12:20
**M-O-L-L** 34:12

---

## N

**N** 3:1 5:9 76:4,4,4,7 158:1
**name** 9:21 16:9 18:18 22:24
    43:3 89:4 125:11,18 139:21
    151:13,14
**named** 34:11,12,15
**names** 34:14,16 40:5 54:9
**Nascar** 8:20
**national** 55:19
**nationally** 55:19
**nature** 5:25 8:13 9:3 16:6 18:13
    55:13 107:24
**necessarily** 136:2 155:16
**necessary** 5:5 86:9 100:7 129:8
**necessitate** 88:11
**need** 63:6 68:3 71:21 72:11
    111:3 133:1 135:12 140:3
**needed** 63:18 139:4 140:16
**needs** 59:6 64:21 139:19,24
    155:8
**negotiate** 53:11 54:22
**neither** 41:25 139:12
**net** 47:17 64:24 71:25 72:9,20
    72:25 73:1 80:14 81:17 86:16
    87:6,8
**Nevada** 121:23 143:17 144:5,11
    144:22
**never** 8:10 20:17 37:21 59:15
    65:22 75:19,21 97:3 109:24,25
    110:2 121:14 125:13 134:2
    139:18
**new** 1:1,14 2:2,7,10 3:8,8,18,18
    12:4,22 13:8 51:3 53:16,20,23
    54:7,9 90:14 121:25 122:2,8
    130:23 151:16 159:3,8
**nice** 23:3
**nine** 54:21
**Ninety** 88:17
**Ninety-nine** 122:15
**nominal** 1:3,10 67:25
**Nope** 11:1
**Notarized** 134:22,24
**Notary** 2:9 5:10 159:7
**note** 90:18,23 96:21 127:11
**noted** 76:2 157:6
**notice** 61:17 100:20 101:16
    102:10 107:23 114:16 116:21
    118:11 124:4,8,13 142:9,10
    158:9

**noticed** 108:7
**notices** 100:25 123:22 141:17
    141:18
**notified** 116:23
**notify** 115:25 116:8
**November** 1:15 2:1 159:19
**number** 37:16 48:10 69:14 73:9
    74:24 78:2,9 88:21 97:24
    99:13,23 137:15,15 146:10,14
    146:16,16,17,20 149:12 152:9
**numbered** 77:11
**numbers** 55:22

---

## O

**O** 76:4,4,4
**oath** 4:9
**object** 11:20 15:13,19 16:15
    26:10,19 28:11 32:8 33:18
    34:21 39:11 40:16 41:14,19
    42:7 43:10 46:23 56:3 59:17
    61:7 71:13 75:24 82:19 91:11
    92:1 94:4,10 102:22 103:25
    109:8,15 121:1 128:19 129:10
    138:7 143:20 144:7,12 154:8
**Objection** 13:23 17:15,21,25
    19:1 20:19 26:14,22 27:15
    28:18 30:4,10 31:21 38:13
    41:21 43:19 45:13 49:1 52:10
    60:15 71:20 75:9 81:11,19
    83:3 85:21 86:3 100:12 103:11
    111:13 113:8 117:14 122:11
    149:9
**objections** 4:3
**obligated** 135:4
**obligations** 42:2 155:25
**obvious** 138:8
**obviously** 26:24 87:15 118:20
    128:17 148:10 154:10
**occasion** 22:15
**occur** 29:7 41:10 62:1 83:19
    123:5
**occurred** 41:2,22 42:15 61:15
    106:15 116:24
**October** 61:5,9 70:21 100:16
    101:17 103:21 106:25 107:15
    108:9,13 123:13 124:3 150:21
    150:24
**offer** 21:14 74:18 114:11 121:19
**offered** 22:21 74:8,16 114:8,14
**offering** 21:8 93:2
**offhand** 48:9 116:6
**office** 22:18 23:13,17 90:14
    121:9,20 122:25 128:13 130:5
    130:8 131:11 144:20 147:25
**officer** 4:8 17:4 35:10,23 41:25
    44:25 52:9 55:24 70:2 75:6
    84:12 109:13 132:6

Endervelt, Jeffrey                                              11/8/2007

**officers** 11:14 15:7 69:8,10,12
    71:5 76:15 78:22 82:13 83:17
    85:20 87:13 97:24 101:21
    107:10
**offices** 28:2
**offset** 136:8
**Oh** 7:8 67:15 104:22 135:11
    140:6
**Oil** 55:17
**Okay** 106:23 149:1
**once** 21:18
**ones** 6:18
**one-man** 12:18
**Onorato** 34:15
**open** 37:17 58:2
**opening** 22:18 130:20
**operating** 39:18 81:9
**operation** 23:22 93:1 128:14
    130:1
**operational** 51:1 53:8 56:2,9,10
**operationally** 51:5
**operations** 50:17,18 53:4 93:5
    99:14 129:16
**opinion** 81:18 107:13
**opinions** 125:14
**opportunity** 114:8 121:20
**opposed** 135:20
**option** 19:12
**options** 13:25
**oral** 8:18 37:19,21
**orally** 83:16
**oranges** 49:12
**order** 2:8 58:21 71:18 72:16
**organization** 35:9
**original** 18:19
**outcome** 159:17
**outside** 11:18 84:15
**outstanding** 20:22 69:24 77:20
    77:25 78:14 81:6
**oversee** 53:4
**overtime** 63:17
**overview** 36:14
**owe** 58:18 136:6,16
**owed** 5:7
**owes** 136:7
**owned** 16:23 17:18 19:4,15 20:8
    52:5 78:6 89:7 91:9,23 92:4
**owner** 7:14 9:5 16:7 17:4 19:2
    20:17 24:19 37:11 44:12 46:25
**owners** 18:19 21:1
**ownership** 17:13 19:8 24:25
    90:20,22 91:18 92:10,19 99:1
    146:1
**owning** 41:23
**owns** 32:2 46:9 150:1

**P**

**P** 3:1,1
**package** 142:25 143:8 144:5,11
    145:2,3 147:19,21
**page** 69:3 77:11,12 78:19,19
    82:12 90:18,25 93:15 96:21
    97:8,9,19 98:1,23 99:8,12
    101:13 106:20 114:19 115:8
    116:19 118:12 127:4 131:13
    141:22 142:14 143:24 144:3
    156:18 160:5
**pages** 100:22 117:20 119:25
**paid** 19:23 36:3,4 45:9 48:19
    49:17 50:19 52:13,15 63:12,17
    72:3 75:15,20 77:1 78:25
    80:17 81:10 82:18 87:20 89:13
    94:1 95:11 97:14,16 110:15,19
    128:18,20 130:5,6,22 133:15
    133:18 137:16,17 138:8
    140:12 149:7,23 151:6,24
    152:2 154:13,22
**Pam** 43:3
**paragraph** 135:2
**part** 39:20 41:1 48:13 49:25
    79:12 91:9,19 95:18,20 148:21
**participate** 33:24,25
**participated** 31:13 32:20 131:17
**particularly** 40:25
**parties** 5:1 6:6 159:15
**party** 5:22
**part-time** 147:25
**pass** 108:16
**Pasta** 16:11
**pasting** 54:8
**Paul** 34:15
**pay** 16:16 19:19,24 20:6,9 46:17
    55:3 57:23 59:15 64:11,17
    65:13 67:21 68:6,6 72:8,14,22
    75:21 76:25 77:4,7 81:3,4,12
    85:18,23 86:4,13 87:5,16,17
    89:15 94:19 95:1,12,20 96:4,5
    111:1 112:7 132:5 133:10
    135:12,18 136:1,2,6,9,16
    137:12,25 138:5,18 140:5
**payable** 93:16 99:7
**paying** 49:8 67:20,24 72:15
    79:23 86:25 94:13,25 95:1,3
    128:10 129:4 130:8 132:22
    136:5,15 140:8
**payment** 93:21 100:9 111:9
    128:3 136:24 149:14
**payroll** 151:20
**pays** 64:23 95:14,15 110:24
    112:8
**PC** 3:5
**peak** 62:25 63:2
**people** 13:25 34:10 40:23 42:22
    51:9,11 56:10 92:4 128:12

    129:21 147:24
**people's** 40:5
**percent** 14:3,4,7,9 19:13,15
    32:2 47:13,16 48:1,2 49:14,17
    57:24 75:13 78:7,11 79:11
    88:17,21 98:8,16 135:17
    152:21,23
**percentage** 46:17 47:9 50:7
    85:11
**performance** 26:13 36:15,23
**performed** 39:1 46:1
**period** 6:11,13,14 17:2,3 23:9
    34:17 45:21 64:1,13 96:6,7
**permitted** 122:9
**Perry** 38:5
**person** 18:6 34:19 39:18 60:11
    137:7 147:16 151:10
**personal** 93:21 94:2,13,17
    100:10
**personally** 5:24 6:4,23 96:9
    110:17 115:18,18
**pertaining** 75:8 90:12 113:22
**Phone** 3:9,19
**phonetic** 12:11,18 22:23 34:15
    38:4,5 51:13 129:16 143:4
**place** 28:14,16,21 32:12,21,23
    39:16 46:20 100:16 130:2
**places** 33:23
**Plains** 1:14 2:2,7
**Plaintiff** 1:4 2:8 3:2 5:7 63:7
**Plaintiff's** 68:8,13 100:19
    104:24 106:18 126:25 134:13
    142:5 145:17 148:2 158:7
**playing** 132:8
**please** 41:13 56:22 64:19 73:23
    106:21 140:6
**PLI** 15:23
**pocket** 67:5,8 75:22 138:15
**point** 6:5,20 15:10 16:21 19:2
    24:18 25:5 26:1 29:11 32:1
    33:14 34:14,16 35:7,8,20,22
    43:8 56:23,25 60:20 62:14
    63:23 82:2 83:13 87:24 93:12
    95:7 115:10,12,25 116:13
    153:16 154:25
**pole** 14:17
**policy** 28:14,21
**Political** 10:21
**portion** 79:1 128:14,17 140:11
    150:19
**position** 25:8 33:20 41:4 72:8
    72:22 73:9 81:12 111:15
**positions** 12:14 15:5 30:19
**possession** 116:5
**possible** 119:3 137:19,20,20,21
    137:25 138:3,10,12,13
**Possibly** 110:14

postal 115:13
post-2003 62:6
post-2004 61:16
potentially 116:7
power 59:8,10 87:24 88:1
  108:25 109:5 111:10,14,18
  112:3 125:3 136:22
practice 11:25
practiced 12:24
premiums 95:4,15
prepare 10:8
prepared 68:5
present 3:22 19:9 85:5 101:1
  108:21
Presently 95:23
presents 110:4
president 13:3,7,9,10,13 25:9
  25:18,24 26:2,4,8,17,18 30:20
  30:21,22 35:14,15,17 36:12,16
  36:17 50:16 53:2 94:24 129:12
  151:22,25
presume 87:19
pretty 53:1 73:8
prevent 136:20,23
previous 35:1 54:1 105:23
  107:22 142:14
previously 53:25 76:8
prime 89:18
principal 8:22 9:5 96:23,25 97:2
printed 148:16 150:21,24
prior 33:21 36:9 41:22 49:19
  102:2 103:6,15,17 107:14
  108:10 113:25 134:5
private 49:21
privilege 90:2,9 102:25 106:10
privileged 90:8
probably 6:23 7:5 15:24 16:1
  33:13,21 37:4 43:15 55:8 56:4
  66:17 79:3 84:5 91:5 98:13
  100:6 104:22 118:9 147:15
  152:20
problem 53:11 55:21 150:9
problems 133:14
proceeding 133:5
process 119:1
processing 118:17
produce 5:6 141:25 155:4
produced 37:23 117:21 141:22
  143:7 144:4 145:6 148:17
production 22:8 155:21
products 130:23
program 95:19
project 54:20
promises 156:1
promoted 25:5,11 26:7
promotion 25:14
proper 32:21

protect 140:25
provide 46:4 47:7 72:16,18
  103:14,22 105:3 109:21
  112:17 113:3,11,12 131:14
  132:16
provided 24:25 45:18 48:8
  70:21 80:5 105:11 112:21
Provident 126:2,5
provides 51:15,21
provision 48:18 107:12
proxy 32:24 33:1,25 34:3
  124:24
public 2:9 5:11 12:16 49:20
  159:8
purchase 18:24 19:13
purchased 17:10 44:7 96:9,23
  97:3
purportedly 61:5 142:8
purporting 147:9
purports 142:24 144:10,25
purpose 64:3,8,9 67:17,18 71:3
  76:19,20 79:21,22 85:7,16,19
  86:11 88:25 89:9 90:6 92:8
  94:20 101:17 107:9 153:6,17
  153:21,24 154:6
purposely 28:7
purposes 85:25 90:20
pursuant 2:8 29:21,24 80:6
  121:9
put 20:10 22:7 45:11 54:12 56:2
  59:3,6 63:18,19 64:25 86:6,8
  92:3,6 111:7 119:11,14 130:15
  130:23 135:14 137:3 138:2
  139:19 140:4 155:20,22
puts 137:7
putting 49:5 138:16
p.m 76:3,5 157:6

## Q

Quarropas 2:6
question 4:4 36:18 47:25 56:2
  57:17 65:15,18,19 67:6 71:15
  79:12 90:3 91:15 102:4,22
  103:19 105:24 111:24 124:1
  126:14 132:9 135:21 137:18
  137:23 144:1,3,19 151:1
questions 49:6 103:19 126:12
  138:23 155:3
quick 16:8
quickly 65:14
quite 62:11 92:20 132:11

## R

R 3:1 5:9,9 76:4,7,7 159:1 160:1
  160:1
raising 150:16
ran 22:24

range 23:8 24:12 63:25 65:9
rate 57:22 75:11 135:16
ratify 101:20
ratifying 107:9
read 36:19,20 54:19 102:5,6
  103:9,10,18 104:20 105:24,25
  106:23 126:17
readily 131:10
reading 68:16
real 14:23,23,24 84:22 93:3,4,7
really 30:12 42:20 49:11 54:7,20
  65:22 117:23 118:25 142:19
  144:8
reason 28:19 66:5 91:16 99:24
  132:18,25 148:14 150:16
  160:7,9,11,13,15,17,19
reasonable 74:18
reasons 33:17 160:3
recall 5:21 6:4,8,18,20,24 7:9,11
  7:22 8:7 9:14,15,15 10:1 11:24
  15:22 16:4,23 18:21 22:11
  25:4,22 26:5,6,16 29:12,15,22
  30:22 34:14,16 40:5 42:20
  43:12,17 56:18 57:5,6,8,11,22
  57:25 59:21 61:13,14 62:17
  63:16 69:14 70:5,8,9,11,23,24
  71:1,6 73:21 76:21,24 79:4
  82:22 83:14 84:2 85:19 88:4
  88:17 91:7,12,13 92:13 93:22
  94:16 98:22 100:17 104:1
  107:3 115:7 116:10,14,17
  118:5,6,10 119:5,8 122:17
  124:9,21 126:22 143:10
  153:16
recalls 80:12,13
receipt 120:19 142:16 146:9,19
receipts 101:4
receive 10:22 16:19 44:20 45:4
  48:14,16 87:2,24 98:21 111:5
  124:7
received 17:1,23 46:2 62:16,20
  63:7,12 71:16 77:2 115:13,16
  116:22 123:21 134:7 135:3
  139:15 142:9,9,17 143:8 144:5
  144:13,14,25 147:10
receives 51:19 111:2
receiving 47:3 70:9 138:24
Recess 47:24 76:2 141:15
recognize 68:22 77:22 114:23
  117:1,22 127:6 134:17 142:25
  145:16,22 148:6
recollection 8:15 11:22 20:20
  21:5 30:11 31:6 37:14 43:23
  57:21 71:9 74:10,12 76:18
  78:1 80:7 88:20 89:10 94:18
  99:2 108:12 113:4 120:10
  124:18,20 125:25

**recommended** 39:23 84:4
**record** 18:12 33:2 36:20 68:15
   76:1 102:6 103:6,8,10 105:25
   112:19 119:16 126:17 134:19
   157:1,3 159:13
**recorded** 123:3,15
**records** 16:25 17:6 28:1,6,15
   32:25 34:3,18,24 35:4 36:7
   70:12,15 76:23 78:13 79:5
   80:3 93:23 105:4 113:6,19
   114:9,12,14 117:5,12 119:22
   121:9,21 122:8 123:17 125:5
   126:23 128:21 146:5 151:17
   152:3 153:8 154:1
**reduce** 65:10,22,25
**reelected** 31:10,13
**refer** 135:22 144:18
**reference** 112:23 113:21
**referenced** 97:25
**referring** 20:2 53:14 70:20
   83:10 90:23 114:11 116:12
   144:16
**refers** 131:5
**reflecting** 92:19 93:23
**refresh** 80:7 99:2 125:24
**regarding** 11:21 113:17,19
   114:17
**register** 21:13
**registered** 115:6
**reinvested** 86:19,21
**related** 159:14
**relation** 116:16
**relationship** 13:15 17:12,17
   39:17 40:22 42:22
**remember** 8:1,18 14:19,21
   22:15 23:9,16 24:1 62:7
   89:17 116:15,15 117:18,19
   119:15 126:18 129:2
**remembered** 57:13
**remove** 32:4
**render** 108:25
**renegotiate** 55:1
**rent** 130:6
**rented** 22:19
**repaid** 58:21 79:9 81:8 135:15
   135:19 139:11,12
**repay** 58:1 79:13 135:5,9,11,13
   139:14
**repetitive** 53:23
**rephrase** 56:21
**report** 66:6,12,24 74:6,7 132:12
**reported** 66:8,13,15,20
**Reporter** 159:7
**reports** 23:23,24 53:8 56:2,6,7,9
   56:10
**represent** 111:15
**representation** 9:11 42:10

**representations** 41:24
**representative** 7:3,4
**request** 22:4,7,8 73:23 120:20
   121:10 155:20
**requested** 117:7
**requests** 75:17 119:9 158:2,3
**require** 90:3 126:20
**required** 21:11 23:24 51:6
   107:21
**requirements** 21:16
**resale** 52:24 53:20,21 54:25
**resales** 51:3 54:24
**resent** 116:3
**reserved** 4:4
**reside** 101:23 147:11
**resides** 151:15
**resign** 30:17 40:10
**resignation** 31:9 39:8
**resignations** 126:19
**resigned** 29:11 30:8,16,18,24
   31:4,17,22,22 32:15 34:19
**resigning** 140:22
**resources** 40:21 43:2 129:5
**respect** 71:15 112:15 155:4
   156:4
**respond** 22:9 117:17
**responded** 118:22
**responding** 105:8 106:8
**responsibilities** 16:2
**rest** 70:5
**restaurant** 16:8 18:17
**restaurants** 18:15 55:17 130:20
**results** 73:21
**resumed** 76:7
**return** 49:10 101:4 142:16 146:9
   146:19
**returned** 124:5
**revenue** 98:21 140:11
**revenues** 48:20
**review** 8:5 25:3 38:11 52:25
   53:7,16 62:25 121:20 155:8,11
**reviewed** 63:5 80:3 101:12,13
   106:22 155:15,16
**reviewing** 10:11 56:2 107:12
**revisit** 80:2
**Ricci** 1:6 3:24 29:3 34:6 52:7
   58:13,17,22 59:9,14,19 115:23
   115:24 116:8,23 120:1,22
   131:18,25 147:17
**right** 16:20 33:3 40:6 44:17
   47:20 55:5 88:7,13 104:18
   117:11 126:19 134:5 135:15
   138:21 140:1,17 141:22 147:1
   154:16
**rights** 46:13 49:16
**right-hand** 115:9
**Rochelle** 122:8

**Rodriguez** 75:2
**room** 47:23
**roughly** 29:5
**royalties** 46:17 47:8 52:18 55:3
**royalty** 47:10 49:18
**rules** 155:23,25
**running** 64:12

---

**S**

**S** 1:2 3:1 76:4,4,4 158:6
**sake** 110:12
**salary** 26:16 35:25 36:8 45:10
   47:4 50:19 64:10,11,17,23
   65:1,4,5,13,16,22,23 66:6,12
   66:13,15 67:21,21 68:1,6
   79:24 85:18,23 86:4,6 87:22
   94:25 132:5,19 133:2 138:5,18
   138:21 155:18
**sale** 21:14
**sales** 47:17 51:13 129:14
**salesman** 9:20
**salesperson** 51:24
**satisfaction** 130:4
**saying** 30:24 31:4 51:14 61:22
   67:13 106:3,8,11 107:17
**says** 69:8 77:19 91:17 93:15
   96:22 97:10 99:13 107:21
   120:19 143:11,13 146:10
   150:10 152:10 153:3
**scale** 55:20
**school** 10:16,17,23 11:2,7,15
   11:17
**science** 10:21
**second** 21:6 102:21 104:15
   118:12 127:4 149:1
**secretarial** 22:22 129:19
**secretary** 52:11 130:6,7
**section** 106:20 107:23 146:15
   146:21
**see** 78:21 82:13,16 88:8,10
   91:14 97:10,23 98:18 99:13
   107:20 108:2 118:14 120:18
   135:2 145:2 146:10 154:1
**seeing** 43:17 69:11
**seen** 77:22 117:3 119:18
**sell** 21:13 74:11,13
**selling** 52:2 74:20 93:2 130:19
**Sellon** 40:4
**seminars** 15:24
**send** 50:6 53:8 104:3 121:6,23
   146:18
**sending** 49:7 119:16 142:19
**sends** 53:9,10
**sense** 5:24 15:1 121:24 142:3
**sent** 61:17 104:4 114:25 115:4,5
   118:5,7,8,20 119:15,23 120:22
   143:13 145:25 147:19,20

148:1
**sentence** 107:20
**seriously** 74:25
**served** 12:23 13:5,6 33:1 34:3
    36:16
**service** 115:14 146:10,12
**services** 22:22 45:18 51:20
    111:1 132:16
**set** 53:6 63:5 79:14 138:4
    159:11,18
**sets** 148:9,15,19
**setting** 146:1
**settled** 38:22 89:16,17
**settlement** 38:20
**seven** 54:21 57:24
**severing** 39:17
**share** 51:25 129:5,23
**shared** 51:25 131:6
**shareholder** 14:5 29:25 30:1
    31:19 32:19 56:24 59:10,11
    61:3,19,20 70:22 71:21 76:16
    84:7 96:18,23,25 97:2 100:15
    101:23 103:24 106:24 107:1
    108:11 109:11,12 110:12
    111:11 117:8,10 118:11
    119:12 122:13 123:2,14,18
    124:10 128:6 139:3 141:8,17
    142:11
**shareholders** 16:17 27:24 30:2
    30:6 32:6,9 33:10 48:19 49:9
    58:8 59:24 60:5 61:18 71:7,11
    71:18 72:4,18 77:8 79:17,19
    80:6,17 83:1 86:14 100:17,20
    105:12 109:5 112:4,17 116:1
    119:10 122:12 124:8 127:24
    133:21 136:13 146:2 158:9
**shares** 19:20,24 20:6,21 77:19
    77:24 78:6,6,10,14 128:16
    130:9
**sharing** 128:15,15 132:21
**sheet** 69:2 72:12 77:10 82:12
    88:11 91:14
**sheets** 101:6
**shopping** 54:18,19
**short** 14:16
**show** 24:15 31:11 43:14 70:13
    80:8 114:14 116:5 142:8,24
    143:7 144:4,10,25 147:10
    151:17 152:15
**showed** 70:19
**showing** 16:25 24:21,24 25:23
    26:21 31:7 32:25 34:3,18 36:7
    79:5 116:21 126:23 128:21
**shows** 149:14 153:11
**shut** 121:5
**side** 37:22
**sign** 8:6,8 125:9,11 139:21

**signature** 101:14 139:21 143:1
    143:3,16,18 147:9 160:22
**signed** 4:7,9 37:23 38:12
    125:18 142:25 144:10
**significant** 41:8
**silly** 65:18,18 67:6 140:6
**simple** 121:3
**simply** 65:16
**sir** 8:12 12:6 14:6 36:10 42:6,12
    42:16 44:14,18 45:1,3 66:25
    67:2,4 69:7 81:16 131:16
    135:8
**sister** 143:6,8,19 144:4,10
**sister's** 147:9
**sit** 98:14 155:19
**sitting** 9:15 22:2 27:2 29:22
    30:12 32:13 37:14 40:6 42:20
    43:12 76:23 85:14 88:4 104:18
    126:18 152:1 154:14
**situation** 123:1 136:10
**situations** 38:25
**six** 12:23 54:21 57:24 75:13
    135:2
**Sixty-six** 11:10
**size** 140:8
**skip** 99:10
**SLEDZIK** 3:15 5:4 11:20 13:23
    15:13,19 16:15 17:15,21,25
    19:1 20:19 22:6 26:10,14,19
    26:22 27:15 28:10,18 30:4,10
    31:2,21 32:8 33:18 34:21
    36:18 38:13 39:11 40:16 41:14
    41:19,21 42:7 43:10,19 44:15
    45:13 46:23 47:18 49:1 51:17
    52:10,21 56:3 57:12 59:17
    60:1,15 61:7 64:4 68:15 70:16
    71:13,20 75:9,24 77:13 78:19
    80:4 81:11,19 82:5,19 83:3
    85:21 86:3 88:6,19 89:24
    90:24 91:11 92:1 94:4,10
    95:23,25 96:12 100:12,22,25
    101:3,8 102:21 103:3,8,11,25
    104:15 105:13,17,23 106:1,6
    106:19 109:8,15 111:23
    112:19 113:8 114:20 117:14
    118:13 120:11,15 121:1
    122:11 123:9,24 125:22
    126:13 127:9 128:19 129:10
    134:22 137:22 138:7 140:18
    141:14,19 142:2 143:20 144:1
    144:7,12 147:5 148:8,14,18,22
    149:9 150:5,7,14,19,23 154:8
    155:2,12 156:25
**slightly** 73:11
**Slough** 12:18
**small** 25:19 35:9 60:10,25 67:25
    68:5 75:18 81:4,16 129:22

**smaller** 50:7,8
**smoothie** 16:9,10 52:2 92:10
    130:24
**sole** 60:23 68:4
**soliciting** 90:6
**somewhat** 53:23
**soon** 14:20 119:3 141:3
**sophisticated** 84:24
**sorry** 8:1 39:24 56:7 68:19
    99:15 110:1 123:12
**sought** 74:11 103:24
**source** 139:5
**sources** 52:17
**South** 143:9 145:8,13 146:6
**SOUTHERN** 1:1
**space** 22:19,21
**speak** 8:2 133:5
**speaks** 150:25
**special** 106:21,25 107:6,23
**specific** 15:14 64:4 113:18
**specifically** 15:22 102:11,12
    105:14 154:16
**specified** 102:9
**specify** 107:24
**speech** 15:4
**Spencer** 21:3 22:11 25:5 29:18
    35:23 37:8 39:18 55:7,23 79:3
    81:1 82:24 83:11 92:10 95:21
    112:9 113:5 114:5 116:9 117:1
    118:16 123:21 124:6,7 133:5
    133:15,20,25 138:1 140:5
    143:6,14,22 147:11
**Spencer's** 39:6 115:17 125:10
    143:8 144:4,10 145:9 146:4
    147:8 155:18
**split** 152:14,20,25 153:3
**spoke** 60:12 100:15 116:10
    121:14
**spoken** 24:6 116:14
**sponsoring** 8:19
**spread** 91:14
**spreadsheet** 70:7,18,20,25 71:2
    80:5 112:20,24 113:2,13,20,24
    114:1
**Ss** 159:4
**ssledzik@jonesgarneau.com**
    3:20
**Stacy** 38:5
**stages** 36:23
**stake** 93:3
**Stanley** 12:22
**start** 14:15 40:24 62:15 126:16
**started** 24:15 47:3 85:3 92:7,9
**state** 2:9 12:22 76:22 107:4
    135:3 159:3,8
**stated** 22:10 139:2 140:15,18
**statement** 37:23,24 38:11 41:17

Endervelt, Jeffrey                                          11/8/2007

78:18 97:6 98:24
**statements** 8:9 37:12,19 63:9
   68:9,25 74:4 98:8,16 113:21
   119:13 158:8
**Staten** 12:20
**states** 1:1 12:1,3 21:12 28:5
   90:19 107:8
**stay** 86:22
**stayed** 88:13 97:20
**stead** 111:17
**Steingut** 12:22
**stenographer** 123:7
**step** 21:6
**stepped** 127:11
**steps** 115:24 116:8
**STEVEN** 3:15
**stick** 75:4 143:24
**stipulated** 4:2,6 5:2
**stock** 13:8,18,18,20 19:4,13
   146:1
**stockholder** 8:25 27:17 31:16
   42:1 127:16
**stockholders** 13:22 31:25 87:2
   114:17 127:14,20,25
**Stockholder's** 77:18
**stopped** 33:14,19,21
**STORCH** 3:5
**store** 23:24 53:24 54:1,1
**stores** 23:25 51:1,2,4,5 56:11
**Street** 2:7 3:7,17
**Strike** 103:20
**strongly** 39:23
**stuck** 148:19
**stuff** 14:21 25:3 155:24
**subleased** 89:5
**Subscribed** 157:13
**subsidiary** 44:6,10 88:22 89:1,2
   89:5 130:24
**substance** 43:6
**substantial** 36:25 54:23 55:2
**sued** 8:16
**suggested** 40:21
**suite** 3:17 22:19
**sum** 36:25 88:10
**summarize** 10:14
**summarizing** 65:14
**Sumpter** 35:6 143:4 147:15
**support** 60:23 68:4
**sure** 8:4,11 34:2 35:6 36:1 74:6
   82:9 93:25 94:15 116:20 131:9
   138:2 141:14 150:15 152:14
   154:1 157:2
**sustainable** 131:4
**Suzuki** 7:7,16 8:13,15,19 39:10
   40:19,24,25 42:15
**sworn** 4:7,10 5:10 76:8 157:13
   159:12

**Sylvain** 50:14,16,22 56:12
**system** 12:16

---
**T**

**T** 3:15 5:9 76:4,7 158:6 159:1,1
   160:1
**Tacos** 16:7 52:1 150:1,4 151:5
   151:24 154:13,21
**take** 11:13 15:15 46:20 54:21,23
   64:10 65:5,12 66:5 68:5,12
   72:12 73:2 74:25 86:6 93:4
   106:17 115:24 116:8 132:19
   136:7 137:10 138:4 139:10
   141:12
**taken** 2:7 11:23 15:22 32:23
   47:24 54:20 62:2,9,10,13 65:8
   66:18 76:2 101:19 137:14
   141:15
**talk** 14:14 83:24 102:24
**talked** 24:6 60:13
**talking** 6:11 15:2 17:19 76:14
   110:5,6,8
**tax** 68:6 77:1,4
**teacher** 12:15
**technically** 46:8
**tell** 8:8 22:6 83:13,24 122:1
   147:12 153:20
**telling** 84:21 106:1,9 148:18
**ten** 5:21 55:21
**tenant** 89:18
**tenure** 12:14 60:25
**term** 17:17
**terminate** 41:1 59:8
**terminated** 30:17 34:20 40:8
   42:14
**termination** 39:8
**terms** 12:8 15:8 54:11 79:7 93:2
   123:25
**testified** 5:11 76:9 82:8 85:24
**testimony** 8:3 51:18 65:12,14
   108:4 159:13
**testing** 37:18
**Thank** 5:16 111:3
**theoretically** 65:19
**theory** 75:21,25
**thing** 42:21 54:5 89:25 137:1
   138:21
**things** 61:2 74:3 100:7 101:1
   112:11 119:13 130:7,15
   131:23 144:15 152:19
**think** 6:22 7:8 8:20 11:10 14:9
   14:19 16:20 19:4 22:17 25:3
   25:13 34:16 39:13 47:25 53:1
   55:14,16 62:24 63:2 65:6,7,8
   69:17,17 73:11,18 74:7 78:4
   80:4 82:9 85:2 86:2 89:19
   92:16 98:13,15 100:7 109:3,18

111:20,23,24 112:2,20,24
   113:5 116:2,22 133:19 135:17
   139:24 141:18 143:2,10,13
   145:7,11 150:14 154:24
   155:21 156:2,6,9
**third** 116:19
**Thirteen** 100:24
**thought** 25:15 57:17 70:18
   74:14 93:1 103:19
**thousand** 48:11 73:14
**three** 10:24 52:2
**Thursday** 1:15
**time** 4:4 6:11,13,14 8:23 13:2,9
   14:2 17:2,3 18:16 22:17 23:4,6
   23:7 24:7 25:2 26:23 28:11
   30:3,13 35:6 38:3,16 39:16
   41:9 45:11,17,21 51:25 54:11
   54:23 55:2,7 56:1,17,19,23
   57:4,25 58:3 59:5,22 60:10,20
   62:15,18 63:17 65:9 69:17
   71:10,16,17 75:15 76:2 77:21
   79:13,14 80:11,25 83:11 94:12
   96:8 104:20 110:11 116:11
   117:7 123:25 133:3 135:25
   154:18 157:6
**times** 5:20 28:4 35:2,4 60:24
   64:14 67:22 155:9,13
**tiny** 35:7 60:22
**tired** 132:17
**title** 23:18 26:1 35:13
**titles** 50:15
**today** 9:16 21:1 27:2 29:23
   30:12 32:13 37:15 42:21 43:12
   58:14,15,16 73:1 76:23 85:14
   92:15 95:22 98:15 139:7,7
   140:19 152:1 154:14 155:19
**today's** 10:9 68:10 100:21 105:1
   127:2 134:15 145:19 148:4
**told** 37:20 61:24 105:14,15,16
   106:9,10,12 107:18 122:7
**tomorrow** 25:4 63:1 155:10
**tonight** 155:20
**top** 61:12 101:13 144:16 150:20
**topic** 80:3
**total** 47:16 88:10
**totaled** 90:20 94:8
**totally** 140:13
**totem** 14:17
**Tower** 3:6
**trademark** 47:11
**trademarks** 16:10 46:9 47:1
**training** 23:23 51:2,3 52:25
   129:17
**transacted** 107:25 108:1,6
**transaction** 46:20,21 126:6
   148:24,25 149:17 150:10
   151:1 153:7

---

**transactions** 48:13 148:3,12 158:15
**transmittal** 101:6
**trial** 4:5 38:6,18
**tried** 14:19 100:5
**trouble** 68:1
**true** 159:12
**truly** 65:18
**try** 65:21 119:24 130:17 133:2 140:9 155:23
**trying** 32:14,17,19 87:4 92:25 92:25 112:11,13 130:15 148:22 150:17
**turn** 49:8 50:5 98:23 99:12 127:4 138:19 141:17,21
**Turning** 69:2 119:25 131:13
**twist** 112:11,13 140:9
**twisting** 49:11 114:13 131:23 132:10
**two** 21:1 33:22 34:17 40:5 44:13 48:2 49:14,17 50:12 51:8 52:4 77:11 87:3,4,4 93:5,5 103:19 117:20 119:25 126:12 137:15 144:14 148:9,15,19 152:19
**type** 14:11 27:13 28:14 45:4,6 51:20 53:13,25 71:23 94:5 111:1 116:21 126:8 146:10,12
**typical** 9:12

**U**

**UFOC** 53:15
**umbrella** 54:2
**uncle** 12:17 14:22
**understand** 70:3 98:11 135:20
**understanding** 24:8 68:2 71:10 71:14,17 78:3 121:22
**unfortunately** 28:4 33:5,20 36:21
**uniform** 21:7
**unit** 92:16 93:11
**UNITED** 1:1
**units** 37:16
**universe** 155:3
**University** 11:3,4,9,12 12:7
**unsure** 28:13
**untruthful** 8:9
**upper** 115:8
**use** 112:3 128:11,12,13 133:3
**U.S** 2:6

**V**

**V** 5:9 76:7
**vacancy** 29:8,10
**vague** 111:25
**valid** 103:7 108:7
**validly** 107:15
**Valley** 13:7 143:9 145:8,13

146:6
**valuation** 73:16,25
**valuations** 74:5
**value** 16:13 73:6,17 125:15
**Verbally** 124:16
**Verde** 143:9 145:8 146:6
**verify** 115:17
**vice** 25:9,18,24 26:2,4,7,17,18 30:20,21,22 36:11,16,17 50:16 129:12
**virtue** 49:15
**visit** 23:25
**vote** 29:21,24,25,25 30:1 31:14 31:15,15,19,19,23 32:7,11,15 32:20,20,22,23 101:19 102:1 102:16 103:6,7 104:8 105:5,6 105:10 106:4,15 107:13,15 108:7,13,16 109:5,5 111:16 112:15 113:25 114:7 124:25 131:17
**voted** 32:16 103:16 108:23 111:15 113:6 131:14
**votes** 108:18 109:11,14 132:4
**voting** 31:19 32:7 111:17
**vs** 1:5

**W**

**Wait** 31:2 57:12 81:19,19 102:21 104:15
**waive** 90:9 102:25 103:2
**waived** 105:15,21
**waiving** 106:10
**want** 12:12 14:1,14 21:13 50:5 61:22 66:6 74:22 76:22 80:8 102:21,25 103:2 156:7,25
**wanted** 94:25
**warrants** 14:1
**wasn't** 15:1 42:3 57:10,14,15 58:2 61:19 67:20 68:5 71:14 85:10 86:5 109:19 142:18
**waste** 154:18
**Watson** 2:9 159:7,21
**way** 31:10 50:5 62:19 65:17 74:23 104:19 107:2 121:25 127:10 129:15 130:23 133:19 139:8 140:8 148:16 159:16
**ways** 74:5
**week** 37:22 38:18 54:12,14 130:21 149:18,24
**weekly** 149:7
**weeks** 54:15
**Weintraub** 34:17
**went** 10:16,23 12:10,17 14:22 55:18 70:3
**weren't** 67:13 94:25 123:3
**we'll** 22:8 80:11
**we're** 16:11 35:7 60:10 72:21,24

81:4,12 128:15 130:14,15,19 130:25 133:9
**we've** 35:24 52:18 54:17,18 75:4 77:11 122:13
**WHEREOF** 159:18
**whim** 59:16
**White** 1:14 2:2,7
**wholly** 89:7
**willful** 41:10,12
**Wilshire** 22:13 143:14,22 144:21
**Winchel's** 55:15
**wish** 160:2
**witness** 5:10 47:21,22 88:20 102:4 127:11 134:14 150:17 150:21 158:12 159:10,13,18 160:22
**woman** 43:3 84:20,25
**word** 60:19
**work** 12:10,17 15:1,3 23:4 45:6 46:1 51:1,9 53:5,13,22,25 54:3 54:11 129:19 133:24,25 137:17 139:3,5 140:17 147:25
**worked** 7:13 9:20 14:12 15:3 65:6,20 134:2
**working** 22:20 24:15 65:19 72:11,13,17 90:20 132:17 137:16
**world** 39:13 89:4
**worth** 64:24 72:20,25 73:1 87:6 87:8
**wouldn't** 33:5,24 72:19 74:19 98:18 121:24 122:1 136:2
**write** 63:24 120:7
**writing** 15:4 22:7,9 83:16,21 155:22
**written** 8:18 37:19,23 43:21 57:9,16,18,20 75:7 124:7,13 154:1,2
**wrong** 82:15 90:24 98:15 153:2
**wrote** 63:25

**X**

**x** 1:2,11 158:1,6
**X2Y1** 13:14,21 14:3,7 16:5,19 16:22 17:1,8,13,24 52:5 95:14 95:15,25 96:4,17,19 128:4,7 128:10,18,20,24 129:4,6 130:2 130:18,25 149:4,12,15,17 150:2 152:16 153:1,10,12 154:12,21,22

**Y**

**Y** 5:9 76:7
**Yeah** 55:12 56:6 83:7 85:6 116:13,24 122:6 128:23
**year** 7:16,17 10:22 11:8 12:15

Endervelt, Jeffrey                                          11/8/2007

21:23 29:5 48:12 49:8 50:23
  50:23 54:24 61:6,14 65:8
  66:10,11,22,23 69:5 76:15,20
  78:23 82:21 88:12 99:6 140:3
  148:13,25
**yearly** 45:9,10,12,14
**years** 10:24 11:23 17:6 34:17
  36:22 55:21 62:10,11 63:22,23
  64:13 65:6,20,23 66:18 73:20
  80:2,12 82:15 85:4 92:21
  101:22 104:23 137:15 138:9
**year-end** 87:13
**York** 1:1,14 2:2,7,10 3:8,8,18,18
  12:4,22 13:8 90:15 121:25
  122:2 151:16 159:3,8
**young** 23:3 74:23 147:24

———————— **Z** ————————

**zero** 65:10,10 66:2
**Zill** 38:5
**Z2Y1** 13:16

———————— **$** ————————

**$10,000** 134:7 150:4 151:6,24
  152:2 153:11 154:6
**$100,000** 136:14,16
**$11,000** 19:24
**$12,000** 128:4,10 129:5 149:4
**$140,000** 73:5
**$150,000** 59:5 86:18
**$16,000** 152:16
**$167,000** 99:8
**$189,000** 63:1
**$195,000** 80:16
**$199,059** 69:9
**$20,000** 85:13
**$200,000** 37:4 38:20 74:16
**$22,000** 138:9
**$25** 75:3
**$3,000** 149:12,18,21,24
**$31,000** 72:9
**$350,000** 45:16 49:8 139:15
  140:10
**$38,000** 69:18
**$4,000** 87:12
**$40,000** 50:23
**$50,000** 50:22 65:8 131:15
  132:12,15 133:18 134:10
**$500,000** 20:15
**$60,000** 69:25 70:3 75:5 97:14
**$700,000** 46:2

———————— **#** ————————

**#4** 88:18,21 89:7,14,18,20,21
  91:4

———————— **0** ————————

**07** 1:5

———————— **1** ————————

**1** 68:8,13 158:8
**1,000** 78:1,6
**1/26/07** 150:8
**1/8/07** 149:18
**1:17** 76:5
**10** 7:5 152:21
**10,000** 66:22 70:4 153:12
**10:50** 1:16
**100** 98:8,16 158:9
**1000** 78:15
**10017** 3:8
**10165** 3:18
**104** 158:10
**10850** 143:14,22 144:21
**11th** 159:19
**12** 65:9,24
**12,000** 149:24
**12:21** 76:3
**126** 158:11
**13** 127:6,17 128:3
**134** 158:12
**140** 3:7
**140,000** 82:4
**145** 158:14
**148** 158:15
**15** 19:13 78:7
**150** 78:6,10
**155** 158:3
**16,000** 153:3
**17** 64:12 116:25
**17th** 118:19
**18** 115:10
**189,000** 63:11
**19** 143:21
**1966** 12:8
**1975** 6:17
**1984** 18:4 49:16,18
**1985** 19:9
**199,0059** 69:12
**1990** 21:5 22:11 35:16
**1992** 24:11
**1998** 19:14 56:25 110:12
**1999** 101:22 122:14

———————— **2** ————————

**2** 3:6 78:19 93:15 97:19 99:8
  100:19 112:23 114:20 127:20
  127:22 141:19,21 146:16
  152:12 158:9
**2:59** 157:6
**20** 7:5 63:24,25 65:9,24
**20th** 118:21
**2000s** 83:20
**2001** 17:8 68:16 69:6 71:5 88:5

88:9 90:21 93:16 97:21
**2002** 7:19 13:11 17:9,11 36:9
  68:16,17 69:23 70:10 71:5,25
  75:4 76:15 77:7 78:23 80:15
  85:5 90:21 96:22 97:1,13,21
  98:21 99:6,17,20
**2003** 68:17,18 78:18,23
**2004** 29:16 30:9 31:18 32:5
  68:18,18 82:11 83:12 86:13,17
  87:13
**2005** 68:18,19,20 87:11,14 88:1
  101:1 117:1 118:2,14 121:10
  124:7 127:15,23 134:7 142:12
  143:21
**2006** 45:24,25 47:2 48:6,14
  68:20 73:4 82:6 99:10,20
  100:11 114:18 115:10 124:4
  127:20,22 133:16 134:4 148:9
  148:13,25
**2007** 1:15 2:1 61:9 70:21 100:16
  101:18,22 103:21 107:15
  108:9,14 123:13 124:3 127:6
  127:15,17 128:3 134:21 148:9
  148:13,24 150:11 151:2
  152:12 157:14 159:19
**21** 158:3
**210** 88:11
**210,000** 88:8 90:21
**212** 3:9,10,19
**22,000** 63:24,25
**23** 17:11 45:24,25 47:2 48:6,14
  78:11 114:18 118:2
**23rd** 118:22
**24** 96:22 118:14 127:23 142:12
**242,000** 93:17
**25th** 3:7
**26th** 151:2
**275,000** 82:2
**28** 99:14
**282,000** 78:22

———————— **3** ————————

**3** 104:24 106:18,20,21 127:15
  146:10 158:10
**30** 55:5
**300** 2:6
**31** 68:16,17,17,18,19,19 73:4
  134:21 150:10
**31,524** 72:2
**3210** 3:17
**335,000** 78:23 82:14
**378,000** 82:14

———————— **4** ————————

**4** 126:25 150:22,24 152:23
  158:11
**4.6** 14:9

**42** 82:18
**42nd** 3:17
**42,000** 85:8,11
**43,000** 82:18
**4484** 149:12
**4493** 149:17
**45th** 3:7
**4500** 149:21
**4511** 150:3,6 151:1
**4539** 152:9
**4542** 153:10,10
**4697** 1:5
**47** 99:4
**490-4100** 3:9
**490-4208** 3:10

— 5 —
**5** 97:8 134:13 158:12
**5th** 112:20
**50** 143:9 145:8 146:7
**50,000** 66:22
**55** 145:13 146:6
**56** 14:4

— 6 —
**6** 47:16 48:1 79:11 99:12 135:17
   145:15,17,23 158:13
**60** 3:17 14:4
**640** 77:19 78:9,14
**68** 158:8

— 7 —
**7** 75:13 79:11 148:2,7 156:5
   158:15
**73** 158:3
**759-2500** 3:19

— 8 —
**8** 1:15 2:1 61:9 90:18 98:23
   101:17 103:21 106:25 107:15
   108:9,13
**80s** 6:18 13:5 27:11 34:11
**85** 19:15 32:2
**89** 35:16

— 9 —
**90** 23:8 24:12 88:21 130:20
**90s** 26:25 29:20 33:13 66:17
   83:20 95:5
**92** 23:8 24:12
**9465** 22:13 23:16